# Exhibit A

FILED

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

2010 OCT 14 P 1: 57

ALISHA W. WILKES

         Plaintiff,

v.

EXPERIAN INFORMATION SOLUTIONS, INC.

    SERVE:    David N. Anthony
               Troutman Sanders, LP
               Troutman Sanders Building
               1001 Haxall Point
               Richmond, VA 23219

TRANS UNION, LLC

    SERVE:    Corporation Service Company
               11 South 12th Street
               Richmond, VA  23218

GMAC MORTGAGE, LLC

    SERVE:    Corporation Service Company
               505 5th Avenue, Suite 729
               Des Moines, IA 50309

WESTERN SIERRA ACCEPTANCE CORP.

    SERVE:    Daniel Ridley
               1547 Palos Verdes, # 264
               Walnut Creek, CA 94597

DCFS USA, LLC

    SERVE:    CT Corporation System
               30600 Telegraph Road, 2345
               Bingham Farms, MI 48025

CREDIT INFONET, INC.

    SERVE:    Thomas L. Midkiff, Jr.
               4540 Honeywell Ct.
               Dayton, OH 454240000

CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

CIVIL NO. 1:10 CV 1160
CmH / TRJ

CREDIT ONE BANK, N.A.                          :
585 Pilot Road                                 :
Las Vegas, NV 89119-3619                       :
                                               :
    SERVE:    Secretary of the Commonwealth   :
                Richmond, VA              :
                                               :
FAMS/ One Technologies                         :
1500 NW Bethany Blvd.                           :
Beaverton, OR 97006                            :
                                               :
    SERVE:    Secretary of the Commonwealth   :
                Richmond, VA              :
                                               :
NATIONAL FUTURE MORTGAGE, INC.                 :
                                               :
    SERVE:    National Registered Agents, Inc.  :
                201 N. Union St., Suite 140   :
                Alexandria, VA 22314         :
                                               :
AMERICA FUNDING, INC.                          :
                                               :
    SERVE:    Scott M. Carpenter.             :
                1749 Old Meadow Road, Suite 100  :
                McLean, VA 22102              :
                                               :
NATIONSTAR MORTGAGE, LLC                        :
                                               :
    SERVE:    Corporation Service Company     :
                11 S. 12th Street     :
                Richmond, VA 23218           :
                                               :
                Defendants.                  :

# COMPLAINT

COMES NOW the Plaintiff, ALISHA W. WILKES (hereafter "Wilkes" or "Plaintiff"),

by counsel, and as for her Complaint against the Defendants, she alleges as follows:

## PRELIMINARY STATEMENT

1.    This is an action for actual, statutory, and punitive damages, costs, and attorney's

fees brought pursuant to 15 U.S.C. § 1681 et seq. (the Federal Fair Credit Reporting Act or "FCRA").

## JURISDICTION

2.     This Court has jurisdiction pursuant to 28 U.S.C.  § 1331 and 1367 and pursuant to 15 U.S.C. § 1681(p).

## PARTIES

3.     The Plaintiff is a natural person and is a "consumer" as defined by the FCRA.

4.     Defendant Experian Information Solutions, Inc. ("Experian") is a foreign corporation doing business in Virginia.  At all times relevant hereto, it was a "credit reporting agency" as defined by the FCRA.

5.     Defendant Trans Union, LLC ("Trans Union") is a foreign corporation doing business in Virginia.  At all times relevant hereto, it was a "credit reporting agency" as defined by the FCRA.

6.     Defendant GMAC Mortgage, LLC ("GMAC") is a foreign corporation with its principal place of business located in Fort Washington, Pennsylvania and which regularly conducts business in Virginia.  At all times relevant hereto, it was a "furnisher of information" as defined by the FCRA.

7.     Defendant Western Sierra Acceptance Corp. ("Western Sierra") is a foreign corporation with its principal place of business located in Fort Washington, Pennsylvania and which regularly conducts business in Virginia.  It is a "user" of credit reports for purposes of the FCRA.

8.     Defendant DCFS USA, LLC ("DCFS") is a foreign corporation with its principal place of business located in Farmington Hills, Michigan and which regularly conducts business

3

in Virginia. It is a "user" of credit reports for purposes of the FCRA.

9.     Defendant Credit Infonet, Inc. ("Credit Infonet") is a foreign corporation with its principal place of business located in Dayton, Ohio and which regularly conducts business in Virginia. It is a "user" of credit reports for purposes of the FCRA.

10.     Defendant Credit One Bank ("Credit One") is a foreign corporation with its principal place of business located in Las Vegas, Nevada and which regularly conducts business in Virginia. It is a "user" of credit reports for purposes of the FCRA.

11.     Defendant FAMS / One Technologies ("FAMS") is a foreign corporation that regularly conducts business in Virginia. It is a "user" of credit reports for purposes of the FCRA.

12.     Defendant National Future Mortgage, Inc. ("National Future") is a foreign corporation with its principal place of business located in Gibbsboro, New Jersey and which regularly conducts business in Virginia. It is a "user" of credit reports for purposes of the FCRA.

13.     Defendant America Funding, Inc. ("America Funding") is a foreign corporation with its principal place of business located in San Diego, California and which regularly conducts business in Virginia. It is a "user" of credit reports for purposes of the FCRA.

14.     Defendant Nationstar Mortgage, LLC ("Nationstar") is a foreign corporation with its principal place of business located in Lewisville, Texas and which regularly conducts business in Virginia. It is a "user" of credit reports for purposes of the FCRA.

## STATEMENT OF FACTS

15.     On or about January 27, 2005, Plaintiff and her now ex-husband, Mr. Daniel Wilkes, purchased the property located at 18018 Densworth Mews, Gainesville, VA 20155 ("Property"). They took title as tenants by the entireties.

4

16.     On or about April 25, 2008, Mr. Daniel Wilkes executed a promissory note ("Promissory Note") and a deed of trust securing the Promissory Note in the amount of $368,000.00 ("Deed of Trust"). EXHIBIT 1 and EXHIBIT 2.

17.     Mr. Daniel Wilkes forged Plaintiff's signature on the Promissory Note and the Deed of Trust. Plaintiff had no knowledge of, nor did she consent to, nor participate in the execution of the Promissory Note or the Deed of Trust recorded against the Property.

18.     On or about October 14, 2008, Plaintiff began to receive calls from apparently distressed creditors of Mr. Daniel Wilkes. It was at that time Plaintiff obtained a copy of her credit report and discovered that Equifax and Defendants Experian and Trans Union were all reporting that she was responsible for a derogatory GMAC Mortgage Account No. 477177 as a result of the April 25, 2008 transaction in which the Promissory Note and the Deed of Trust were executed ("GMAC Mortgage account"). At that time, Plaintiff was unaware of the facts and circumstances surrounding the April 25, 2008 transaction.

19.     In addition, on or about October 14, 2008, after obtaining a copy of her credit report, Plaintiff discovered that the Defendants National Future, America Funding, and Nationstar accessed her credit report. Defendants National Future, America Funding, and Nationstar lacked a permissible purpose to access Plaintiff's credit report as she did not authorize them to do so.

20.     On or about November 25, 2008, Plaintiff filed a complaint with Prince William County Circuit Court requesting, among other things, that the Court void the Promissory Note and Deed of Trust. The complaint was amended a number of times. The final version was the Fourth Amended Complaint. EXHIBIT 3.

5

21.     GMAC was named as a Defendant in Plaintiff's Fourth Amended Complaint and was an active participant in the litigation.

22.     On or about January 25, 2010, the matter went to trial. After two days of hearing evidence, the Court took the matter under advisement.

23.     On or about February 4, 2010, the Court issued a written opinion letter voiding the Promissory Note and Deed of Trust as to Ms. Wilkes. It also declared that Mr. Daniel Wilkes forged Ms. Wilkes' purported signatures. The final order was entered on February 26, 2010. EXHIBIT 4.

24.     In addition to the Fourth Amended Complaint, Plaintiff took additional steps to void the GMAC Mortgage account. On or about May 31, 2009, Plaintiff sent an "ID Theft Affidavit" to GMAC concerning the GMAC Mortgage account. Plaintiff never received a direct response from GMAC concerning the "ID Theft Affidavit". EXHIBIT 5.

25.     On or about January 13, 2010, Detective Richard Downham of the Virginia Fairfax County Police Department issued three felony arrest warrants for Mr. Daniel Wilkes for identity theft, forgery, and larceny. These charges were brought in connection with the April 25, 2008 transaction in which the Promissory Note and the Deed of Trust were executed. EXHIBIT 6.

26.     On or about March 8, 2010, Plaintiff sent her first dispute letter to Equifax and Defendants Experian and Trans Union concerning, among other things, the GMAC Mortgage account. The letter included the Final Judgment Order voiding the Promissory Note, the Deed of Trust, and a handwriting expert's report stating that the signatures on the Promissory Note and the Deed of Trust did not belong to Ms. Wilkes. EXHIBIT 7.

27.     Upon receiving the first dispute letter, Equifax quickly removed the GMAC Mortgage account from Plaintiff's credit file.  Defendants Experian and Trans Union, however, verified the GMAC Mortgage account and continued to report it as being accurate.

28.     On or about May 12, 2010, Plaintiff sent her second dispute letter to Defendants Experian and Trans Union concerning the GMAC Mortgage account.  The second dispute letter included additional contact information for Detective Richard Downham, and Plaintiff additionally offered to pay for a handwriting expert.  EXHIBIT 8.

29.     Upon receiving the second dispute letter, Defendants Experian and Trans Union refused to re-investigate the matter and deemed Plaintiff's dispute frivolous.

30.     On or about June 22, 2010, Plaintiff sent her third dispute letter to Defendants Experian and Trans Union and her first dispute letter to Defendant GMAC concerning the GMAC Mortgage account.  These dispute letters included the three felony arrest warrants for Mr. Daniel Wilkes and other documents that were previously provided.  EXHIBIT 9 and EXHIBIT 10.

31.     Upon information and belief, upon receipt of Plaintiff's dispute letters, Defendants Experian and Trans Union transmitted an incomplete and insufficient CDV to GMAC regarding the GMAC Mortgage account.

32.     Upon information and belief, Defendants Experian and Trans Union failed to transmit all relevant information to GMAC regarding the GMAC Mortgage account.

33.     Upon information and belief, following notification of the dispute from Defendants Experian and Trans Union, GMAC failed to review original documents or to, in any other manner, perform a reasonable investigation into Plaintiff's disputes.

34.     Upon information and belief, GMAC instructed Experian and Trans Union that

7

Plaintiff was responsible for the GMAC Mortgage account and directed Experian and Trans Union to leave the derogatory fraud account on Plaintiff's credit report.

35.     Upon information and belief, Experian and Trans Union followed the instructions of GMAC and undertook no additional investigative steps to ascertain the validity of Plaintiff's dispute.

36.     Notwithstanding Plaintiff's disputes, Defendants Experian and Trans Union continued to sell credit reports that regarded the Plaintiff to potential creditors which lacked a permissible purpose for the access of the report, including but not limited to Defendants Western Sierra, DCFS, Credit Infonet, Credit One, and FAMS.

## COUNT ONE
### Violation of 15 U.S.C. § 1681e(b)
### (Experian and Trans Union only)

37.     Plaintiff realleges, reaffirms, and incorporates paragraphs 1-36 above as if fully set forth herein.

38.     Defendants Experian and Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

39.     As a result of Defendants' conduct, actions, and inaction, the Plaintiff suffered actual damages. These damages included, by example only, without limitation: denial and inability to obtain credit; damage to reputation; violation of Plaintiff's statutory right to privacy; embarrassment and humiliation; and other emotional and mental distress related to these alleged events.

40.     Experian's and Trans Union's conduct, actions, and inaction were willful,

8

rendering them liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n. In the alternative, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

41.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and her attorney's fees from Experian and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and/or 15 U.S.C. §1681o.

## COUNT TWO
### Violation of 15 U.S.C § 1681i(a)(1)
### (Experian and Trans Union only)

42.    Plaintiff realleges, reaffirms, and incorporates paragraphs 1–42 above as if fully set forth herein.

43.    Defendants Experian and Trans Union violated 15 U.S.C § 1681i by failing to delete or correct inaccurate information in Plaintiff's credit file after receiving actual notice of such inaccuracies and after conducting a reinvestigation; by failing to maintain reasonable procedures by which to filter and verify disputed information in Plaintiff's credit file; by failing to note that disputed accounts were disputed; by failing to complete their investigation within the time limits set forth by the FCRA; and by failing to conduct a reasonable investigation with regard to Plaintiff's dispute.

44.    As a result of Defendants' conduct, actions, and inaction, the Plaintiff suffered actual damages. These damages included, by example only, without limitation: denial and inability to obtain credit; damage to reputation; violation of Plaintiff's statutory right to privacy; embarrassment and humiliation; and other emotional and mental distress related to these alleged events.

45.    Experian and Trans Union's conduct, actions and inaction were willful, rendering

9

them liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n. In the alternative, they were negligent, entitling Plaintiff to recover under 15 U.S.C. §1681o.

46.     Plaintiff is entitled to recover actual damages, statutory damages, costs, and her attorney's fees from Experian and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and/or 15 U.S.C. §1681o.

**COUNT THREE**
**Violation of 15 U.S.C § 1681i(a)(2)**
**(Experian and Trans Union only)**

47.     Plaintiff realleges, reaffirms, and incorporates paragraphs 1-46 above as if fully set forth herein.

48.     Defendants Experian and Trans Union each independently violated 15 U.S.C § 1681i(a)(2) by conduct that included, but is not limited to: failing to send all relevant information that they received in Plaintiff's communications to GMAC.

49.     As a result of Defendants' conduct, actions, and inaction, the Plaintiff suffered actual damages. These damages included, by example only, without limitation: denial and inability to obtain credit; damage to reputation; violation of Plaintiff's statutory right to privacy; embarrassment and humiliation; and other emotional and mental distress related to these alleged events.

50.     Experian and Trans Union's conduct, actions, and inaction were willful, rendering them liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n. In the alternative, they were negligent, entitling the Plaintiff to recover pursuant to 15 U.S.C. §1681o.

51.     Plaintiff is entitled to recover actual damages, statutory damages, punitive

10

damages, costs, and her attorney's fees in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and 15 U.S.C. §1681o.

## COUNT FOUR
### Violation of 15 U.S.C §1681i(a)(4)
### (Experian and Trans Union only)

52.     Plaintiff realleges, reaffirms, and incorporates paragraphs 1-51 above as if fully set forth herein.

53.     Defendants Experian and Trans Union each independently violated 15 U.S.C § 1681i(a)(4) by their conduct that included, but is not limited to: failing to review and consider all relevant information that they received in Plaintiff's communications.

54.     As a result of the Defendants' conduct, actions, and inaction, the Plaintiff suffered actual damages. These damages included, by example only, without limitation: denial and inability to obtain credit; damage to reputation; violation of Plaintiff's statutory right to privacy; embarrassment and humiliation; and other emotional and mental distress related to these alleged events.

55.     Experian and Trans Union's conduct, actions, and inaction were willful, rendering each liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n. In the alternative, the Defendants were negligent, entitling the Plaintiff to recover pursuant to 15 U.S.C. § 1681o.

56.     Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and her attorney's fees in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and 15 U.S.C. §1681o.

11

## COUNT FIVE
### Violation of 15 U.S.C § 1681i(a)(5)
### (Experian and Trans Union only)

57.     Plaintiff realleges, reaffirms, and incorporates paragraphs 1-56 above as if fully set forth herein.

58.     Defendants Experian and Trans Union each independently violated 15 U.S.C § 1681i(a)(5) by their conduct which includes, but is not limited to: failing to delete any information that was the subject of Plaintiff's disputes and that was inaccurate or could not be verified.

59.     As a result of the Defendants' conduct, actions, and inaction, the Plaintiff suffered actual damages.  These damages included, by example only, without limitation: denial and inability to obtain credit; damage to reputation; violation of Plaintiff's statutory right to privacy; embarrassment and humiliation; and other emotional and mental distress related to these alleged events.

60.     Experian and Trans Union's conduct, actions, and inaction were willful, rendering each liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, the Defendants were negligent, entitling the Plaintiff to recover pursuant to 15 U.S.C. § 1681o.

61.     The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and her attorney's fees in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o.

12

## COUNT SIX
### Violation of 15 U.S.C § 1681b
### (Experian only)

62. Plaintiff realleges, reaffirms, and incorporates paragraphs 1-61 above as if fully set forth herein.

63. Experian violated 15 U.S.C § 1681b by furnishing multiple consumer reports in connection with credit transactions that were not initiated by the Plaintiff to entities which lacked a permissible purpose for access of the report, including but not limited to Defendants Western Sierra, DCFS, Credit Infonet, Credit One, and FAMS.

64. As a result of Experian's conduct, actions, and inaction, the Plaintiff suffered actual damages. These damages included, by example only, without limitation: denial and inability to obtain credit; damage to reputation; violation of Plaintiff's statutory right to privacy; embarrassment and humiliation; and other emotional and mental distress related to these alleged events.

65. Experian's conduct, actions, and inaction were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Experian was negligent, entitling the Plaintiff to recover under 15 U.S.C. § 1681o.

66. The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and her attorney's fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o.

### COUNT SEVEN
### Defamation
### (GMAC only)

67. Plaintiff realleges, reaffirms, and incorporates paragraphs 1-66 above as if fully

13

set forth herein.

68. Defendant GMAC published the false representation to Experian and Trans Union that Plaintiff was obligated on the GMAC Mortgage account, and on multiple occasions, thourgh Experian and Trans Union to all of Plaintiff's potential lenders, including but not limited to:

a) Each date on which GMAC sent information concerning the inaccurate tradeline to the credit reporting agencies, which, upon information and belief, is believed to have occurred monthly; and

b) Each date on which GMAC published the defamations through the credit reporting agencies to third parties.

These statements shall be referred to herein simply as "the defamations."

69. The defamations were made with legal malice and a willful intent to injure Plaintiff by placing derogatory information on her credit reports in an illegal and unconscionable attempt to elicit and extort payment from Plaintiff. GMAC had reason to know, both by virtue of information Plaintiff communicated directly to them, the Prince William County Circuit Court, and the credit reporting agencies, that Plaintiff was not obligated on the GMAC Mortgage account and was not the person who had opened the account in question. Furthermore, GMAC willfully adopted procedures which wholly ignored the demands of Plaintiff and other consumers generally that inaccurate information should be removed from their credit files.

70. As a result of GMAC's conduct, actions, and inaction, Plaintiff suffered actual damages. These damages included, by example only, without limitation: denial and inability to obtain credit; damage to reputation; violation of Plaintiff's statutory right to privacy; embarrassment and humiliation; and other emotional and mental distress related to these alleged events.

14

71.     The defamations were malicious, willful, deliberate, intentional and/or with reckless disregard for the interests and rights of Plaintiff, so as to justify an award of punitive damages against GMAC in an amount to be determined by the Court.

## COUNT EIGHT
### Violation of 15 U.S.C. § 1681s-2(b)
### (GMAC only)

72.     Plaintiff realleges, reaffirms, and incorporates paragraphs 1-71 above as if fully set forth herein.

73.     GMAC violated the Fair Credit Reporting Act, 15 U.S.C. §1681s-2(b) by publishing the inaccurate and defamatory tradeline within Plaintiff's credit file to Experian and Trans Union by failing to fully and properly investigate Plaintiff's disputes; by failing to review all relevant information regarding the same; and by failing to correctly report the results of an accurate investigation to Experian and Trans Union.

74.     As a result of GMAC's conduct, actions and inaction, Ms. Wilkes suffered actual damages. These damages included, by example only, without limitation: denial and inability to obtain credit; damage to reputation; violation of Plaintiff's statutory right to privacy; embarrassment and humiliation; and other emotional and mental distress related to these alleged events.

75.     GMAC's conduct, actions and inaction were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n. In the alternative, GMAC was negligent, entitling Ms. Wilkes to recover under 15 U.S.C. §1681o.

76.     Plaintiff is entitled to recover actual damages, statutory damages, costs, and her attorney's fees from GMAC in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and/or 15 U.S.C. §1681o.

15

## COUNT NINE
### Violation of 15 U.S.C. § 1681b(f)
### (Western Sierra only)

77.     Plaintiff realleges, reaffirms, and incorporates paragraphs 1-76 above as if fully set forth herein.

78.     Western Sierra violated the Fair Credit Reporting Act, 15 U.S.C. § 1681b(f) by using or obtaining Plaintiff's consumer report without Plaintiff's consent and without a permissible purpose as defined by 1681b.

79.     As a result of Western Sierra's conduct, the Plaintiff suffered various types of damage as set forth herein, including specifically, the cost of continued credit monitoring, a decreased credit score, the intrusion into her privacy, and the emotional distress and anxiety associated with concern about future unauthorized inquiries into her personal financial information and/or the risk of additional instances of identity theft resulting from such inquiries.

80.     Western Sierra's conduct was willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling the Plaintiff to recover under 15 U.S.C. § 1681o.

81.     The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and her attorney's fees from Western Sierra in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o.

## COUNT TEN
### Violation of 15 U.S.C. § 1681b(f)
### (DCFS only)

82.     Plaintiff realleges, reaffirms, and incorporates paragraphs 1-81 above as if fully set forth herein.

83.     DCFS violated the Fair Credit Reporting Act, 15 U.S.C. § 1681b(f) by using or

16

obtaining Plaintiff's consumer report without Plaintiff's consent and without a permissible purpose as defined by 1681b.

84.    As a result of DCFS's conduct, the Plaintiff suffered various types of damage as set forth herein, including specifically, the cost of continued credit monitoring, a decreased credit score, the intrusion into her privacy, and the emotional distress and anxiety associated with concern about future unauthorized inquiries into her personal financial information and/or the risk of additional instances of identity theft resulting from such inquiries.

85.    DCFS's conduct was willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, it was negligent, entitling the Plaintiff to recover under 15 U.S.C. § 1681o.

86.    The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and her attorney's fees from DCFS in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o.

## COUNT ELEVEN
### Violation of 15 U.S.C. § 1681b(f)
### (Credit Infonet only)

87.    Plaintiff realleges, reaffirms, and incorporates paragraphs 1-86 above as if fully set forth herein.

88.    Credit Infonet violated the Fair Credit Reporting Act, 15 U.S.C. § 1681b(f) by using or obtaining Plaintiff's consumer report without Plaintiff's consent and without a permissible purpose as defined by 1681b.

89.    As a result of Credit Infonet's conduct, the Plaintiff suffered various types of damage as set forth herein, including specifically, the cost of continued credit monitoring, a decreased credit score, the intrusion into her privacy, and the emotional distress and anxiety

17

associated with concern about future unauthorized inquiries into her personal financial information and/or the risk of additional instances of identity theft resulting from such inquiries.

90.     Credit Infonet's conduct was willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, it was negligent, entitling the Plaintiff to recover under 15 U.S.C. § 1681o.

91.     The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and her attorney's fees from Credit Infonet in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o.

## COUNT TWELVE
### Violation of 15 U.S.C. § 1681b(f)
### (Credit One only)

92.     Plaintiff realleges, reaffirms, and incorporates paragraphs 1-91 above as if fully set forth herein.

93.     Credit One violated the Fair Credit Reporting Act, 15 U.S.C. § 1681b(f) by using or obtaining Plaintiff's consumer report without Plaintiff's consent and without a permissible purpose as defined by 1681b.

94.     As a result of Credit One's conduct, the Plaintiff suffered various types of damage as set forth herein, including specifically, the cost of continued credit monitoring, a decreased credit score, the intrusion into her privacy, and the emotional distress and anxiety associated with concern about future unauthorized inquiries into her personal financial information and/or the risk of additional instances of identity theft resulting from such inquiries.

95.     Credit One's conduct was willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, it was negligent, entitling the Plaintiff to recover under 15 U.S.C. § 1681o.

96.     The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and her attorney's fees from Credit One in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o.

## COUNT THIRTEEN
### Violation of 15 U.S.C. § 1681b(f)
### (FAMS only)

97.     Plaintiff realleges, reaffirms, and incorporates paragraphs 1-96 above as if fully set forth herein.

98.     FAMS violated the Fair Credit Reporting Act, 15 U.S.C. § 1681b(f) by using or obtaining Plaintiff's consumer report without Plaintiff's consent and without a permissible purpose as defined by 1681b.

99.     As a result of FAMS's conduct, the Plaintiff suffered various types of damage as set forth herein, including specifically, the cost of continued credit monitoring, a decreased credit score, the intrusion into her privacy, and the emotional distress and anxiety associated with concern about future unauthorized inquiries into her personal financial information and/or the risk of additional instances of identity theft resulting from such inquiries.

100.    FAMS's conduct was willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, it was negligent, entitling the Plaintiff to recover under 15 U.S.C. § 1681o.

101.    The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and her attorney's fees from FAMS in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o.

## COUNT FOURTEEN
### Violation of 15 U.S.C. § 1681b(f)
### (National Future only)

102.    Plaintiff realleges, reaffirms, and incorporates paragraphs 1-101 above as if fully set forth herein.

103.    National Future violated the Fair Credit Reporting Act, 15 U.S.C. § 1681b(f) by using or obtaining Plaintiff's consumer report without Plaintiff's consent and without a permissible purpose as defined by 1681b.

104.    As a result of National Future's conduct, the Plaintiff suffered various types of damage as set forth herein, including specifically, the cost of continued credit monitoring, a decreased credit score, the intrusion into her privacy, and the emotional distress and anxiety associated with concern about future unauthorized inquiries into her personal financial information and/or the risk of additional instances of identity theft resulting from such inquiries.

105.    National Future's conduct was willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, it was negligent, entitling the Plaintiff to recover under 15 U.S.C. § 1681o.

106.    The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and her attorney's fees from National Future in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o.

## COUNT FIFTEEN
### Violation of 15 U.S.C. § 1681b(f)
### (America Funding only)

107.    Plaintiff realleges, reaffirms, and incorporates paragraphs 1-106 above as if fully set forth herein.

108.    America Funding violated the Fair Credit Reporting Act, 15 U.S.C. § 1681b(f) by

using or obtaining Plaintiff's consumer report without Plaintiff's consent and without a permissible purpose as defined by 1681b.

109.    As a result of America Funding's conduct, the Plaintiff suffered various types of damage as set forth herein, including specifically, the cost of continued credit monitoring, a decreased credit score, the intrusion into her privacy, and the emotional distress and anxiety associated with concern about future unauthorized inquiries into her personal financial information and/or the risk of additional instances of identity theft resulting from such inquiries.

110.    America Funding's conduct was willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling the Plaintiff to recover under 15 U.S.C. § 1681o.

111.    The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and her attorney's fees from America Funding in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o.

**COUNT SIXTEEN**
**Violation of 15 U.S.C. § 1681b(f)**
**(Nationstar only)**

112.    Plaintiff realleges, reaffirms, and incorporates paragraphs 1-111 above as if fully set forth herein.

113.    Nationstar violated the Fair Credit Reporting Act, 15 U.S.C. § 1681b(f) by using or obtaining Plaintiff's consumer report without Plaintiff's consent and without a permissible purpose as defined by 1681b.

114.    As a result of Nationstar's conduct, the Plaintiff suffered various types of damage as set forth herein, including specifically, the cost of continued credit monitoring, a decreased credit score, the intrusion into her privacy, and the emotional distress and anxiety associated with

21

concern about future unauthorized inquiries into her personal financial information and/or the risk of additional instances of identity theft resulting from such inquiries.

115. Nationstar's conduct was willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling the Plaintiff to recover under 15 U.S.C. § 1681o.

116. The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and her attorney's fees from Nationstar in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o.

WHEREFORE, the Plaintiff, ALISHA W. WILKES, demands judgment for compensatory, statutory, and punitive damages against the Defendants; for injunctive and declaratory relief, specifically including, but not limited to, an order declaring that Ms. Wilkes is not an obligor on the account reported by the Defendant GMAC and ordering that the Defendant GMAC ceases the reporting of any derogatory information regarding said account and Defendants cease any future unauthorized inquiries into her credit file; for her attorney's fees and costs; for pre-judgment and post-judgment interest at the legal rate, and such other relief the Court does deem just, equitable, and proper.

**TRIAL BY JURY IS DEMANDED**.

Respectfully submitted,
**ALISHA W. WILKES**

By: _____
                              Counsel

John C. Bazaz, Esq., VSB #70796
SUROVELL MARKLE ISAACS & LEVY PLC
4010 University Drive, Suite 200
Fairfax, VA 22030
Telephone: 703-251-5400
Facsimile: 703-591-9285
Counsel for Ms. Wilkes

Matthew J. Erausquin, Esq., VSB #65434
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Telephone: 703-273-7770
Facsimile: 888-892-3512
Counsel for Ms. Wilkes

Leonard A. Bennett, Esq., VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
12515 Warwick Boulevard, Suite 100
Newport News, VA 23606
Telephone: 757-930-3660
Facsimile: 757-930-3662
Counsel for Ms. Wilkes

## Listing of Attached Exhibits

EXHIBIT 1. Promissory Note (April 25, 2008).

EXHIBIT 2. Deed of Trust (April 25, 2008).

EXHIBIT 3. *Alisha W. Wilkes v. First Class Settlement, LLC et al.*, the Prince William County Circuit Court, Case No. Cl-85687, Fourth Amended Complaint (July 28, 2009).

EXHIBIT 4. *Alisha W. Wilkes v. First Class Settlement, LLC et al.*, the Prince William County Circuit Court, Case No. Cl-85687, Final Judgment Order (February 26, 2010).

EXHIBIT 5. ID Theft Affidavit to GMAC (May 31, 2009).

EXHIBIT 6. *Commonwealth of Virginia v. Daniel S. Wilkes*, the Fairfax County Circuit Court, Felony Arrest Warrants for Daniel S. Wilkes (January 13, 2010).

EXHIBIT 7. First Dispute Letter to Equifax, Experian and Trans Union with handwriting expert's report and illustration. Other referenced attachments to this letter (i.e. Promissory Note, the Deed of Trust, Court Order) are attached hereto as exhibits (March 8, 2010).

EXHIBIT 8. Second Dispute Letter to Equifax, Experian and Trans Union without attachments (May 12, 2010).

EXHIBIT 9. Third Dispute Letter to Experian and Trans Union without attachments. Attachments to this letter are attached hereto as exhibits (June 22, 2010).

EXHIBIT 10. First Dispute Letter to GMAC without attachments. Attachments to this letter are attached hereto as exhibits (June 22, 2010).



EXHIBIT
1

# NOTE

APRIL 25TH, 2008                    MCLEAN                    VIRGINIA
[Date]                              [City]                    [State]

18018 DENSWORTH MEWS, GAINESVILLE, VA 20155
[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $   368,000.00   (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is   HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   5.8750   %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the   FIRST   day of each month beginning on   JUNE 1ST, 2008   . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   MAY 1ST, 2038   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   2101 REXFORD, SUITE 250W, CHARLOTTE, NC 28211   or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $   2,176.86   .

### 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

VIRGINIA FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

-5N(VA) (0006)
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3                    Form 3247 1/01

Initials: _____

MFVA9064 - (08/2008) / 047-717658-0



## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge s ) be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.00 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor and waive the benefit of the homestead exemption as to the Property described in the Security Instrument (as defined below). "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

)

-6N(VA) (0005)

Page 2 of 3    MFVA6054 - (08/2008) / 047-717858.0

Form 3247 1/01
Initials: _____

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

X _____ (Seal)
ALISHA W WILKES                -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

*[Sign Original Only]*

This is to certify that this is the Note described in and secured by a Deed of Trust dated   APRIL 25TH, 2008
on the Property located in   GAINESVILLE                        , Virginia.

My Commission Expires: 12 31 09

CHRISTIE N. EKASONE
Notary Public
Commonwealth of Virginia
My Commission Exps. Dec. 91, 2009

Notary Public

-5N(VA) (0005)                Page 3 of 3    MFVA6054 - (08/2006) / 047-717858-0          Form 3247 1/01

#358624

R.A.I 1/20/2010

Instr:200805010041668 Pg: 1 of 18
Prince William County, VA
05/01/2008 3:13:11PM
Michele B. McGuing, Clerk

237

08-1687VA

Return To:
Homecomings Financial
233 Gibraltar Road
Horsham PA 19044
Loan Number: 047-717658-0

Tax Map Reference #:

RPC/Parcel ID #:
235209 (TM: 7398-20-7077)

Prepared By:    Homecomings Financial
                2101 Rexford, Suite 250W
                Charlotte, NC 28211

--------- [Space Above This Line For Recording Data] ---------

# DEED OF TRUST

MIN 100062604771765809

The following information, as further defined below, is provided in accordance with Virginia law:

This Deed of Trust is given by
DANIEL S. WILKES AND ALISHA W. WILKES , HUSBAND AND WIFE

Borrower (trustor), to Samuel I. White, PC, a Corp. Chartered in the Commonwealth of VA                                                              , as

Trustee, for the benefit of Mortgage Electronic Registration Systems, Inc. as beneficiary.                          , as

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

VIRGINIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3047 1/01
Wolters Kluwer Financial Services          MFVA7770 (08/2007) / 047-717658-0
VMP ®-6A(VA) (0705)
Page 1 of 14          Initials: _____
                        DSW




EXHIBIT
2





Instr:200803010041559
Pg: 2 of 18

(A) "Security Instrument" means this document, which is dated APRIL 25TH, 2008 together with all Riders to this document.

(B) "Borrower" is
ALISHA W WILKES

Borrower is the trustor under this Security Instrument.

(C) "Lender" is HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)
Lender is a LIMITED LIABILITY COMPANY
organized and existing under the laws of DELAWARE
Lender's address is 2101 REXFORD, SUITE 250W
CHARLOTTE, NC 28211

(D) "Trustee" is Samuel I. White, PC, a Corp. Chartered in the Commonwealth of VA
Trustee (whether one or more persons) is a Virginia resident and/or a United States- or Virginia-chartered corporation whose principal office is located in Virginia. Trustee's address is 209 Business Park Drive, Virginia Beach , VA 23462
"Trustee" is

Trustee (whether one or more persons) is a Virginia resident and/or a United States- or Virginia-chartered corporation whose principal office is located in Virginia. Trustee's address is

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated APRIL 25TH, 2008
The Note states that Borrower owes Lender THREE HUNDRED SIXTY EIGHT THOUSAND AND NO/100
Dollars
(U.S. $ 368,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than MAY 1ST, 2038 . The interest rate stated in the Note is FIVE AND SEVEN EIGHTHS
percent ( 5.8750 %).
If this Security Instrument is an adjustable rate mortgage loan, this initial rate is subject to change in accordance with the attached Adjustable Rate Rider.

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

VMP ®-6A(VA) (0705)
MFVA7770 (08/2007) / 047-717658-0

Page 2 of 14

Initials: auw
DsW

Form 3047 1/01

Instr:20080501004155B
Pg: 3 of 18

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider   ☐ Condominium Rider            ☐ Second Home Rider
☐ Balloon Rider           ☒ Planned Unit Development Rider ☐ 1-4 Family Rider
☐ VA Rider                ☐ Biweekly Payment Rider        ☐ Other(s) [specify]

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

VMP ®-6A(VA) (0705)
MFVA7770 (08/2007) / 047-717658-0

Page 3 of 14

Initials: _awu_
_DSW_

Form 3047  1/01



Instr:20088891804166
Pg: 4 of 18

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the   COUNTY
                                                                                                [Type of Recording Jurisdiction]
of  PRINCE WILLIAM
                                          [Name of Recording Jurisdiction]:
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

which currently has the address of
18018 DENSWORTH MEWS
                                                                                                    [Street]
GAINESVILLE
("Property Address"):                        (City/County),  Virginia   20155        [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

Instr:200905010041869
Pg: 6 of 18

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such

VMP ®-6A(VA) (0705)
MFVA7770 (08/2007) / 047-717658-0

Page 5 of 14

Initials: _aww_
_DSw_

Form 3047  1/01



Instr:200809001004056
Pg: 6 of 18

amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the

VMP ®-6A(VA) (0705)
MFVA7770 (08/2007) / 047-717658-0

Page 6 of 14

Initials: *a ww*
*DSW*

Form 3047  1/01



Case 1:10-cv-19501 Document 1-2 Filed 03/04/10 Page 35 of 82

payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or

VMP®-6A(VA) (0705)
MPVA7770 (08/2007) / 047-717658-0
Page 7 of 14

Initials: DSW MMW

Form 3047  1/01



Instr:20080910041668
Pg: 8 of 18

condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage

VMP ®-8A(VA) (0705)
MFVA7770 (08/2007) / 047-717658-0

Page 8 of 14

Initials: _aww_
_DSW_

Form 3047   1/01

Instr:200908010041989
Pg: 9 of 18

Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

VMP ®-6A(VA) (0705)
MFVA7770 (08/2007) / 047-717658-0

Page 9 of 14

Initials: _auu_
_DSW_

Form 3047  1/01



Instr:20006501004189
Pg: 10 of 18

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the

Instr:20000501004155B
Pg: 11 of 18

permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of

Instr:200805011041666
Pg: 12 of 19

Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).


Instr:208885016941558
Pg: 13 of 18

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall give to Borrower, the owner of the Property, and all other persons, notice of sale as required by Applicable Law. Trustee shall give public notice of sale by advertising, in accordance with Applicable Law, once a week for two successive weeks in a newspaper having general circulation in the county or city in which any part of the Property is located, and by such additional or any different form of advertisement the Trustee deems advisable. Trustee may sell the Property on the eighth day after the first advertisement or any day thereafter, but not later than 30 days following the last advertisement. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by advertising in accordance with Applicable Law. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property with special warranty of title. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to discharge the expenses of executing the trust, including a reasonable commission to Trustee; (b) to discharge all taxes, levies, and assessment, with costs and interest if these costs have priority over the lien of this Security Instrument, including the due pro rata thereof for the current year; (c) to discharge in the order of their priority, if any, the remaining debts and obligations secured by this Security Instrument, and any liens of record inferior to this Security Instrument under which sale is made, with lawful interest; and, (d) the residue of the proceeds shall be paid to Borrower or Borrower's assigns. Trustee shall not be required to take possession of the Property prior to the sale thereof or to deliver possession of the Property to the purchaser at the sale.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

VMP ®-6A(VA) (0705)
MFVA7770 (08/2007) / 047-717658-0

Page 13 of 14

Initials: _____
DSw

Form 3047   1/01



Instr:200908010041658
Pg: 14 of 18

( )

**24. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**NOTICE: THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____(Seal)
-Borrower

ALISHA W WILKES

_____(Seal)
-Borrower

DANIEL S. WILKES

_____(Seal)
-Borrower

_____(Seal)
-Borrower

_____(Seal)
-Borrower

_____(Seal)
-Borrower

_____(Seal)
-Borrower

_____(Seal)
-Borrower

**STATE OF VIRGINIA,**
The foregoing instrument was acknowledged before me this FAIRFAX 4|25 County, ss:    2008 by
DANIEL S. WILKES AND ALISHA W. WILKES , HUSBAND AND WIFE

My Commission Expires: 12|81|09         _____
                                         Notary Public

VMP ®-6A(VA) (0705)
MFVA7770 (08/2007) / 047-717658-0

Page 14 of 14                Form 3047   1/01

CHRISTIE N. EKASONE
Notary Public
Commonwealth of Virginia
My Commission Exps. Dec. 31, 2009

R QZ 1/20/2010


Instr: 2005050810041868
Pg: 15 of 18

# Exhibit A

Lot 17, Section 6, PIEDMONT SOUTH, as the same is duly dedicated in Instrument No. 200402240031319, and as shown on a corresponding plat as Instrument Number 200402240031320, both recorded among the land records of Prince William County, Virginia.

Being the same property conveyed to Daniel S. Wilkes and Alisha W. Wilkes by Deed from NVR, Inc., a Virginia Corporation, dated January 27, 2005 and recorded January 28, 2005 as Instrument No. 200501280014907, among the aforesaid land records.

Property Address: 18018 Densworth Mews, Gainsville, VA 20155
Tax ID No.: GPIN # 7398-20-7077

15



Instr:200808010041659
Pg: 16 of 18

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 25TH day of APRIL, 2008, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to

HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:
18018 DENSWORTH MEWS
GAINESVILLE, VA 20155

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in COVENANTS, CONDITIONS, AND RESTRICTIONS

(the "Declaration"). The Property is a part of a planned unit development known as PIEDMONT SOUTH

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01    MFCD8055 (08/2008) / 047-717658-0
Wolters Kluwer Financial Services    Page 1 of 3
VMP®-7R (0411).01

Initials: _Aew_
_DSW_

16



Instr:200808010041650
Pg: 17 of 18

B. **Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

C. **Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

D. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

E. **Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

F. **Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

VMP®-7R (0411).01
MFCD8055 (08/2008) / 047-717650-0

Page 2 of 3

17

Initials: _Aur_
_DGW_     Form 3150 1/01



Instr:200000001041000
Pg: 18 of 18

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
ALISHA H WILKES              -Borrower

_____ (Seal)
DANIEL S. WILKES            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

VMP®-7R (0411).01
(MFCD2055 (02/2006) / 047-717658-0

Page 3 of 3

Form 3150 1/01

18

PRINCE WILLIAM COUNTY CIRCUIT COURT
I certify this to be a true and correct copy
of the original on file and of record in
my office this 30 day of Oct, 2008.
    Michelle B. McQuigg, Clerk
BY Theresa a. Arres
    Deputy Clerk

R Q5 1/20/2010

VIRGINIA:

## IN THE CIRCUIT COURT FOR THE COUNTY OF PRINCE WILLIAM
Civil Division

| | |
|---|---|
| ALISHA WILSON WILKES, | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No. CL-85687 |
| | ) |
| FIRST CLASS SETTLEMENT LLC, | ) |
| (f/k/a Virginia Land Title, LLC), et al. | ) |
| | ) |
| and | ) |
| | ) |
| DANIEL S. WILKES | ) |
| Serve: 2161 Tannin Place, #37 | ) |
| Vienna, VA 22182 | ) |
| and | ) |
| | ) |
| LINDA L. WIGGIN | ) |
| Serve: 1916 Briar Rose Lane, Apt. 101 | ) |
| Woodbridge, VA 22192 | ) |
| and | ) |
| | ) |
| FEDERAL NATIONAL MORTGAGE | ) |
| ASSOCIATION (d/b/a Fannie Mae), | ) |
| Serve: Jodie L. Kelly, Esq. | ) |
| VP & Deputy General Counsel | ) |
| 3900 Wisconsin Avenue, NW | ) |
| Washington, DC 20016-2892 | ) |
| | ) |
| Defendants. | ) |

## FOURTH AMENDED COMPLAINT

The Plaintiff, ALISHA WILSON WILKES ("Ms. Wilkes"), by counsel, moves for

judgment against the Defendants and states as follows:

<u>Parties</u>

1.     The Plaintiff, Ms. Wilkes, is a natural person who is a resident and

domiciliary of the Commonwealth of Virginia.


EXHIBIT
3

2. The Defendant, FIRST CLASS SETTLEMENT LLC ("Virginia Land Title") is a limited liability company registered with the Virginia State Corporation Commission and authorized to conduct business in the Commonwealth of Virginia. Virginia Land Title is the trustee concerning the Second Deed of Trust as defined herein.

3. The Defendant, CONCORDE ACCEPTANCE CORPORATION ("Concorde"), is a corporation registered with the Virginia State Corporation Commission and authorized to conduct business in the Commonwealth of Virginia. Concorde is the note holder concerning the Second Deed of Trust as defined herein.

4. The Defendant, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), is a corporation registered with the Virginia State Corporation Commission and authorized to conduct business in the Commonwealth of Virginia. MERS is the beneficiary concerning the Second and Sixth Deeds of Trust as defined herein.

5. The Defendant, COUNTRYWIDE HOME LOANS, INC. ("Countrywide"), is a corporation registered with the Virginia State Corporation Commission and authorized to conduct business in the Commonwealth of Virginia. Countrywide is believed to be the beneficiary concerning the Second Deed of Trust as defined herein.

6. The Defendant, BANK OF NEW YORK, INC. ("Bank of New York"), is a bank that has conducted business in the Commonwealth of Virginia. Bank of New York is believed to be the note holder concerning the Second Deed of Trust as defined herein.

7. The Defendant, PRLAP, INC. ("PRLAP"), is a corporation registered with the Virginia State Corporation Commission and authorized to conduct business in the Commonwealth of Virginia. PRLAP is the trustee concerning the Third Deed of Trust as defined herein.

2

8.     The Defendant, BANK OF AMERICA, NA ("BOA"), is a bank registered with the Virginia State Corporation Commission and authorized to conduct business in the Commonwealth of Virginia. BOA is the note holder concerning the Third Deed of Trust as defined herein.

9.     The Defendant, CECIL B. STONE ("Ms. Stone"), is a natural person who is a resident and domiciliary of the Commonwealth of Virginia. Ms. Stone is a trustee concerning the Fourth and Fifth Deeds of Trust as defined herein.

10.     The Defendant, SHEILA THOMPSON ("Ms. Thompson"), is a natural person who is a resident and domiciliary of the Commonwealth of Virginia. Ms. Thompson is a trustee concerning the Fourth and Fifth Deeds of Trust as defined herein.

11.     The Defendant, SUNTRUST BANK ("SunTrust"), is a bank registered with the Virginia State Corporation Commission and authorized to conduct business in the Commonwealth of Virginia. SunTrust is the note holder concerning the Fourth and Fifth Deeds of Trust as defined herein.

12.     The Defendant, SAMUEL I. WHITE, P.C. ("White PC") is a professional corporation registered with the Virginia State Corporation Commission and authorized to conduct business in the Commonwealth of Virginia. White P.C. is the trustee concerning the Sixth Deed of Trust as defined herein.

13.     The Defendant, HOMECOMINGS FINANCIAL, LLC ("Homecomings Financial"), is a limited liability company registered with the Virginia State Corporation Commission and authorized to conduct business in the Commonwealth of Virginia.

14.     The Defendant, GMAC MORTGAGE, LLC ("GMAC"), is a limited liability company registered with the Virginia State Corporation Commission and authorized to

3

conduct business in the Commonwealth of Virginia. GMAC is the beneficiary concerning the Sixth Deed of Trust as defined herein.

15. The Defendant, FEDERAL NATIONAL MORTGAGE ASSOCIATION ("Fannie Mae"), is a company registered in Washington DC and authorized to conduct business in the Commonwealth of Virginia. Fannie Mae is the note holder concerning the Sixth Deed of Trust as defined herein.

16. The Defendant, DANIEL S. WILKES ("Mr. Wilkes"), is a natural person who is a resident and domiciliary of the Commonwealth of Virginia. Mr. Wilkes forged Ms. Wilkes signature on the Second Deed of Trust, the Promissory Note and the Sixth Deed of Trust as defined herein.

17. The Defendant, LINDA L. WIGGIN ("Ms. Wiggin"), is a natural person who is a resident and domiciliary of the Commonwealth of Virginia. Ms. Wiggin was a notary public and notarized the Second Deed of Trust as defined herein.

18. The Defendant, CHRISTIE EKASONE ("Ms. Ekasone"), is a natural person who is a resident and domiciliary of the Commonwealth of Virginia. Ms. Ekasone was a notary public and notarized the Sixth Deed of Trust as defined herein.

19. The Defendant, NORTH AMERICAN CLOSING SERVICES, LLC ("NACS"), is a limited liability company registered with the Virginia State Corporation Commission and authorized to conduct business in the Commonwealth of Virginia. NACS was Ms. Ekasone's employer at the time the Sixth Deed of Trust was executed.

<u>Jurisdiction</u>

20. The Circuit Court for the County of Prince William has subject matter jurisdiction as the real property in question is located in Prince William County and all relevant transactions occurred within the Commonwealth of Virginia.

4

21.     The Circuit Court for the County of Prince William has personal jurisdiction over the Defendants pursuant to § 8.01-328.1 of the Code of Virginia.

22.     The Circuit Court for the County of Prince William is the proper venue for this action pursuant to § 8.01-261 of the Code of Virginia.

### Facts

23.     On or about January 27, 2005, Ms. Wilkes and her estranged husband, Mr. Wilkes, purchased the property located at 18018 Densworth Mews, Gainesville, VA 20155 ("Property"). They took title as tenants by the entireties. EXHIBIT 1.

24.     On or about January 27, 2005, Ms. Wilkes and Mr. Wilkes executed a deed of trust securing a promissory note in the amount of $459,800.00 ("First Deed of Trust"). EXHIBIT 2.

25.     On or about November 3, 2005, a certificate and affidavit of satisfaction was filed with the Prince William County Circuit Court releasing the First Deed of Trust. EXHIBIT 3.

26.     On or about July 21, 2006, Mr. Wilkes executed a deed of trust securing a promissory note in the amount of $400,000.00 ("Second Deed of Trust"). EXHIBIT 4.

27.     Mr. Wilkes forged Ms. Wilkes signature on the Second Deed of Trust. Ms. Wilkes had no knowledge of, nor did she consent to, nor participate in the execution of the Second Deed of Trust recorded against the Property. EXHIBIT 5.

28.     Ms. Wiggin notarized the Second Deed of Trust however Ms. Wilkes was not in the presence of Ms. Wiggin at the time of notarization. Mr. Wilkes was the only one in Ms. Wiggin's presence when the Second Deed of Trust was notarized.

29.     Ms. Wilkes' name does not appear anywhere on the promissory note secured by the Second Deed of Trust.

5

30. On or about February 8, 2007, Mr. Wilkes executed a credit line deed of trust securing a promissory note in the amount of $150,000.00 ("Third Deed of Trust"). EXHIBIT 6.

31. Ms. Wilkes did not sign the Third Deed of Trust.

32. On or about April 23, 2007, Mr. Wilkes executed a credit line deed of trust securing a promissory note in the amount of $130,000.00 ("Fourth Deed of Trust"). EXHIBIT 7.

33. Ms. Wilkes did not sign the Fourth Deed of Trust.

34. On or about October 1, 2007, Mr. Wilkes executed a credit line deed of trust securing a promissory note in the amount of $54,800.00 ("Fifth Deed of Trust"). EXHIBIT 8.

35. Ms. Wilkes did not sign the Fifth Deed of Trust.

36. On or about April 25, 2008, Mr. Wilkes executed a promissory note ("Promissory Note") and a deed of trust securing the Promissory Note in the amount of $368,000.00 ("Sixth Deed of Trust"). EXHIBIT 9 and EXHIBIT 10.

37. Mr. Wilkes forged Ms. Wilkes signature on the Promissory Note and the Sixth Deed of Trust. Ms. Wilkes had no knowledge of, nor did she consent to, nor participate in the execution of the Promissory Note or the Sixth Deed of Trust recorded against the Property. EXHIBIT 11.

38. Ms. Ekasone notarized the Promissory Note and the Sixth Deed of Trust however Ms. Wilkes was not in the presence of Ms. Ekasone at the time of notarization. Mr. Wilkes was the only one in Ms. Ekasone's presence when the Promissory Note and the Sixth Deed of Trust were notarized.

6

39.     On or about October 15, 2008, Ms. Wilkes began to receive contacts from apparently distressed creditors of Mr. Wilkes. It was at that time Ms. Wilkes became acquainted with her husband's financial distress arising from an apparent gambling addiction, of which she was heretofore not aware.

40.     Ms. Wilkes consulted with counsel who caused an examination of the title to the Property, upon which Ms. Wilkes discovered the existence of the aforementioned deeds of trust.

41.     Mr. Wilkes used the money that he received from the aforementioned deeds of trust to satisfy his gambling debts. Ms. Wilkes did not receive any benefit from the aforementioned transactions.

42.     Ms. Wilkes never signed nor authorized anyone to sign her name to the Second Deed of Trust, the Promissory Note, or the Sixth Deed of Trust, nor did she ever provide a power of attorney to anyone purporting to act on her behalf.

43.     On or about November 18, 2008, Mr. Wilkes and Ms. Wilkes, as tenants by the entirety and pursuant to a divorce action, conveyed the Property to Ms. Wilkes alone.

### COUNT I - FRAUD
### (Mr. Wilkes)

44.     Paragraphs 1 through 43 are realleged, reaffirmed, and incorporated herein by reference.

45.     Mr. Wilkes forged Ms. Wilkes' signature on the Second Deed of Trust, the Promissory Note, the Sixth Deed of Trust and other related documents.

46.     Mr. Wilkes forged Ms. Wilkes' signature on the aforementioned documents with the intent to defraud.

7

47. Certain Defendants have relied on the aforementioned documents as being genuine and have attempted to foreclose on Ms. Wilkes' Property.

48. Ms. Wilkes has suffered significant damages as a result of Mr. Wilkes' fraudulent conduct including, but not limited to, attorney fees incurred in this litigation and $768,000.00 should she not prevail on her claims to remove clouds from title.

## COUNT II - DECLARATORY JUDGMENT
### (All Defendants)

49. Paragraphs 1 through 48 are realleged, reaffirmed, and incorporated herein by reference.

50. All of the note-holders and trustees identified herein purport to have a secured interest in the Property.

51. Ms. Wilkes' signature was forged by Mr. Wilkes on the Second Deed of Trust, the Promissory Note and the Sixth Deed of Trust. Therefore, the Second Deed of Trust and the Sixth Deed of Trust are void.

52. The Property was owned by Mr. Wilkes and Ms. Wilkes as tenants by the entireties at the time the Second Deed of Trust and the Sixth Deed of Trust were forged. Therefore, the Property is exempt from the creditors of Mr. Wilkes alone.

53. Mr. Wilkes executed the Third Deed of Trust, Fourth Deed of Trust and the Fifth Deed of Trust without Ms. Wilkes knowledge, consent or authorization and without Ms. Wilkes signature. The Property was titled as tenants by the entireties and thus Mr. Wilkes cannot unilaterally encumber the Property.

54. The aforementioned deeds of trust and promissory notes are void as they relate to Ms. Wilkes.

8

55. The aforementioned deeds of trust currently constitute clouds on the title of the Property and must be removed.

## COUNT III – REMOVE CLOUD FROM TITLE
### (All Defendants)

56. Paragraphs 1 through 55 are realleged, reaffirmed, and incorporated herein by reference.

57. All of the note-holders and trustees identified herein purport to have a secured interest in the Property.

58. Ms. Wilkes' signature was forged by Mr. Wilkes on the Second Deed of Trust, the Promissory Note and the Sixth Deed of Trust. Therefore, the Second Deed of Trust and the Sixth Deed of Trust are void.

59. The Property was owned by Mr. Wilkes and Ms. Wilkes as tenants by the entireties at the time the Second Deed of Trust and the Sixth Deed of Trust were forged. Therefore, the Property is exempt from the creditors of Mr. Wilkes alone.

60. Mr. Wilkes executed the Third Deed of Trust, Fourth Deed of Trust and the Fifth Deed of Trust without Ms. Wilkes knowledge, consent or authorization and without Ms. Wilkes signature. The Property was titled as tenants by the entireties and thus Mr. Wilkes cannot unilaterally encumber the Property.

61. The aforementioned deeds of trust and promissory notes are void as they relate to Ms. Wilkes.

62. The aforementioned deeds of trust currently constitute clouds on the title of the Property and must be removed.

9

## COUNT IV - INJUNCTION FROM FORECLOSURE
### (All Defendants)

63.    Paragraphs 1 through 62 are realleged, reaffirmed, and incorporated herein by reference.

64.    Ms. Wilkes believes, and therefore avers, that the note-holders secured by the aforementioned deeds of trust may attempt to foreclose on the Property.

65.    Ms. Wilkes will suffer irreparable and permanent harm if anyone of the note-holders or trustees are allowed to foreclose on the Property.

66.    Ms. Wilkes has a legally recognizable right and that right is currently being infringed upon by the Defendants.

67.    There is no adequate legal remedy available to Ms. Wilkes.

68.    An injunction is practicable, feasible, and effective and needed to protect Ms. Wilkes' ownership rights concerning the Property.

69.    In balancing the hardships, all relevant factors are in favor of Ms. Wilkes and not the Defendants.

70.    An injunction would not adversely affect the public interests and Ms. Wilkes would be irreparably harmed in the absence of an injunction.

71.    The Defendants have no equitable defenses.

## COUNT V – CIVIL LIABILITY OF NOTARY
### (Ms. Wiggin)

72.    Paragraphs 1 through 71 are realleged, reaffirmed, and incorporated herein by reference.

73.    At the time the Second Deed of Trust was notarized Ms. Wiggin was a "notary public" or "notary" as defined by § 47.1-2 of the Code of Virginia.

74. On or about July 21, 2006, Ms. Wiggin performed a "notarial act" or "notarization" as defined by § 47.1-2 of the Code of Virginia.

75. On or about July 21, 2006, Ms. Wiggin committed an act of "official misconduct" as defined by § 47.1-2 of the Code of Virginia when she notarized the Second Deed of Trust without Ms. Wilkes being present.

76. Ms. Wiggin is liable for all damages proximately caused by her official misconduct.

77. Ms. Wilkes has suffered significant damages as a result of Ms. Wiggin's official misconduct including, but not limited to, attorney fees incurred in this litigation and $400,000.00 should she not prevail on her claims to remove clouds from title.

## COUNT VI – CIVIL LIABILITY OF NOTARY
### (Ms. Ekasone and NACS)

78. Paragraphs 1 through 77 are realleged, reaffirmed, and incorporated herein by reference.

79. At the time the Sixth Deed of Trust was notarized Ms. Ekasone was a "notary public" or "notary" as defined by § 47.1-2 of the Code of Virginia.

80. On or about April 25, 2008, Ms. Ekasone performed a "notarial act" or "notarization" as defined by § 47.1-2 of the Code of Virginia.

81. On or about April 25, 2008, Ms. Ekasone committed an act of "official misconduct" as defined by § 47.1-2 of the Code of Virginia when she notarized the Promissory Note and the Sixth Deed of Trust without Ms. Wilkes being present.

82. Ms. Ekasone is liable for all damages proximately caused by her official misconduct.

11

83. At the time the Promissory Note and the Sixth Deed of Trust were notorized NACS was Ms. Ekasone's employer.

84. At the time the Promissory Note and the Sixth Deed of Trust were notorized Ms. Ekasone was acting within the scope of her employment.

85. NACS had actual knowledge of, or reasonably should have known of, such notary's misconduct.

86. NACS is liable for all damages proximately caused by Ms. Ekasone's official misconduct pursuant to § 47.1-27 of the Code of Virginia and/or the doctrine of *respondeat superior.*

87. Ms. Wilkes has suffered significant damages as a result of Ms. Ekasone's official misconduct including, but not limited to, attorney fees incurred in this litigation and $368,000.00 should she not prevail on her claims to remove clouds from title.

WHEREFORE the Plaintiff, ALISHA WILSON WILKES, requests the following relief:

1. That the Court enter an order declaring the Second Deed of Trust and the Sixth Deed of Trust void for any purpose;

2. That the Court enter an order declaring the Promissory Note unenforceable against Ms. Wilkes;

3. That the Court enter an order removing the Second Deed of Trust and the Sixth Deed of Trust from the Property;

4. That the Court enter an order enjoining any and all note-holders and their trustees from executing any provisions of any deed of trust identified herein;

5. That the Court award Ms. Wilkes compensatory damages in the amount of $800,000.00, punitive damages in the amount of $350,000.00, and costs and attorney

12

fees against Mr. Wilkes;

     6.    That the Court award Ms. Wilkes compensatory damages in the amount of $400,000.00, should she not prevail on her claims to remove clouds from title, and/or costs and attorney fees against Ms. Wiggin;

     7.    That the Court award Ms. Wilkes compensatory damages in the amount of $368,000.00, should she not prevail on her claims to remove clouds from title , and/or costs and attorney fees against Ms. Ekasone and NACS, jointly and severally;

     8.    That Ms. Wilkes be awarded her costs and reasonable attorney's fees; and

     9.    That the Court award Ms. Wilkes any further relief it deems proper.


     I, ALISHA WILSON WILKES, hereby swear and affirm that the foregoing allegations are true and accurate to the best of my knowledge.

                                       ALISHA WILSON WILKES

STATE OF WEST VIRGINIA:
CITY/COUNTY OF _Mineral_ _____, to wit:

     SWORN and SUBSCRIBED to me on this _16_ day of July, 2009.

                                         Notary Public

My Commission Expires: _4/13/12_ _____.

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
ROBERT G. EAGLE JR.
1440 BEACON STREET
KEYSER, WV 26726
My commission expires April 13, 2012

13

ALISHA WILSON WILKES

By: _____
Counsel

Robert J. Surovell, Esq., VSB #6193
John C. Bazaz, Esq., VSB #70796
SUROVELL MARKLE ISAACS & LEVY PLC
4010 University Drive, 2nd Floor
Fairfax, VA 22030
Telephone: 703-251-5400
Facsimile: 703-591-9285
Counsel for Ms. Wilkes

## Certificate of Service

I certify that on July 28, 2009 a copy of the foregoing was emailed or mailed to:

Donna J. Hall, Esq.
SAMUEL I. WHITE, P.C.
5040 Corporate Woods Dr., Suite 120
Virginia Beach, VA 23462

Linda L. Wiggin
1916 Briar Rose Lane, Apt. 101
Woodbridge, VA 22192
*Pro Se* Defendant

Richard D. Beard III, Esq.
THE LAW OFFICE OF RICHARD D.
BEARD PLLC
9300 Forest Point Circle
Manassas, VA 20110

Christopher C. Nolan
NOLAN, MROZ & MCCORMICK
130 Park St., SE, Suite 200
Vienna, VA 22180

Wayne F. Cyron, Esq.
CYRON & MILLER LLP
100 N. Pitt Street, Suite 200
Alexandria, VA 22314-3134

Nelson Blitz, Esq.
EXECUTIVE COUNSEL PLC
2883 Macao Dr.
Herndon, VA 20171

Daniel S. Wilkes
2161 Tannin Place, #37
Vienna, VA 22182
*Pro Se* Defendant

John C. Bazaz

14

VIRGINIA:

## IN THE CIRCUIT COURT FOR THE COUNTY OF PRINCE WILLIAM
### Civil Division

ALISHA WILSON WILKES,        )
               Plaintiff,   )
          )
       v.                )       Case No. CL-85687
          )
FIRST CLASS SETTLEMENT LLC,   )
(f/k/a Virginia Land Title, LLC), et al.   )
              Defendants.   )
          )

### JUDGMENT ORDER - FOURTH AMENDED COMPLAINT

THIS CAUSE CAME to be heard before the Hon. Craig D. Johnston on January

25-26, 2010; upon the Fourth Amended Complaint filed by the Plaintiff, ALISHA W.

WILKES ("Ms. Wilkes"), seeking the removal of the Deed of Trust dated July 21, 2006

which was purportedly executed by the grantors **DANIEL S. WILKES** and **ALISHA**

**W. WILKES** and recorded with the Prince William County land records on July 26,

2006 at 2:02:17PM, **Instr. #200607260110171**, ("Deed of Trust dated July 21,

2006") and the Deed of Trust dated April 25, 2008 which was purportedly executed by

the grantors **DANIEL S. WILKES** and **ALISHA W. WILKES** and recorded with

Prince William County land records on May 1, 2008 at 3:13:11PM, **Instr.**

**#200805010041558**, ("Deed of Trust dated April 25, 2008"), from the Property, **Tax**

**ID/GPIN #7398-20-7077; Lot 17, Section 6, Piedmont South**, ("Property"), and

a declaration that the Promissory Note dated April 25, 2008 in the amount of

$368,000.00 secured by the Deed of Trust dated April 25, 2008 ("Promissory Note"), is

void as to Ms. Wilkes and the Property; and

IT APPEARING TO THE COURT that after hearing the evidence presented at



EXHIBIT
4

trial and the arguments made by counsel for each party that Ms. Wilkes has proven her case by clear and convincing evidence for the reasons set forth in the Hon. Craig D. Johnston's letter opinion dated February 4, 2010 and the attachment to the letter opinion ("Letter Opinion"), to which ruling the Defendants have noted their exceptions; and

IT FURTHER APPEARING TO THE COURT that the Defendant, Bank of New York, Inc., is the current noteholder of the Deed of Trust dated July 21, 2006, that the Defendant, First Class Settlement, LLC (f/k/a Virginia Land Title), is the trustee of the Deed of Trust dated July 21, 2006, that the Defendant, Mortgage Electronic Registration Systems, Inc., is the former beneficiary of the Deed of Trust dated July 21, 2006, and that the Defendant, Countrywide Home Loans, Inc., is the servicer of the Deed of Trust dated July 21, 2006; and

IT FURTHER APPEARING TO THE COURT that the Defendant, Federal National Mortgage Association, is the current noteholder of the Promissory Note dated April 25, 2008 secured by the Deed of Trust dated April 25, 2008; that the Defendant, Homecomings Financial, LLC, is the former noteholder of the Deed of Trust dated April 25, 2008, that the Defendant, Samuel I. White, PC, is the trustee of the Deed of Trust dated April 25, 2008, and that the Defendant, GMAC Mortgage, LLC, is the servicer of the Deed of Trust dated April 25, 2008; it is therefore,

ORDERED that (1) the Deed of Trust dated July 21, 2006; (2) the Deed of Trust dated April 25, 2008; and (3) the Promissory Note are **VOID**, as a matter of law, as they relate to Ms. Wilkes and the Property; and it is

FURTHER ORDERED that the Hon. Craig D. Johnston's Letter Opinion is incorporated herein by reference; and it is

FURTHER ORDERED that the Deed of Trust dated July 21, 2006 which was purportedly executed by the grantors **DANIEL S. WILKES** and **ALISHA W. WILKES** and recorded with the Prince William County land records on July 26, 2006 at 2:02:17PM, **Instr. #200607260110171**, is hereby **RELEASED**; and it is

FURTHER ORDERED that the Deed of Trust dated April 25, 2008 which was purportedly executed by the grantors **DANIEL S. WILKES** and **ALISHA W. WILKES** and recorded with Prince William County land records on May 1, 2008 at 3:13:11PM, **Instr. #200805010041558**, is hereby **RELEASED**; and it is

FURTHER ORDERED that upon the expiration of any applicable appeal periods the Clerk of the Prince William County Circuit Court shall record this order with land records of Prince William County, together with a reference to the instrument numbers 200607260110171 and 200805010041558, where such instrument numbers are recorded; and it is

FURTHER ORDERED that Count I (Fraud) of the Fourth Amended Complaint against the Defendant, Daniel S. Wilkes, is dismissed for the reasons stated in the Letter Opinion; and it is

FURTHER ORDERED that Count IV (Injunction from Foreclosure) of the Fourth Amended Complaint is dismissed as being moot.

AND THIS CAUSE IS ENDED.

ENTERED THIS _26th_ DAY OF FEBRUARY, 2010.

HON. CRAIG D. JOHNSTON

A COPY-TESTE:

BY: _____
Deputy Clerk

3

I ASK FOR THIS:

SUROVELL MARKLE ISAACS & LEVY PLC

By: _____

     John C. Bazaz, Esq., VSB #70796
     Kristi N. Cahoon, Esq., VSB #72791
     SUROVELL MARKLE ISAACS & LEVY PLC
     4010 University Drive, 2nd Floor
     Fairfax, VA 22030
     Telephone: 703-251-5400
     Facsimile: 703-591-9285
     Counsel for Ms. Wilkes

SEEN AND _Exceptions noted to all adverse rulings for reasons stated_
_on the record and in the pleadings._
SAMUEL I. WHITE, P.C.


By: _Donna Hall by Christopher C. Nolan_
     Donna J. Hall, Esq., VSB #26513
     SAMUEL I. WHITE, P.C.
     5040 Corporate Woods Drive, Suite 120
     Virginia Beach, Virginia 23462
     Telephone: 757-457-1485
     Facsimile: 757-497-2802
     Counsel for Defendants, Samuel I. White, P.C., Trustee

SEEN ~~AND~~ _____:

THE LAW OFFICE OF RICHARD D. BEARD PLLC

By: _____

     Richard D. Beard III, Esq., VSB #48078
     THE LAW OFFICE OF RICHARD D. BEARD PLLC
     9300 Forest Point Circle
     Manassas, VA 20110
     Telephone: 703-361-2278
     Facsimile: 703-361-8777
     Counsel for Defendant First Class Settlements, LLC

4

SEEN AND EXCEPTIONS NOTED to all adverse rulings for the reasons set forth on the record and in the memoranda and cases filed with the court or referenced herein by any party:

CYRON & MILLER LLP

By: _____

    Wayne F. Cyron, Esq., VSB #12220
    CYRON & MILLER LLP
    100 N. Pitt Street, Suite 200
    Alexandria, VA 22314-3134
    Telephone: 703-299-0600
    Facsimile: 703-290-0603
    Counsel for the Defendants Countrywide Home Loans, Inc., Mortgage Electronic
    Registration Systems, Inc. and Bank of New York, Inc.

SEEN AND *Exceptions noted to all adverse rulings for the reasons set forth on the record and in pleadings.*

NOLAN, MROZ & MCCORMICK

By: _____

    Christopher C. Nolan, Esq., VSB #26043
    NOLAN, MROZ & MCCORMICK
    130 Park St., SE., Suite 200
    Vienna, VA 22180
    Telephone: 703-281-2600
    Facsimile: 703-281-6238
    Counsel for Defendants Fannie Mae, Homecomings Financial, LLC and GMAC
    Mortgage, LLC

SEEN AND_____:


_____

Mr. Daniel Wilkes, *Pro Se* Defendant



**THIRTY-FIRST JUDICIAL CIRCUIT OF VIRGINIA**
PRINCE WILLIAM COUNTY
CITIES OF MANASSAS AND MANASSAS PARK

CHAMBERS OF
**CRAIG D. JOHNSTON**
JUDGE

CIRCUIT COURT CHAMBERS
9311 LEE AVENUE
MANASSAS, VIRGINIA 20110
TELEPHONE: (703) 792-6010

February 4, 2010

Robert J. Surovell, Esq.
John C. Bazaz, Esq.
Surovell Markle Isaacs & Levy, PLC
4010 University Dr., 2nd Floor
Fairfax, VA 22030
Fax: 703-591-9285

Donna J. Hall, Esq.
Samuel I. White, P.C.
5040 Corporate Woods Dr., Suite 120
Virginia Beach, VA 23462
Fax: 757-492-2802

Christopher C. Nolan, Esq.
Nolan, Mroz, & McCormick
130 Park St., SE, Suite 200
Vienna, VA 22180
Fax: 703-281-6283

Edward W. Cameron, Esq.
Cameron / McEvoy, PLLC
11325 Random Hills Rd., Suite 200
Fairfax, VA 22030
Fax: 703-273-8897

Richard D. Beard, Esq.
9300 Forest Point Circle
Manassas, VA 20110
Fax: 703-361-8777

Wayne F. Cyron, Esq.
Cyron & Miller, LLP
100 N. Pitt St., Suite 200
Alexandria, VA 22314
Fax: 703-290-0603

Edward J. Tolchin, Esq.
Fettman, Tolchin & Majors, P.C.
10509 Judicial Drive, Suite 300
Fairfax, VA 22030
Fax: 866-653-4485

**RE: CL 04-85687-00 - Wilkes v. First Settlement LLC, et al.**

Dear Counsel:

These actions came for trial before the court, sitting without a jury, on January 25 and 26, 2010. At the conclusion of the trial, I took all matters under advisement, and stated that I would either provide a letter opinion, or invite further memoranda if I considered these necessary to a decision. I have decided that the briefs, argument, and authorities already provided are sufficient, and so make the following decision:

Summary of Decision:

      As discussed in detail below, I find for the Plaintiff, Mrs. Wilkes, upon the Fourth Amended Complaint, and will enter a decree accordingly, and I find for the Plaintiffs, GMAC and Homecomings Financial, on the Third Party Complaint, and will enter judgment accordingly.

Procedural Posture:

      These actions came to trial on the Fourth Amended Complaint filed by Alisha Wilson Wilkes ("Mrs. Wilkes") and Answers thereto, and upon the Third Party Complaint and Answers thereto. A number of the original defendants to the Fourth Amended Complaint had been nonsuited or dismissed prior to trial, and trial on this Complaint proceeded only as to (1) Daniel S. Wilkes ("Mr. Wilkes," who was in default, and who failed to appear despite being summoned as a witness), (2) Trustees, Noteholders, and other Defendants associated with what in the pleadings and trial have been referred to as the "Second Deed of Trust," and also as "Bank of New York" (herein collectively "Bank of New York"), and (3) Trustees, Noteholders, and other Defendants associated with what in the pleadings and trial are referred to as the "Sixth Deed of Trust," and also as "GMAC" (herein collectively "GMAC"). Trial also proceeded on the Third Party Complaint by GMAC against the third party defendants. GMAC moved for a nonsuit without objection during trial as to third party defendants Mr. Wilkes and Ms. Ekasone, and trial on the Third Party Complaint proceeded to conclusion only as to third party defendant NACS. In the Complaint, Mrs. Wilkes seeks judgment against Mr. Wilkes, a declaration that the Second Deed of Trust and the Sixth Deed of Trust are void and unenforceable due to her signatures thereon being forgeries and due to ownership of the property as tenants by the entireties, as well as an order quieting title and ordering release of these Deeds of Trust, a declaration that the Promissory Note secured by the Sixth Deed of Trust is void and unenforceable as to her due her signature thereon being forged, and an injunction prohibiting attempted enforcement of either deed of trust or note. In the Third Party Complaint, GMAC alleges that, if the relief in the Complaint is granted, it will suffer damages for which NACS is liable, and seeks judgment for those damages.

Summary of Findings of Fact as to Fourth Amended Complaint:

      I have made detailed findings of fact as appropriate in an attachment hereto. In summary, I find by clear and convincing evidence that Mr. Wilkes or someone at his behest forged Mrs. Wilkes' signature on the Second and Sixth Deeds of Trust, the Sixth Deed of Trust Note, and all papers purportedly bearing her signature in connection with these two loans. I further find, and so find by clear and convincing evidence to the extent this is required, that she did not acknowledge her signatures on the Deeds of Trust, nor did she authorize or ratify Mr. Wilkes' actions in obtaining these loans, nor did she know of these loans prior to October 2008. The evidence does not establish, under any standard

of proof, that she received any substantial benefit from these loans, or that she acquiesced in such loans after knowledge thereof. She acted promptly to disavow the loans, and her husband as well, after learning of the loans in October 2008. I find her testimony convincing that she knew nothing of the loans before then, and received no demonstrable benefit. The appearance of mortgage interest on tax returns she may have signed does not change this — Mr. Wilkes' ability to deceive at least two lenders, and likely three or four, as well as his ability to deceive Mrs. Wilkes in other matters, persuade me that he would have had little difficulty in hiding this line item on tax returns from her. As to the funds he received from these loans, while some of them apparently went into a joint account at BB&T at some point, they did not remain there long, and he kept total control of this account. During the same period he was working on a daily basis at his online stock trading job, the same job which apparently had produced enough income in the year prior to the first loan to pay off a loan of in excess of $400,000, and had (apparently) earned him the distinction of being an instructor for his on-line stock investment company, so there was nothing to alert Mrs. Wilkes that funds he contributed to common expenses might be coming from an improper source, nor is there any evidence from which I can positively conclude that the sums he contributed to common expenses in fact came from either loan. Neither can I positively identify the source of the relatively small sums she seized from that account and from the joint account she normally used after Mr. Wilkes left.

My findings of fact and conclusions of law as to the Third Party Complaint are set forth below.

## Conclusions of law as to Fourth Amended Complaint:

1. The lien of the Second Deed of Trust and of the Sixth Deed of Trust did not attach to the Property.

   Discussion: Under principles announced in numerous Virginia cases, the signature of one spouse upon a deed of trust, like the lien of a judgment against one spouse, does not create any lien against real property owned as tenants by the entireties. Accordingly, Mr. Wilkes' forgery of Mrs. Wilkes' signature upon both deeds of trust created no lien upon the property, or upon her or his interest therein. The defenses asserted by Bank of New York, in arguing that the lien should be deemed to attach, were principally ratification and estoppel. I did not find either to be supported by the evidence. Ratification requires actual knowledge, or acceptance of benefits after knowledge; I found neither. Estoppel requires knowledge plus reasonable reliance by the injured party; these were not established either. Similar defenses were asserted by GMAC, though their principal thrust was that NACS was liable to them for the damages incurred.

2. No fraudulent or voluntary conveyance occurred, nor did any lien arise, upon conveyance of the property to Mrs. Wilkes.

Discussion: Bank of New York asserted fraudulent conveyance as a defense, while GMAC asserted both voluntary and fraudulent conveyance as defenses, each in connection with the conveyance of the property to Mrs. Wilkes, as more fully recited below. These are defenses separate from the other equitable defenses, in that they claim that, even if no lien or other obligation of Mrs. Wilkes existed by reason of the forgeries, nonetheless a lien was somehow created, or a fraudulent or voluntary conveyance occurred, when Mr. and Mrs. Wilkes joined together to convey the property to her alone. Both lenders take great exception to this conveyance, because if permitted, the property ends up in the hands of Mrs. Wilkes free and clear of any claim by either of them, a result they regard as unjust. However, the case law leads to this result. In general, where one spouse owns property in his or her own name, and transfers it to the other spouse or into joint names while indebted to a third party, such a transfer is regarded with suspicion, and the transferring spouses must justify it or it may well be set aside as being in fraud of the third party creditor. The rule is otherwise, however, with regards to property already owned as tenants by the entireties when a debt arises. Because the property is owned in a fashion which is beyond the reach of creditors of either, the law permits transfer to either, or to a third party, with or without substantial monetary consideration, since such a transfer does no harm to the position of any creditor of either. See Vasilion v. Vasilion, 192 Va. 735, 743 (1951). Conceptually, this is a logical result, as a creditor's remedy under the fraudulent and voluntary conveyance statutes is to void a transfer—to put the property back the way it was before the transfer. In the case of property held by tenants by the entireties, such a transfer would put the property back beyond the reach of any creditor of either. I recognize that a divorce, like the death of one of the parties, has the effect of converting the property to a tenancy in common, and leads to the subsequent possibility that the one half undivided interest of each spouse might thereafter be subjected to the debts of that spouse. However, Mr. and Mrs. Wilkes were still married when they conveyed the property to Mrs. Wilkes, and I find no case that holds that real property owned and conveyed by spouses as tenants by the entireties, and conveyed by both, while still married, to one of them pursuant to a property settlement agreement, stands on different footing from any other transfer. Inherent in ownership as tenants by the entireties is the concept that only death of one, divorce, or joint conveyance serves to change the nature of ownership.

3. Mrs. Wilkes has no obligation on the Sixth Deed of Trust Note:

Discussion: Since Mrs. Wilkes did not sign the Sixth Deed of Trust Note, and since her name was forged without her knowledge or consent, she has no obligation thereon, and it may not be enforced against her. The discussion of defenses asserted to the Deeds of Trust as discussed above, and following the detailed findings of fact below, applies equally here, and will not be repeated.

4. Mr. Wilkes committed fraud upon Mrs. Wilkes in the manner set forth above, but I have not yet determined that it is proper to enter any money judgment at this time against Mr. Wilkes, for the following reasons:

   i. There is a pending divorce proceeding; generally other courts defer to divorce proceedings, at least initially, as all liabilities of one spouse to another may be pending for adjudication therein.

   ii. A property settlement agreement between Mr. and Mrs. Wilkes was submitted in evidence in this action. It was signed after this action was commenced and on its face, appears to resolve all matters in issue between the parties. Whether it does so or not may be appropriately deferred until after the divorce proceedings are concluded, as this question may come before the divorce court.

   iii. The evidence of monetary damage, other than attorney fees, was inconclusive, especially in light of the Court's ruling on other matters. I am not certain of Mrs. Wilkes' right to claim attorney fees in this action.

   iv. The pendency of felony charges arising from the same facts adds additional question as to whether a civil judgment should be entered at this time.

   v. Accordingly, I will defer, at least until the proposed date of entry of final decree, the question of what monetary judgment, if any, I should enter against Mr. Wilkes.

As a result of the foregoing, I will defer decision as to Mr. Wilkes, as discussed, but as to the other matters at issue under the Fourth Amended Complaint, I will enter a decree declaring that the Second Deed of Trust and the Sixth Deed of Trust are void and unenforceable due to Mrs. Wilkes' signatures thereon being forgeries and due to ownership of the property as tenants by the entireties, as well as an order quieting title in Mrs. Wilkes and ordering release of these Deeds of Trust, together with a declaration that the Promissory Note secured by the Sixth Deed of Trust is void and unenforceable as to her due her signature thereon being forged, and, if necessary and appropriate, an injunction prohibiting attempted enforcement of either deed of trust or the note. I will reserve for argument whether it is either necessary or appropriate to enter any injunction.

Findings of Fact, Conclusions of Law, and Decision on Third Party Complaint:

NACS is liable on the Third Party Complaint for the full sum transferred to NACS in funding the Sixth Deed of Trust Loan.

Discussion:

i. NACS effectively conceded breach of the contract contained in the loan closing instructions when it conceded that it had failed to detect that the affidavit and certificate of satisfaction purportedly releasing the Second Deed of Trust that Mr. Wilkes tendered to it was a forgery, and that the defects which would have caused it to be questioned were ones which NACS, in the exercise of reasonable diligence, should have noticed. NACS also conceded breach in failing to have its agent secure a valid signature and/or acknowledgement by Mrs. Wilkes on the Sixth Deed of Trust. Each of these was a material undertaking by NACS in the contract, and I find that the failure to perform each of these was in fact a material breach of the loan closing agreement, and that this breach proximately caused damages.

ii. However, NACS asserted that no judgment should be entered for two reasons: failure to establish that FNMA was the proper party plaintiff because its status as noteholder was not established by any writing before the court, and failure to establish the amount of damages suffered. With respect to the proper party plaintiff, the issue might be different if this were an action on a note, but it is not. This action is upon an alleged breach of a loan closing agreement between Homecomings Financial LLC and NACS. Both Homecomings and FNMA are before the court, and both allege that FNMA is now the holder of the right of action upon the contract and hence is the proper party plaintiff, and there is no evidence to the contrary. As a result, this defense will not avail in this action.

iii. With respect to the measure of damages, as NACS' counsel argues, this loan should never have closed and disbursed. NACS should have detected on at least two occasions that the affidavit and certificate of satisfaction that Mr. Wilkes tendered was forged. The first was when it was submitted, due to its obvious internal defects. The second was in connection with the title examination. The forged document was never in fact recorded, and its absence from the land records should have been detected before the Sixth Deed of Trust was recorded and the loan disbursed. If the document had been detected as a forgery on either occasion, the loan closing or disbursement would have halted. The fact that this did not happen led directly to Mr. Wilkes being able to take his next step, one which was not unforeseeable given the initial forgery, which

was to forge Mrs. Wilkes' name on the Deed of Trust (which should also have been detected, but which I do not find to have been the first material breach), on the Deed of Trust Note, and on the other papers, as well as to receive and convert the loan proceeds. This leaves FNMA with no remedy except the likely fruitless pursuit of Mr. Wilkes, who has unserved felony warrants and likely has long since squandered the loan proceeds. As a result, the entire loan proceeds wired to NACS are likely unrecoverable, and the sum of these proceeds, and not some different measure, I find to be the proper measure of damages.

Accordingly, judgment will be entered on the Third Party Complaint for the proceeds wired to fund the loan, which my notes show was $366,681.15. I will consider the question of interest on this sum on the date set for entry of the order, if no agreement is reached.

Please prepare a final order that incorporates the above, and I will consider any remaining issues and enter that order on February 26th.

Sincerely,

Judge Craig D. Johnston

Enclosure

Wilkes v. First Class Settlements, Inc.—Attachment to letter opinion

<u>Detailed Findings of Fact and Further Conclusions of Law upon Fourth Amended Complaint:</u>

iv. Mr. and Mrs. Wilkes purchased property located at 18018 Densworth Drive, Gainesville, Virginia, located in Prince William County, on or about January 27, 2005, and in connection with this they signed and recorded a purchase money deed of trust $459,800.00. They were married at the time, and took title as tenants by the entireties with right of survivorship.

v. A certificate and affidavit of satisfaction of the purchase money deed of trust was recorded November 3, 2005. The source of funds for this satisfaction is uncertain, but presumably Mr. Wilkes paid it off. There is no evidence that it was paid off and released in any improper fashion, or with funds obtained in any improper fashion. Accordingly, as of November 3, 2005, the property was owned free and clear of any deed to trust.

vi. Mrs. Wilkes did not sign the Second Deed of Trust (dated July 1, 2006), the Sixth Deed of Trust, the Sixth Deed of Trust Note (both dated April 25, 2008), nor any of the papers which purport to bear her signature in connection with the loans involved.

vii. Mrs. Wilkes did not appear before any notary, speak with any notary, nor acknowledge her signature before any notary, in connection with the purported acknowledgements of the signatures appearing on in the Second and Sixth Deeds of Trust.

viii. Mrs. Wilkes had no knowledge of the Second or Sixth Deed of Trust or of the loans involved prior to October 2008.

ix. Mr. Wilkes and/or someone else at his behest forged Mrs. Wilkes' signature upon the Second Deed of Trust, the Sixth Deed of Trust and Note, and upon the loan documents which purport to bear her signature.

x. The forgeries of Mrs. Wilkes' signatures were without her knowledge, authorization, or consent.

    xi.  The forgeries of Mrs. Wilkes signatures were without the knowledge or consent of any of the other parties to this action.

2. I found each of the witnesses who appeared before me entirely credible. Together, their testimony established that Mr. Wilkes engaged in a calculated, lengthy, and for a long time successful, campaign to deceive and defraud all of the other parties to this action. He undertook, successfully, to deceive every one of the fact witnesses who appeared before the court. A partial list of the many actions he took as part of this include:

    vi.  He forged Mrs. Wilkes' signature upon the Second Deed of Trust,

    vii.  He deceived the notary upon the Second Deed of Trust, with whom he was acquainted, and persuaded her by a falsehood to notarize Mrs. Wilkes' signature even though Mrs. Wilkes never appeared before or spoke to the notary.

        1.  He deceived the loan officer and underwriter of the Sixth Deed of Trust loan by representing Mrs. Wilkes as the borrower, and representing that she was the owner of a business who had a very high income, when she in fact was a stay at home mother with no knowledge of the proposed loan. He apparently had a female confederate speak to them as well, when they sought to verify what he had told them. (I note in this regard that Mrs. Wilkes denied ever speaking with them. I find this credible—neither the loan officer or closer who testified could state positively that the woman they spoke to did more than identify herself as Mrs. Wilkes. Given the various misrepresentations made in the loan process by Mr. Wilkes, and the fact that he was hiding all of his ongoing deceptions from Mrs. Wilkes as well as everyone else, I find it inconceivable that he would have had the loan officer or underwriter speak with the true Mrs. Wilkes.)

        2.  He deceived the settlement company as well as the lender in the Sixth Deed of Trust loan by presenting four forged affidavits and certificates of satisfaction, which purported to release the four prior deeds of trust which appeared of record (These being the Second Deed of Trust, and the Third, Fourth and Fifth Deed of Trust identified in the Complaint), as well as by forging or having forged Mrs. Wilkes' signature on the closing documents.

3. He deceived the notary upon the Sixth Deed of Trust with a scheme of deception designed to play upon her sympathy, having her meet him at a hospital where his wife was supposedly in attendance on their very ill son, and unavailable to appear in person, though she entrusted identification documents to him to show to the notary. Neither Mrs. Wilkes nor her son was in fact at the hospital.

4. He doctored documents such as credit card statements to deceive Mrs. Wilkes — hiding large charges — so as to mislead her on the occasions she inquired concerning such things. She discovered one doctored bank statement in the house after he left. Given his successful deceit of at least two lenders, he likely altered, doctored, and/or forged numerous other documents.

viii. Mrs. Wilkes did not know of any of the loans until October 2008, when she received a call from one of his creditors. He claimed to her to have been a victim of identity theft, which she believed at first, but another call soon thereafter yielded facts which caused her to doubt him, following which she ran a credit report and a title examination which gave her some idea of the enormity of what he had done. Searches of the house and his computer yielded other information, including pictures of him and women with whom he had apparently been associating.

ix. How Mr. Wilkes disposed of the loan proceeds is not fully known. A significant portion went into his online investment trading business—during the two years in question his principal occupation was as a supposedly successful online stock trader. Another large portion went to the Belagio Casino and Hotel in Las Vegas — Mr. Wilkes liked to gamble, according to Mrs. Wilkes. I am advised that there are pending, unserved felony warrants outstanding against Mr. Wilkes issued by Fairfax County authorities; criminal proceedings may shed more light upon his disposition of the loan proceeds.

Further defenses:

a. Laches – Discussion:

i. Both Bank of New York and GMAC assert, in their pleadings, the defense of laches. Laches is a delay in the enforcement of one's

rights as works a disadvantage to another; or, such delay without regard to the effect it may have upon another as will warrant the presumption that the party has waived his right. The defense of laches imposes the burden of proving (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense. I find that GMAC did not prove the first element. Per the findings of fact above, prior to October 2008, Mrs. Wilkes failed to learn of her husband's activities due to his considerable skill at concealing them, and not through any lack of diligence on her own part. I also find that GMAC failed to prove the second element, that of prejudice. For the reasons stated earlier, no action, or lack thereof, by Mrs. Wilkes could be said to prejudice the positions of GMAC or Bank of New York.

b.  Equitable Estoppel - Discussion:

   i.  Bank of New York also asserted, in its pleadings, the defense of equitable estoppel. The elements necessary to establish an equitable estoppel claim are: (1) A representation by the party the defense would be asserted against, (2) reliance by the party asserting the defense, (3) a change of position by that party, and (4) detriment to the party asserting the defense. I find that Mrs. Wilkes did not make the necessary representation to GMAC because Mrs. Wilkes did not sign the Second Deed of Trust, did not have knowledge of it, and did not contact that party before October 2008.

c.  Waiver – Discussion:

   i.  GMAC, in its pleadings, further asserted the defense that Mrs. Wilkes waived some right to the Property. As no evidence as to this defense was adduced at trial and no argument presented, I cannot rule that Mrs. Wilkes waived any of her rights to the Property during the course of this case.

d.  Unclean Hands - Discussion:

   i.  GMAC, in its pleadings, asserted the defense of unclean hands. I found no evidence no evidence to support a defense of unclean hands.

To the extent is necessary to determine that Mrs. Wilkes was in possession of information from which she should have detected Mr. Wilkes' frauds earlier than she did, I find no evidence from which I could so conclude. He was very careful to conceal matters from her as well as others, and it was only her receipt of a chance call that precipitated her discovery and prompted her actions thereon.

The holders of the Second and Sixth Deed of Trust Holders argue that it is inequitable to allow Mrs. Wilkes to retain the property lien-free, and without any obligation, and leave them with the entire loss. To the extent that some further weighing of equities is required other than as elsewhere discussed, the evidence showed that the parties owned their home free and clear of liens, and that Mr. Wilkes was apparently a very successful investor, husband and father, before he commenced his fraudulent schemes. By law, these schemes could not result in any lien on their jointly owned property, and it is not inequitable that this is the result, since he was the one who committed the fraud, and he was the one who received the benefits. In addition, his schemes not only defrauded his lenders, they defrauded Mrs. Wilkes as well. She is left with large joint credit card debts which he incurred, as well undoubtedly with large legal bills. She is also left without the husband and the father she thought she had for her child.

Name _Alisha W. Wilkes_          Phone number (571) 229-0001  Page 1

# ID Theft Affidavit

Victim Information

(1) My full legal name is _Alisha_ _Wilson_ _Wilkes_ ___
          (First)      (Middle)      (Last)      (Jr., Sr., III)

(2) (If different from above) When the events described in this affidavit took place, I was known as

___
      (First)      (Middle)      (Last)      (Jr., Sr., III)

(3) My date of birth is _01 | 08 | 1977_
                (day/month/year)

(4) My Social Security number is _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_

(5) My driver's license or identification card state and number are _WV E757953_

(6) My current address is _1575 Funderburg St._
   City _Keyser_      State _WV_      Zip Code _26726_

(7) I have lived at this address since _01 / 2009_
                    (month/year)

(8) (If different from above) When the events described in this affidavit took place, my address was
_18018 Densworth Mews_
   City _Gainesville_      State _VA_      Zip Code _20155_

(9) I lived at the address in Item 8 from _02/2005_ until _01/2009_
                      (month/year)        (month/year)

(10) My daytime telephone number is ( _571_ ) _229-0001_

   My evening telephone number is ( _571_ ) _229-0001_

## DO NOT SEND AFFIDAVIT TO THE FTC OR ANY OTHER GOVERNMENT AGENCY



EXHIBIT
5

Name _Alisha W. Wilkes_     Phone number (571) 209-000 1   Page 2

**How the Fraud Occurred**

### Check all that apply for items 11 – 17:

(11) ☑ I did not authorize anyone to use my name or personal information to seek the money, credit, loans, goods or services described in this report.

(12) ☑ I did not receive any benefit, money, goods or services as a result of the events described in this report.

(13) ☑ My identification documents (for example, credit cards; birth certificate; driver's license; Social Security card; etc.) were ☑ stolen ☐ lost   on or about _____?_____ .
                                                     (day/month/year)

(14) ☑ To the best of my knowledge and belief, the following person(s) used my information (for example, my name, address, date of birth, existing account numbers, Social Security number, mother's maiden name, etc.) or identification documents to get money, credit, loans, goods or services without my knowledge or authorization:

_Daniel Sae Yun Wilkes_
Name (if known)
_2161 Tannin Pl #37, Vienna VA 22182_
Address (if known)
_(703)587-5645_
Phone number(s) (if known)
_Social Security number: 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_
Additional information (if known)

PO Box 57
Haymarket VA
20168

_____
Name (if known)
_____
Address (if known)
_____
Phone number(s) (if known)
_____
Additional information (if known)

(15) ☐ I do NOT know who used my information or identification documents to get money, credit, loans, goods or services without my knowledge or authorization.

(16) ☑ Additional comments: (For example, description of the fraud, which documents or information were used or how the identity thief gained access to your information.)

_Daniel was my husband at the time. He forged my signature on several documents and created fake documents (tax returns and W2s) in order to obtain credit and loans. I believe he used and/or copied my VA driver's license and social security card._

(Attach additional pages as necessary.)

## DO NOT SEND AFFIDAVIT TO THE FTC OR ANY OTHER GOVERNMENT AGENCY

Name Alisha w. wilkes _____ Phone number (571) 229-0001 Page 3

Victim's Law Enforcement Actions

(17) (check one) I ☑ am  ☐ am not  willing to assist in the prosecution of the person(s) who committed this fraud.

(18) (check one) I ☑ am  ☐ am not  authorizing the release of this information to law enforcement for the purpose of assisting them in the investigation and prosecution of the person(s) who committed this fraud.

(19) (check all that apply) I ☑ have  ☐ have not  reported the events described in this affidavit to the police or other law enforcement agency. The police  ☑ did  ☐ did not  write a report. In the event you have contacted the police or other law enforcement agency, please complete the following:

Prince William Co. Police Dept.
**(Agency #1)**
3/8/2009
(Date of report)
(703) 792-5111
(Phone number)

Officer K.P. Neiswonger
(Officer/Agency personnel taking report)
Did not take a report. Referred me to Fairfax Co
(Report number, if any)

_____
(email address, if any)

Fairfax Co. Police Dept.
**(Agency #2)**
5/8/2009
(Date of report)
(703) 246-4643
(Phone number)

Detective Rich Downham
(Officer/Agency personnel taking report)
in process
(Report number, if any)
Richard.Downham@fairfaxcounty.gov
(email address, if any)

Documentation Checklist

Please indicate the supporting documentation you are able to provide to the companies you plan to notify. Attach copies (NOT originals) to the affidavit before sending it to the companies.

(20) ☑ A copy of a valid government-issued photo-identification card (for example, your driver's license, state-issued ID card or your passport). If you are under 16 and don't have a photo-ID, you may submit a copy of your birth certificate or a copy of your official school records showing your enrollment and place of residence.

(21) ☑ Proof of residency during the time the disputed bill occurred, the loan was made or the other event took place (for example, a rental/lease agreement in your name, a copy of a utility bill or a copy of an insurance bill).

DO NOT SEND AFFIDAVIT TO THE FTC OR ANY OTHER
GOVERNMENT AGENCY

Name _Alisha W. Wilkes_ Phone number (571) 229-0001

(22) ☐ A copy of the report you filed with the police or sheriff's department. If you are unable to obtain a report or report number from the police, please indicate that in Item 19. Some companies only need the report number, not a copy of the report. You may want to check with each company.

## Signature

I certify that, to the best of my knowledge and belief, all the information on and attached to this affidavit is true, correct, and complete and made in good faith. I also understand that this affidavit or the information it contains may be made available to federal, state, and/or local law enforcement agencies for such action within their jurisdiction as they deem appropriate. I understand that knowingly making any false or fraudulent statement or representation to the government may constitute a violation of 18 U.S.C. §1001 or other federal, state, or local criminal statutes, and may result in imposition of a fine or imprisonment or both.

_Alisha W. Wilkes_
(signature)

_5/31/09_
(date signed)

_(Notary signature)_
(Notary)

**OFFICIAL SEAL**
**NOTARY PUBLIC**
**STATE OF WEST VIRGINIA**
**ROBERT G. EAGLE JR.**
1440 BEACON STREET
KEYSER, WV 26726
My commission expires April 13, 2012

[Check with each company. Creditors sometimes require notarization. If they do not, please have one witness (non-relative) sign below that you completed and signed this affidavit.]

**Witness:**

_____
(signature)

_____
(printed name)

_____
(date)

_____
(telephone number)

## DO NOT SEND AFFIDAVIT TO THE FTC OR ANY OTHER GOVERNMENT AGENCY

Name  Alisha W. Wilkus          Phone number (571) 229-0001  Page 5

# Fraudulent Account Statement

### Completing this Statement

- Make as many copies of this page as you need. **Complete a separate page for each company you're notifying and only send it to that company**. Include a copy of your signed affidavit.
- List only the account(s) you're disputing with the company receiving this form. **See the example below**.
- If a collection agency sent you a statement, letter or notice about the fraudulent account, attach a copy of that document (**NOT** the original).

## I declare (check all that apply):

☑ As a result of the event(s) described in the ID Theft Affidavit, the following account(s) was/were opened at your company in my name without my knowledge, permission or authorization using my personal information or identifying documents:

| Creditor Name/Address (the company that opened the account or provided the goods or services) | Account Number | Type of unauthorized credit/goods/services provided by creditor (if known) | Date issued or opened (if known) | Amount/Value provided (the amount charged or the cost of the goods/services) |
|---|---|---|---|---|
| Example<br>Example National Bank<br>22 Main Street<br>Columbus, Ohio 22722 | 01234567-89 | auto loan | 01/05/2002 | $25,500.00 |
| GMAC Mortgage<br>PO Box 4622<br>Water loo IA<br>50704-4622 | 47717-XXXX | Mortgage | 04/2008 | $368,000 |
| | | | | |

☐ During the time of the accounts described above, I had the following account open with your company:

Billing name _____

Billing address_____

Account number _____

## DO NOT SEND AFFIDAVIT TO THE FTC OR ANY OTHER GOVERNMENT AGENCY

VIRGINIA:

IN THE FAIRFAX COUNTY CIRCUIT COURT

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA | ) |
| | ) |
| v. | ) |
| | ) |
| DANIEL S. WILKES, | ) |
| Defendant | ) |

## **AFFIDAVIT**

I, R.L. Downham, being duly sworn, state the following:

1.  I am a Detective with the Fairfax County Police Department;

2.  I am specifically assigned to the Financial Crimes Division within the Criminal Investigations Bureau;

3.  I am the lead Detective in the matter of Commonwealth of Virginia vs. Daniel S. Wilkes;

4.  I was contacted by Alisha Wilkes, the defendant's wife, regarding identity theft.

5.  During my investigation, I was able to develop the defendant as a suspect;

6.  Based on my investigation, I was able to obtain three felony warrants for the defendant's arrest;

7.  The warrants are for: (1) Forging Housing Statement Papers, (2) Identify Theft, and (3) Obtaining property or money by False Pretenses;

8.  The investigation is still on going.

DETECTIVE R.L. DOWNHAM
Fairfax County Police Department

**EXHIBIT**
tabbie
6

STATE OF VIRGINIA

COUNTY OF FAIRFAX, to-wit:

This day personally appeared before me, a Notary Public in and for the County and State aforesaid, R.L. DOWNHAM, a Detective with the Fairfax County Police Department, and made oath that the above statements are true and accurate.

Given under my hand this _13_ day of _January_ , 2010.

_Notary Public_

My Commission Expires: _June 30, 2011_

CARRIE HILLARY
COMMONWEALTH
REGISTRATION NO.
7080696
MY COMM. EXPIRES
06/30/2011
OF VIRGINIA
NOTARY PUBLIC

# WARRANT OF ARREST—FELONY

COMMONWEALTH OF VIRGINIA    Va. Code § 19.2-71, -72

Fairfax

CITY OR COUNTY

☒ General District Court  ☒ Criminal  ☐ Traffic
☐ Juvenile and Domestic Relations District Court

**TO ANY AUTHORIZED OFFICER:**

You are hereby commanded in the name of the Commonwealth of Virginia forthwith to arrest and bring the Accused before this Court to answer the charge that the Accused, within this city or county,

on or about **04/25/2008** _____ did unlawfully and feloniously in violation of Section
DATE

**18.2-186.3** _____ Code of Virginia:

with the intent to defraud, obtain, record or access identifying information not available to the general public of another person without the authorization or permission of such person that would assist in accessing financial resources, obtaining identification documents, or obtaining benefits of such person. The resulting financial loss was greater than $200.00.

I, the undersigned, have found probable cause to believe that the Accused committed the offense charged, based on the sworn statements of

Downham, R.E.  #2862  Fairfax County PD
_____, Complainant.

01/13/2010 09:22 AM
DATE AND TIME ISSUED

_signature_
☐ CLERK  ☒ MAGISTRATE  ☐ JUDGE
Claude J. Beteler

CASE is Required
FORM DC-312/6.   FR. PAGE ONE OF TWO) 12/08

---

CASE NO.

ACCUSED:
**Wilkes, Daniel S**
LAST NAME, FIRST NAME, MIDDLE NAME

**2161 Tammi Place Apt #37**
ADDRESS/LOCATION

**Vienna, VA 22182-4622**

| RACE | SEX | MO. DAY  YR. | HT. IN. | WGT. | EYES | HAIR |
|------|-----|--------------|---------|------|------|------|
| A M | 07/07/1974 | 5' 08" | 175 | BRO | BLK |

SSN
PID  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                         STATE
T61-34-0315                              VA

Hearing Date/Time

☐ **CLASS  6  FELONY**

☐ EXECUTED by arresting the Accused named above
on this day:

_____
DATE AND TIME OF SERVICE

_____
Arresting Officer

_____
BADGE NO., AGENCY AND JURISDICTION

for _____
SHERIFF

Attorney for the Accused:

_____

Short Offense Description (not a legal definition):
**IDENTITY THEFT: FRAUD, USE OF ID, LOSS >=$200**

Offense Tracking Number:

**059GM195100529**

FOR ADMINISTRATIVE USE ONLY
Virginia Crime Code:

**FRD-2509-F6**

**F**
COPY COPY COPY COPY COPY

**FELONY**

# WARRANT OF ARREST—FELONY

COMMONWEALTH OF VIRGINIA   Va. Code § 19.2-71, -72

Fairfax
CITY OR COUNTY

☒ General District Court ☒ Criminal ☐ Traffic
☐ Juvenile and Domestic Relations District Court

## TO ANY AUTHORIZED OFFICER:

You are hereby commanded in the name of the Commonwealth of Virginia forthwith to arrest and bring the Accused before this Court to answer the charge that the Accused, within this city or county, on or about **04/25/2008** _____

DATE

did unlawfully and feloniously in violation of Section

**18.2-172** _____ Code of Virginia,

forge housing statement papers, to the prejudice of another's rights.

I, the undersigned, have found probable cause to believe that the Accused committed the offense charged, based on the sworn statements of

**Downham, R.L. #2862, Fairfax County PD** _____, Complainant.

01/13/2010 09:21 A.M.
DATE AND TIME ISSUED

[signature] Cleole J. Bebeler

☐ CLERK ☒ MAGISTRATE ☐ JUDGE

FORM DC-312 (No.—sTER. PAGE ONE OF TWO) 12/08
CSRE is Required

---

CASE NO.

ACCUSED:
**Wilkes, Daniel S**
LAST NAME, FIRST NAME, MIDDLE NAME

**2161 Tamin Place Apt.#37**
ADDRESS/LOCATION

**Vienna, VA 22182-4622**

Hearing Date/Time

| RACE | SEX | BORN | | | HT. | WGT. | EYES | HAIR |
|---|---|---|---|---|---|---|---|---|
| A | M | MO. 07 | DAY 07 | YR. 1974 | FT. 5" | | | |
| | | | | | IN. 08 | 175 | BRO | BLK |

SSN
PLF    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
T61-34-0315   STATE VA

**CLASS 5 FELONY**

☐ EXECUTED by arresting the Accused named above
on this day:

_____
DATE AND TIME OF SERVICE

_____   Arresting Officer
BADGE NO., AGENCY AND JURISDICTION

for _____
Attorney for the Accused: _____   SHERIFF

Short Offense Description (not a legal definition):
**OTHER FORGERY WRITING-NOT IN 18.2-168 & 18.2-170**

Offense Tracking Number:
**09GM195100528**
FOR ADMINISTRATIVE USE ONLY
Virginia Crime Code:

**FRD-2520-F5**

FELONY

COPY COPY COPY COPY COPY

# WARRANT OF ARREST—FELONY

COMMONWEALTH OF VIRGINIA    Va. Code § 19.2-71, -72

CASE NO.

☒ General District Court  ☒ Criminal  ☐ Traffic
☐ Juvenile and Domestic Relations District Court

**Fairfax**
CITY OR COUNTY

ACCUSED:
**Wilkes, Daniel S**
LAST NAME, FIRST NAME, MIDDLE NAME

2161 Tamin Place Apt.#37
ADDRESS/LOCATION

Vienna, VA 22182-4622

TO ANY AUTHORIZED OFFICER:

You are hereby commanded in the name of the Commonwealth of Virginia forthwith to arrest and

bring the Accused before this Court to answer the charge that the Accused, within this city or county,

on or about **04/25/2008** ......... did unlawfully and feloniously in violation of Section
DATE

**18.2-178** ......... Code of Virginia:

obtain by false pretense or token CASH MONEY, belonging to GMAC, and valued at $200.00 or more with the
intent to defraud.

| RACE | SEX | MO. DAY YR. | BORN | FT. IN HT. | WGT. | EYES | HAIR |
|---|---|---|---|---|---|---|---|
| A | M | 07/07/1974 | 07/07/1974 | 5' 08" | 175 | BRO | BLK |

SSN
DL#    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
T61-34-0315    STATE VA

**CLASS    U    FELONY**

☐ EXECUTED by arresting the Accused named above
on this day:

_____
DATE AND TIME OF SERVICE    Arresting Officer

_____
BADGE NO., AGENCY AND JURISDICTION

Attorney for the Accused:
_____
SHERIFF

for _____

Short Offense Description (not a legal definition):
**OBTAIN MONEY/ETC: FALSE PRETENSE, LARCENY->$200**

Offense Tracking Number:
**059GM195100530**

FOR ADMINISTRATIVE USE ONLY
Virginia Crime Code:
**FRD-2743-F9**

Hearing Date/Time

I, the undersigned, have found probable cause to believe that the Accused committed the offense
charged, based on the sworn statements of

**Downsham, R.L.    #2862    Fairfax County PD** ......... Complainant,

01/13/2010 09:23 AM
DATE AND TIME ISSUED

_____ [signature]
Charles J. Bobek

☐ CLERK  ☒ MAGISTRATE  ☐ JUDGE

CORE is Required
FORM DC-312 (06—.... )ER, PAGE ONE OF TWO) 12/08

**F** COPY

**FELONY**



**ALISHA W. WILKES**
**1575 Funderburg St.**
**Keyser, WV 26726**

March 8, 2010

Equifax Information Services
P. O. Box 740241
Atlanta, GA 30374

Trans Union, LLC.
P. O. Box 200
Chester, PA 19022

Experian Information Solutions
P. O. Box 2104
Allen, TX 75013

re:     Alisha W. Wilkes
          1575 Funderburg St., Keyser, WV 26726
          SSN: 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
          Date of Birth: January 8, 1977

Dear Sir or Madam:

My attorney provided me this letter to send you in order that I may make my dispute
under the Fair Credit Reporting Act.   I am disputing certain inaccurate information
you are reporting within my credit file.

**The following item is not my account:**

> §          The GMAC MTG (Account No. 477177) is listed as a
> derogatory account.

My ex-husband forged my signature on a promissory note dated April 25, 2008 and a
deed of trust dated April 25, 2008 (I have enclosed both of these documents for your
convenience).  As a result of his forgeries, GMAC attempted to foreclose on my home
and the GMAC account now appears on my credit report as a derogatory account and
says "Foreclosure" under pay status.

I was forced to file a lawsuit to prove that my ex-husband forged my signatures on
the aforementioned promissory note and deed of trust.  This lawsuit was filed in the
Prince William County Circuit Court which is located in Virginia.  After a two day
trial, the Court entered an order declaring the aforementioned promissory note and
deed of trust void.  Therefore, I am not responsible for the GMAC loan that appears
on my credit report (I have enclosed the Court's order and a handwriting expert's
report stating[1] that the signatures on the promissory note and deed of trust are not
mine).



EXHIBIT
7

report (I have enclosed the Court's order and a handwriting expert's report stating¹ that the signatures on the promissory note and deed of trust are not mine).

Please immediately remove this negative account information from my credit report. Please forward this letter and the attachments to GMAC and ask that they verify that what I have said is accurate. In addition, please request that the GMAC send you a copy of the application or any other supporting documents to prove that I owe this debt. Once you contact them, please provide me with a copy of the response that they send you.

## The following items are being incorrectly reported:

- ▫ I never had a mailing address of PO Box 58, Haymarket, VA 20168.

- ▪ I never had a mailing address of 15000 Washington St., Haymarket, VA 20169-4926.

- ▪ I never worked at DSW Investments, Inc. In fact no such corporation exists.

My ex-husband provided this false information to the mortgage broker that originated the aforementioned GMAC loan. I never used the above addresses and never worked for DSW Investments, Inc. Please remove this inaccurate information from my credit report. Once you do, please send me a copy of my credit report without this information listed incorrectly.

## I need additional information concerning the following items:

- ▫ I do not know what the ODPT/CBSD (Account No.: 60116562000) is.

- ▪ I do not know what the UNVL/CITI (Account No.: 54911300) is.

- ▪ I do not know what the CITIZENS BANK (Account No.: 101606) is.

- ▪ I do not know what the ACS/PCR PERS COMP RENT (Account No.: 235153) is.

- ▪ I do not know what the CITIFINANCIAL (Account No.: 607460361217) is.

I do not recall having any dealings with any of the creditors listed above. This information is not accurate. As I stated above, my husband forged my signatures on many documents. Please forward this letter and the attachments to the creditors listed above and ask that they verify that what I have said is accurate. In addition, please request that the creditors above send you a copy of the application or any other

---

¹ The signature page of the promissory note dated April 25, 2008 is identified in the handwriting expert's report as Q1. The signature pages of the deed of trust dated April 25, 2008 are identified in the handwriting expert's report as Q2 and Q5. An illustration has also been provided for your own comparison of the questioned signatures and the known signatures.

supporting documents to prove that I owe these debts and/or paid late. Below is a signature block of mine so that you can verify what my signature looks like:



## The following accounts have been paid and no longer carry a balance:

- The BK of AMER account has been paid and closed. There is no longer an outstanding balance.

- The WFNNB/VICTORIAS SECRET account is closed and there is no outstanding balance.

- The AMEX (Account No.: 349991069826) has been paid and closed. There is no longer an outstanding balance.

- The US DEPT OF EDUCATION (Account No.: 235153) has been paid and closed. There is no longer an outstanding balance.

Please correct this inaccurate account information on my credit report. These accounts have been paid and no longer have a balance. These accounts should be marked as closed. Please forward this letter and the attachments to the creditors listed above and ask that they verify that what I have said is accurate. In addition, please request that the creditors above send you proof and any supporting documentation that any of these accounts are still carrying a balance and/or that they remain open.

My credit report contains a laundry list of entities that have looked at my credit report. This list is contained under the heading "Inquires." I have not authorized anyone to look at my credit report over the past 3 years with only a few exceptions. Please provide me with additional information concerning the entities that appear on my credit report as having inquired. I would like to determine who has looked at my credit report with a permissible purpose and who has not. Please tell me what each inquires alleged permissible purpose was.

I insist that you investigate my credit file and delete the inaccurate information that I have noted above. When you have completed your investigation, please send me a copy of my credit report that shows the exact information that you would give to someone who was considering me for a loan. Please also send a corrected report to each company that you previously provided a report since January 1, 2008.

Please forward a copy of this letter to your customers when you convey my disputes. If you are not willing to do so, please immediately provide me the names,

3

addresses, and telephone numbers of the people you deal with at these companies so that I can send them a dispute myself.

In the event you require additional information, please contact me directly at 571-229-0001. I can answer your questions and provide additional documentation.

Please do not report any further information regarding these matters until the aforementioned items are addressed and ultimately resolved. Thank you for your time and attention in this matter.

Sincerely,

Alisha W. Wilkes

STATE OF WEST VIRGINIA
CITY/COUNTY OF _____ MineRAl _____, to-wit:

Subscribed and sworn to before me this ___6__ day of March, 2010 by Alisha W. Wilkes.

_____
NOTARY PUBLIC

My Commission Expires: __4/13/12__.

```
OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
ROBERT G. EAGLE JR.
149 BEACON STREET
KEYSER, WV 26726
My commission expires April 13, 2012
```

4



**Ronald N. Morris & Associates, Inc.**
Ronald N. Morris
Certified Forensic Document Examiner
REPORT

June 27, 2009

**RNM&AI Case No.**    09-1225
**RNM&AI Case title:**    Alisha Wilson Wilkes v. First Class Settlement LLo, et al.

I.    **Exhibit(s) examined**

QUESTIONED:
The following questioned documents are further identified with a questioned document number.

✓ Q1    Copy of Page 3 of 3, Form 3247, bearing a questioned signature in the name Alisha W. Wilkes.
✓ Q2    Copy of Page 14 of 14, Form 3047, bearing questioned signatures in the name Alisha W. Wilkes and Daniel S. Wilkes.
✓ Q3    Copy of Page 13 of 14, MBRS Modified Form 3047 01/01, bearing questioned signatures in the name Alisha W. Wilkes and Daniel S. Wilkes.
✓ Q4    Copy of Page 3 of 3, Form 3150 01/01, bearing questioned signatures in the name Alisha W. Wilkes and Daniel S. Wilkes.
✓ Q5    Copy of Page 3 of 3, Form 3150 1/01, bearing questioned signatures in the name Alisha W. Wilkes and Daniel S. Wilkes.

KNOWN:

K1    The following documents were submitted as bearing known writing, signatures, of Alisha W. Wilkes.
✓ A.    One sheet of legal size paper bearing copies of the bio-page of US Passport No. 208306859; a Social Security Card, and Virginia Driver's License.
✓ B.    Copy of check No. 345, dated Oct, 14, 08.
✓ C.    Copy of the signature page of a document dated February 16, 2009.
✓ D.    Two sheets of lined paper bearing a total of ten originally written signatures.
✓ E.    Copy of the signature page 2, of a document dated November 24, 2008.
✓ F.    Copy of the signature page of a document dated February 16, 2009.
✓ G.    Copy of the signature page 10, of a document dated November 24, 2008.
✓ H.    Copy of the signature page 2, of a document dated November 24, 2008.
I.    Copy of the signature page 3 of 3, of an undated document, Form number FB-4279. There is also a signature in the name of Daniel S. Wilkes on this document.
✓ J.    Copy of the signature page 3 of 3, of an undated document, Form number 3160 1/01. There is also a signature in the name of Daniel S. Wilkes on the document.
✓ K.    Copy of the signature page 2, of a document dated February 16, 2009.
✓ L.    Copy of the signature page 2, of a document dated November 18, 2008. There is also a signature in the name of Daniel S. Wilkes on the document.
✓ M.    Copy of the signature page 18, of a document dated November 18, 2008. There is also a signature in the name of Daniel Sae Yun Wilkes on the document.
✓ N.    Copy of the signature page on a Lender Support Systems, Inc. COU-49.COU (03/03). There is also a signature in the name Daniel S. Wilkes on the document.
✓ O.    Copy of the signature page 14 of 15, on an undated document, Form 3047. There is also a signature in the name Daniel S. Wilkes on the document.

Case Case 1:10-cv-01035-PLF-PLF-RC Document 26-1 Document 61-4 Filed 06/21/14 Filed 03/11/14 Page 93 of 101 Page 6 of 8 PageID# 2086

June 27, 2009
*RNM&AI Case No.*      09-1225
*RNM&AI Case title:*   Alisha Wilson Wilkes v. First Class Settlement LLC, et al.

K2   The following documents were submitted as bearing known writing, signatures, of Daniel S. Wilkes.

   A.   Original Social Security Card.  The last four digits of the card number are, 5820.
   B.   Original of a document to Ms. Kelly Erickson, signed Daniel S. Wilkes.
   C.   Original signature, Daniel S. Wilkes, on page 5 of a faxed document dated 1/17/2005.
   D.   Original of a document to Rolling Brook Village dated January 18, 2005, and signed Daniel S. Wilkes.
   E.   Original signature, Daniel S. Wilkes, on page 6 of a faxed document dated 1/17/2005.
   F.   Copy of a check dated 7/19/2006, in the amount of $15,000.00, and signed Daniel S. Wilkes.
   G.   Copy of check No. 1116, drawn on BB&T bank, dated 1/17/2005.
   H.   Copy of a Deed of Trust, page 14, signed Daniel S. Wilkes.
   I.   Copy of a Deed of Trust, page 14, having an individual acknowledgment area below the signature in the name Daniel S. Wilkes.
   J.   Copy of a Beneficiary Requests Notice ..., signed Daniel S. Wilkes.
   K.   Copy of a Scottrade Authorization to Wire Funds, dated 5/14/2008, and signed Daniel S. Wilkes.
   L.   Copy of Scottrade Distribution Request for Roth SDIRAs, dated 10/09/2006, and signed Daniel S. Wilkes.
   M.   Copy of Scottrade Authorzation To Wire Funds, dated 5/13/2008, and signed Daniel S. Wilkes.

2.   <u>Purpose of the examination</u>

    The purpose of the examination was to determine whether either Alisha Wilson Wilkes (K1), or Daniel S. Wilkes (K2), wrote the respective signatures in their name on Exhibits Q1 through Q5.

3.   <u>Examination methodology and aids</u>

    The described exhibits were examined using established examination techniques, principles of handwriting and hand printing identification, and technical aids as necessary.

4.   <u>Results of examination</u>

    Based on the examination and comparison of the available writing, the following conclusions were reached:
A.   Daniel S. Wilkes (K2) in all probability wrote the questioned signatures in his name on Exhibits Q2, Q3, Q4, and Q5.
B.   There is no evidence that Alisha Wilson Wilkes (K1), wrote the signatures in her name on Exhibits Q1 through Q5.

5.   <u>Remarks</u>

    Except for the original Social Security Card, the submitted questioned and known exhibits are being temporarily retained in this office.  Accompanying this report is the multiple page complaint submitted with the questioned and known documents.  This document is not needed by this office unless it contains questioned or known writings not already identified in the submittal letter.

RNM REPORT FORM (Rev. 12/2003)   P.O. Box 905 Bedford, VA 24523   Telephone: 540-586-6581  (Northern, VA: (703)-451-5002)   E-mail: RNManalis@arola.com

June 27, 2009
*RNM&AI Case No.* 09-1225
*RNM&AI Case title:* Alisha Wilson Wilkes v. First Class Settlement LLC, et al.

In general, the examination of photocopies is problematic and the degree of certainty that can be expressed concerning authorship of photocopied writing is based on the suitability of the writing for a meaningful examination and comparison and the evidence present. The conclusion expressed in this case concerning authorship of the writing is based on an examination and comparison of photocopies that were suitable for comparison purposes. However, if during an examination of the originals of these documents evidence is found that is not present on the examined photocopies, a new examination will be necessary and possibly the writing of another report reflecting the presence of any new evidence.

Ronald N. Morris
Forensic Document Examiner

Attachments

RNM&AI Case No. 09-1225　　　　Case title: Alisha Wilson Wilkes v. First Class Settlement LLc, et al.

## QUESTIONED

## KNOWN









instrument and in any Rider exe











**ALISHA W. WILKES**
**1575 Funderburg St.**
**Keyser, WV 26726**

May 4, 2010

Equifax Information Services, LLC
P.O. Box 740256
Atlanta, GA 30374

Experian Information Solutions, Inc.
P.O. Box 2002
Allen, TX 75013

Trans Union, LLC
P.O. Box 2000
Chester, PA 19022

     re:    Alisha W. Wilkes
              1575 Funderburg St., Keyser, WV 26726
              SSN: 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
              Date of Birth: January 8, 1977

Dear Sir or Madam:

You are still reporting the following account within my credit file. This account is not mine. This account was opened without my knowledge or consent. GMAC is well aware of this fact.

- The GMAC MTG (Account No. 477177)

I have contacted GMAC many, many times over the last year since discovering that my ex-husband opened numerous fraudulent accounts using my name and social security number. A police report was filed with the Fairfax County Police Department in Virginia. In fact, multiple arrest warrants have been issued for my ex-husband. You can verify the accuracy of these events by contacting Det. Richard Downham at 703-246-7800.

GMAC has failed to adequately investigate my claims. They have not provided any evidence that I requested these accounts. I am therefore requesting that you, as the reporting agency, require the furnishers involved to investigate and provide such proof as they have and correct my credit report accordingly.

I have enclosed multiple examples of my signature. Please forward these examples and the other documents I'm providing to GMAC and reinvestigate and remove these accounts.

If you receive verification of any of these accounts, do not re-report them unless you have received the note or application claimed by the creditor so you can compare it

**EXHIBIT**
**8**

to my real signature. If you need a handwriting expert, please call me and I will gladly pay the costs associated with the expert's analysis.

In addition, if any of these accounts are re-verified, please telephone me at 571-229-0001 (weekdays, 8:30 to 5:00) so that I can discuss this further and provide any additional documents you may need.

I have enclosed a copy of my first letter without exhibits (these exhibits should already be in your file), copies of my driver's license, cancelled check (showing my signature), and utility bills showing my address as of 1575 Funderburg St., Keyser, WV 26726.

Please call me if you have any questions or need additional documents.

Sincerely,

*Alisha W. Wilkes*

Alisha W. Wilkes

I swear that the following signature exemplars are my true and actual signatures as witnessed by the below referenced notary:

Signature #1 _*Alisha W. Wilkes*_

Signature #2 _*Alisha W. Wilkes*_

Signature #3 _*Alisha W. Wilkes*_

Signature #4 _*Alisha W. Wilkes*_

STATE OF WEST VIRGINIA
CITY/COUNTY OF ___Mineral___, to-wit:

Subscribed and sworn to before me this __13__ day of May, 2010 by Alisha W. Wilkes.

_*Robert G. Eagle*_
NOTARY PUBLIC

My Commission Expires: __4/13/12__.

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
ROBERT G. EAGLE JR.
1440 BEACON STREET
KEYSER, WV 26726
My commission expires April 13, 2012

2



**ALISHA W. WILKES**
**1575 Funderburg St.**
**Keyser, WV 26726**

June 16, 2010

Experian Information Solutions, Inc.
P.O. Box 2002
Allen, TX 75013

Trans Union, LLC
P.O. Box 2000
Chester, PA 19022

re:    Alisha W. Wilkes
       1575 Funderburg St., Keyser, WV 26726
       SSN: 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
       Date of Birth: January 8, 1977

Dear Sir or Madam:

I am in receipt of your recent letter stating that my dispute is frivolous which is extremely disappointing to me. Please add the following statement of continued dispute to my credit report:

> The GMAC MTG (Account No. 477177) is not mine according to a Court order. Someone stole my identity and opened this account without my knowledge or consent.

I have already sent you two letters concerning the GMAC MTG (Account No. 477177). In those letters, I provided you with the following information and documents that should already be in your file:

- My sworn statement that the GMAC account is not mine
- My detailed narrative about the facts surrounding this matter
- My signature exemplars
- The underlying promissory note
- The underlying deed of trust
- The court order ruling that this account is not mine (attached to this letter)
- A handwriting expert's report stating that the signatures are not mine
- The contact information for Det. Downham
- Two arrest warrants for my ex-husband (attached to this letter)
- The contact information for GMAC's lawyer

The aforementioned evidence is overwhelming that the GMAC account you are reporting in my credit file is inaccurate. Yet, even with this evidence, you are still reporting the GMAC account in my credit file. Furthermore, you recently requested information and documents that have already been provided to you. It is clear that you have not looked at the information and documents that have already been provided and have not taken any steps to contact the people who have actual knowledge of this matter (e.g. Det. Downham, Mr. Nolan, the Prince William County Circuit Court etc.). Instead it seems you have chosen to rely on unsubstantiated statements of GMAC which is puzzling because GMAC was a party to my lawsuit.

At this point, I beg you, as the credit reporting agency, to reinvestigate this matter. I am sure that after you review the information and documents provided that you will conclude the GMAC account is not mine. I strongly urge you to contact the people and entities identified above and in the court order that has already been provided. Each person and entity will tell you that my story is true including GMAC's lawyer, Christopher Nolan, at 703-281-2600.

Once again, if you receive verification of this account, do not re-report it unless you have received the note or application claimed by GMAC so you can compare it to my real signature. If you need a handwriting expert, I will gladly pay the costs associated with the expert's analysis.

In addition, please call me at 571-229-0001 (weekdays, 8:30 to 5:00) if this account is re-verified so that we may discuss this matter in more detail. I will gladly provide any additional documents you may need.

Please call me if you have any questions. Thank you for your time.

Sincerely,

*Alisha W. Wilkes*

Alisha W. Wilkes

I swear that the following signature exemplars are my true and actual signatures as witnessed by the below referenced notary:

Signature #1 _____

Signature #2 _____

STATE OF WEST VIRGINIA
CITY/COUNTY OF __Mineral_____, to-wit:

Subscribed and sworn to before me this __22__ day of June, 2010 by Alisha W. Wilkes.

_____
NOTARY PUBLIC

My Commission Expires: __4/13/12_____.

2

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
ROBERT G. EAGLE JR.
1440 BEACON STREET
KEYSER, WV 26726
My commission expires April 13, 2012

**ALISHA W. WILKES**
**1575 Funderburg St.**
**Keyser, WV 26726**

June 16, 2010

GMAC Mortgage
Attn: Customer Service
P.O. Box 4622
Waterloo, IA 50704-4622

      re:    Alisha W. Wilkes
               1575 Funderburg St., Keyser, WV 26726
               SSN: 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
               Date of Birth: January 8, 1977

Dear Sir or Madam:

My attorney provided me this letter to send you in order that I may make my dispute under the Fair Credit Reporting Act. I am disputing certain inaccurate information that is being reported within my credit file. It is my understanding that you have verified this account as recently as March 2010 with TransUnion and Experian. Please consider the following information and documents and then act accordingly.

**The following item is not my account:**

- The GMAC MTG (Account No. 477177) is listed as a derogatory account.

My ex-husband forged my signature on a promissory note dated April 25, 2008 and a deed of trust dated April 25, 2008 (I have enclosed both of these documents for your convenience). As a result of his forgeries, you attempted to foreclose on my home and the GMAC account now appears on my credit report as a derogatory account and says "Foreclosure" under pay status.

I was forced to file a lawsuit to prove that my ex-husband forged my signatures on the aforementioned promissory note and deed of trust. This lawsuit was filed in the Prince William County Circuit Court which is located in Virginia. After a two day trial, in which you were a party, the Court entered an order declaring the aforementioned promissory note and deed of trust void. Therefore, I am not responsible for the GMAC loan that appears on my credit report (I have enclosed the Court's order and a handwriting expert's report stating[1] that the signatures on the promissory note and deed of trust are not mine).

You must remove this negative account information from your records

---

[1] The signature page of the promissory note dated April 25, 2008 is identified in the handwriting expert's report as **Q1**. The signature pages of the deed of trust dated April 25, 2008 are identified in the handwriting expert's report as **Q2** and **Q5**. An illustration has also been provided for your own comparison of the questioned signatures and the known signatures.



**EXHIBIT**
**10**

immediately and instruct the credit reporting agencies to remove this account from my credit file. I insist that you investigate this matter fully and completely. When you have completed your investigation, please send me a letter detailing the results of your investigation.

In the event you require additional information, please contact me directly at 571-229-0001 (or you can contact GMAC's lawyer Christopher Nolan at 703-281-2600). I can answer your questions and provide additional documentation.

Thank you for your time and attention in this matter.

Sincerely,

*Alisha W. Wilkes*

Alisha W. Wilkes

STATE OF WEST VIRGINIA
CITY/COUNTY OF _____ Mineral _____, to-wit:

Subscribed and sworn to before me this 22 day of June, 2010 by Alisha W. Wilkes.

_____
NOTARY PUBLIC

My Commission Expires: 4/13/12 .

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
ROBERT G. EAGLE JR
1440 BEACON STREET
KEYSER, WV 26726
My commission expires April 13, 2012

2