#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

#### CHARLESTON DIVISION

ALISHA KINGERY,

      Plaintiff,

v.           CIVIL ACTION NO.  2:12-cv-01353

QUICKEN LOANS, INC.,

      Defendant.

#### MEMORANDUM OPINION AND ORDER

Pending before the court is the plaintiff's Motion for Class Certification [Docket 220]. For the reasons discussed below, the motion [Docket 220] is **GRANTED.**

### I. Background

This case arises out of Quicken Loans, Inc.'s ("Quicken") alleged failure to provide credit score disclosures "as soon as reasonably practicable," in violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681g(g). Section 1681g(g), provides as follows:

> Any person who makes or arranges loans and who uses a consumer credit score, as defined in subsection (f) of this section, in connection with an application initiated or sought by a consumer for a closed end loan or the establishment of an open end loan for a consumer purpose that is secured by 1 to 4 units of residential real property . . . . shall provide the following [notice] to the consumer as soon as reasonably practicable[.]

15 U.S.C. § 1681g(g).

To establish a claim under FCRA, Ms. Kingery must show that Quicken violated § 1681g(g) and that the violation was either negligent or willful. *See Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 415 (4th Cir. 2001). If the lender's violation is negligent, the consumer may recover actual damages that result from the lender's failure to comply with the statute. 15

U.S.C. § 1681o(a)(1). In the case of a willful violation, the consumer may recover actual damages or statutory damages ranging from $100 to $1,000 and "such amount of punitive damages as the court may allow[.]" *Id.* § 1681n(a). In any successful action, the plaintiff can obtain attorney fees and costs. *Id.* §§ 1681o(a)(2), 1681n(a)(3).

After 15 U.S.C. § 1681g(g) was enacted, Quicken consulted with in-house and outside counsel to determine how to comply with the statute. After consulting with counsel and reviewing the plain language of the statute, Quicken decided to send the notice in the first mailing to the client. Quicken then implemented procedures to send the notice with the application package or the prequalification denial letter.

### A. How Quicken Processes Loan Inquiries and Delivers Credit Disclosures

Quicken uses several software programs to process loan inquiries. Quicken uses a program called Loan Origination and Lead Allocation ("LOLA") to track, deliver, and allocate mortgage leads. A lead is a consumer who contacts Quicken online, by telephone, or through email inquiry. Once the loan inquiry process is initiated, the lead's contact information is transmitted to LOLA. A Quicken mortgage banker will contact the lead to solicit verbal permission to pull the lead's credit report. If the banker obtains consent, the banker will pull the report.

LOLA then communicates with Loan Platform, an intermediary software, which contacts third-party vendors to obtain the lead's credit report. The report contains the lead's three credit scores. When it receives the lead's credit report, Loan Platform scrapes the data in the credit report. In addition, Loan Platform sorts the three credit scores into high, medium, or low categories. This information is transmitted to LOLA for storage in its database.

Quicken bankers can access the stored credit data for multiple purposes. For example, if the banker wants to market different programs to the lead, he or she can press the "Get Programs" button. (Ex. H, Bradley Hein Dep. Tr. [Docket 216-8], at 96-98, 102-03). An underlying program called Keystroke will look at the lead's middle credit score and provide a list of recommended loan programs.

For various reasons, a mortgage banker may preliminarily deny or withdraw the lead from LOLA. If the banker denies the lead, he or she may manually transfer the lead to AMP, Quicken's originating and underwriting system, for ultimate denial. The banker may also manually transfer the lead to Second Voice, a program that provides a second review of leads by a senior banker.

A nightly program may also send the lead to Second Voice via a two-step process. First, the nightly program runs an exclusionary logic to determine whether to automatically exclude the lead. The lead is automatically excluded if certain conditions are present, including whether the lead has "two or more banker contacts[.]" (Ex. G, Kevin Lang Decl. [Docket 216-7] ¶ 18). If the nightly program does not first exclude the lead, the program will then run an inclusionary logic to determine whether to send the lead to Second Voice. Under the inclusionary logic, the lead will be submitted to Second Voice if the lead's score is greater than or equal to 640.

After the lead is transferred to AMP, the lead will receive a status of "10," which means the loan inquiry is accepted, or "100," which means the loan inquiry is denied. At this time, AMP automatically creates a credit disclosure notice. If the lead has created a MyQL account, the credit disclosure, along with the application package or denial letter, is sent to that account. The lead then receives an email notification that documents are available in his or her MyQL account. These documents are usually placed in the MyQL account on the same day AMP enters a status of 10 or

3

100. If the lead has not provided an email for document disclosure, the documents are mailed to the lead.

### B. The Facts of Ms. Kingery's Case

On April 29, 2010, Ms. Kingery sent a loan inquiry to MortgageLoans.com.[1] MortageLoans.com identified four potential lenders, Loandepot, Ovation Home Loans, Precision Funding Group, and Quicken. Mr. Muskan, a Quicken mortgage banker, obtained Ms. Kingery's credit report on or about May 3, 2010. Mr. Muskan did not submit Ms. Kingery's lead to Keystroke.

Mr. Muskan claims he preliminary denied Ms. Kingery's lead due to a pending foreclosure on her property. Allegedly, Ms. Kingery's credit score played no role in Mr. Muskan's decision to deny her lead. However, Chris McConville, Ms. Kingery's expert, opined that any banker would have considered Ms. Kingery's score in denying her loan inquiry. In addition, a screenshot of a sample Quicken credit report reveals that the banker must scroll past the credit scores to get to the foreclosure information.

After the preliminary denial, the nightly program reviewed Ms. Kingery's lead. (*See* Ex. G, Decl. of Kevin Lang [Docket 216-7]). The nightly program automatically excluded her lead from Second Voice because multiple bankers had attempted to contact her. Therefore, Ms. Kingery's

---

[1] The property that Ms. Kingery sought to refinance has already been subject to litigation. Ms. Kingery's ex-husband forged her name on several deeds of trust that were secured by the property. On February 26, 2010, she obtained a state court judgment that released the property from the deeds of trust. In order to pay off her state court attorneys, she executed a deed of trust in favor of the attorneys' law firm. (*See* Ex. 35, Bryan Garcia Dep. Tr. [Docket 230-35], at 44-45; Ex. 36, Settlement Statement HUD-1 [Docket 230-36]). Trying to take advantage of a discount for paying her legal fees early, she entered into a real estate sales contract. (*See* Ex. 35, Bryan Garcia Dep. Tr. [Docket 230-35], at 45). At this time, Ms. Kingery was renting the property. Because the renters had been rough on the property, it did not show well. (*Id.* at 70-71). Therefore, Ms. Kingery's real estate agent had concerns that the buyer would not consummate the sale. (*See id.* at 71). On April 29, 2010, she sought to refinance her home in order to keep the property.

lead was never reviewed by the nightly program's inclusionary logic. (*See* Ex. K, Lang & Lusk 30(b)(6) Dep. Tr. [Docket 216-11], at 26).

On May 24, 2010, Ms. Kingery's lead was entered into AMP and assigned a 100 status, which indicated that her loan inquiry was denied. On the same day, AMP sent Ms. Kingery's credit disclosure and denial letter to her MyQL account. Quicken sent Ms. Kingery an email that these documents were available for review in her MyQL account.

### II. Legal Standard

An implicit prerequisite of class certification is "ascertainablity." *Roman v. ESB*, 550 F.2d 1343, 1348 (4th Cir. 1976). "In order to determine whether a class action is proper, the district court must determine whether a class exists and if so what it includes." *Id.* In addition to "ascertainability," the proposed class action must satisfy all of the prerequisites of Federal Rule of Civil Procedure 23(a) and fall within one of three categories enumerated in Rule 23(b). *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003). Here, Ms. Kingery seeks to certify a Rule 23(b)(3) class action. (*See* Pl.'s Mot. for Class Certification [Docket 220]).

The court has "wide discretion in deciding whether or not to certify a proposed class." *Cent. Wesleyan College v. W.R. Grace Co.*, 6 F.3d 177, 185 (4th Cir. 1993) (quoting *In re A.H. Robbins Co.*, 880 F.2d 709, 728-29 (4th Cir. 1989)). "The Fourth Circuit reads Rule 23 liberally and applies it flexibly to 'best serve the ends of justice for affected parties and promote judicial efficiencies.'" *Helmick v. Columbia Gas Transmission*, No. 2:07-cv-00743, 2010 WL 2671506, at *9 (S.D. W. Va. July 1, 2010) (quoting *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 237 (S.D. W. Va. 2005)).

Nevertheless, the court must still engage in "rigorous analysis" to determine whether the proposed class meets the Rule 23 requirements. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). The plaintiff bears the burden of persuading the court that a class should be certified. *See Bear v. Oglebay*, 142 F.R.D. 129, 131 (N.D. W. Va. 1992) (citing *Int'l Woodworkers of Am., AFL-CIO v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1267 (4th Cir. 1981)). "The plaintiff . . . must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart*, 131 S. Ct. at 2551.

### III. Discussion

#### A. Ascertainability

An implicit requirement of Rule 23 is that the proposed class definition be "ascertainable." *Roman v. ESB*, 550 F.2d 1343, 1348 (4th Cir. 1976). The class definition must be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." Charles Alan Wright & Arthur R. Miller, 7A *Federal Practice & Procedure* § 1760 (3d ed. 2009). "The proposed class definition must not depend on subjective criteria or the merits of the case or require an extensive factual inquiry to determine who is a class member." *Cuming v. S. Carolina Lottery Comm'n*, No. 3:05-cv-03608-MBS, 2008 WL 906705, at *1 (D.S.C. Mar. 31, 2008). The requirement of "ascertainability" is especially relevant in Rule 23(b)(3) actions where individual monetary awards are likely to be distributed. *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012) (collecting cases).

The proposed class definition is as follows:

> All natural persons residing in the United States who were the subject of at least one consumer credit score obtained and used by Quicken between May 1, 2010 through May 1, 2012 in connection with its evaluation of an application initiated or sought by such natural person for a consumer mortgage loan secured by 1 to 4

6

> units of residential property, whose request for credit was coded by Quicken with an AMP code of "100" and not an AMP code of "10," and to whom the credit score disclosure notice was not provided to that person within 21 days after Quicken obtained the credit score.

(Pl.'s Mot. for Class Certification [Docket 220]).

Ms. Kingery argues that the class is ascertainable because the relevant class variables are in Quicken's "data warehouse," which is electronically searchable. These variables include:

> [T]he class member's name; address; the presence of multiple borrowers; credit score, date and time the three-bureau credit scores were converted to a "middle score"; date and time this score was obtained and used to integrate into Quicken's systems and processes; date and time a consumer ran through the Second Voice or Keystroke processes; date and time the consumer was coded as a "100" code signifying the final denial of the consumer's credit request; and ever the date and time Quicken provide its credit score notice.

(Mem. in Supp. of Pl.'s Mot. for Class Certification ("Pl.'s Mem. in Supp.") [Docket 221], at 11).

Based on the class definition, I conclude that class membership can be ascertained through an objective criteria—consumers, between May 1, 2010 to May 1, 2012, who initiated a loan inquiry, whose scores were used by Quicken, who were denied a loan application, and who did not receive the credit score disclosure within twenty-one days after Quicken obtained the scores. The availability of the data warehouse enhances the feasibility of determining class membership. Although it will require some effort to sift through the data warehouse, I conclude that identifying class members will be manageable. Accordingly, I **FIND** that the class is sufficiently ascertainable.

### B. Federal Rule of Civil Procedure 23(a) Prerequisites

#### i. Numerosity

Federal Rule of Civil Procedure 23(a)(1) requires that the class be of sufficient size that joinder of all members is "impracticable." Fed. R. Civ. P. 23(a)(1); *see also Cypress v. Newport*

*News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967). Here, Ms. Kingery has identified at least 458,354 consumers who were denied at the prequalification stage and did not receive the required credit disclosure within twenty-one days after Quicken obtained their scores. (*See* Ex. 10, Lang & Lusk 30(b)(6) Dep. Tr. [Docket 220-10], at 118). Moreover, Quicken has stipulated that the proposed class satisfies the requirements of Rule 23(a)(1). Accordingly, I **FIND** that the class is sufficiently numerous.

### ii. Commonality

Under Federal Rule of Civil Procedure 23(a)(2), the proposed class must share common questions of law or fact. Fed. R. Civ. P. 23(a)(2). "This factor is stated in the disjunctive," meaning that either common questions of law or fact can establish sufficient commonality. *Black v. Rhone-Poulenc, Inc.*, 173 F.R.D. 156, 161 (S.D. W. Va. 1996). "[F]or purposes of Rule 23(a)(2)[,] even a single common question will do[.]" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2556 (2011).

To show commonality, the class "claims must depend upon a common contention." *Id.* at 2551. The class representative cannot satisfy commonality by simply asserting that the class has "suffered a violation of the same provision of law." *Id.* The class representative must "demonstrate that the class members 'have suffered the same injury.'" *Id.* (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). Moreover, the common question "must be of such a nature that it is capable of classwide resolution—which means that a determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* That is, the class litigation must be capable of generating common answers. *Id.*

There are several common questions in this case, which Ms. Kingery has identified: "(1) What constitutes sufficient use of a credit score to trigger the disclosure requirement of § 1681g(g)?; (2) Whether Quicken provides its score notices 'as soon as reasonably practicable' when it waits at least 21 days and until after its final application denial decision has been made; and (3) Whether Quicken's violation of FCRA disclosure requirements was 'willful.'" (Pl.'s Mem. in Supp. [Docket 221], at 13). Answering these questions will resolve issues central to the class claims.

In addition, the class claims arise from a common set of facts. All class members were denied at the prequalification stage and were not sent a credit disclosure after Quicken obtained their scores. According to Quicken's standard policy, the class members' scores were obtained from a third-party vendor, sorted by Loan Platform, and stored for later use in LOLA. Also, the class members alleged injuries result from Quicken's uniform practice of sending the disclosure at the prequalification denial. Considering that Ms. Kingery need only identify one common question of law or fact, I **FIND** the commonality element is satisfied.

### iii. Typicality

"The typicality requirement goes to the heart of a representative['s] ability to represent a class." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). While commonality focuses on class characteristics, typicality compares the class members' and the representative's claims. If the representative has not suffered the same injury as the class members, it is unlikely that she will vigorously pursue the class claims. Thus, to satisfy typicality, Ms. Kingery's "interest in prosecuting [her] own case must simultaneously tend to advance the interests of the absent class

9

members." *Id.* In this respect, the typicality and commonality prongs of Rule 23(a) overlap. As the Supreme Court reiterated in *Wal-Mart Stores, Inc. v. Dukes*,

> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

131 S. Ct. 2541, 2551 n.5 (2011) (quotations omitted).

"A plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of [her] own individual claim." *Deiter*, 436 F.3d at 466. However, Ms. Kingery's claim does not need to be "perfectly identical" to the class claims. *Id.* Ms. Kingery's claim need only share essential characteristics with the class claims. Factual variation defeats typicality only when "the variation strikes at the heart of the respective causes of action." *Id.*

Ms. Kingery's claims under § 1681g(g) require her to prove (1) that Quicken used her score (2) that the use was in connection with an application initiated or sought by her, and (3) that Quicken failed to provide that score "as soon as reasonably practicable." 15 U.S.C. § 1681g(g). Ms. Kingery's score was sorted by Loan Platform and stored by LOLA. In addition, Quicken sent the required disclosure three weeks after it obtained her score. These facts, which Ms. Kingery shares with the proposed class, tends to advance the class claims that Quicken used their scores and that their credit disclosures were not sent "as soon as reasonably practicable."

Quicken argues that Ms. Kingery's claim is atypical because she did not seek an application to refinance her home. Instead, Quicken contends Ms. Kingery initiated the loan inquiry to generate damages for a collateral lawsuit. Even if this contention is true, this variation

does not "strike at the heart" of the class claims. As already mentioned, under 15 U.S.C. § 1681g(g), to trigger the disclosure requirement all that is required is that the mortgage lender use the score in connection with a loan application initiated or sought by a consumer. Therefore, Ms. Kingery's intent in initiating the loan inquiry is irrelevant to the § 1681g(g) claim.

In addition, Quicken contends that in January 2011 it started sending integrated disclosures, which was in accordance with the Federal Trade Commission's and the Federal Reserve Board's final rules regarding risk-based pricing disclosures. The integrated disclosure contains both supplemental information and the information required under 15 U.S.C. § 1681g(g). According to Quicken, these regulations set the outer time limit for the integrated disclosure, which is the consummation[2] of the loan. However, while these rules may have set the ultimate backstop for the integrated disclosure, there is no indication that these rules modified Quicken's obligation to send the § 1681g(g) disclosure "as soon as reasonably practicable." Moreover, there is no evidence that Quicken altered its interpretation of this section or changed its practice of providing the disclosure when it denied a consumer's loan inquiry. Accordingly, I **FIND** that Ms. Kingery's claims are typical.[3]

### iv. Adequacy

Rule 23(a)(4) requires that the class representative and class counsel adequately represent

---

[2] "Consummation means the time that a consumer becomes contractually obligated on a credit transaction." 12 C.F.R. § 1026.2(a)(13).

[3] Quicken also argues that Ms. Kingery's claim is atypical because Quicken did not use her score and because she did not submit an application. First, Ms. Kingery's claim is not atypical because Quicken believes the requisite use did not occur in Ms. Kingery's case. Ms. Kingery's claim is typical because Quicken's software programs stored and sorted both Ms. Kingery's and the class members' scores in the same fashion. Second, as Quicken admits, "neither the Plaintiff nor any putative class member submitted 'an application.'" (Mem. in Opp'n to Pl.'s Mot. for Class Certification ("Def.'s Mem. in Opp'n") [Docket 227], at 10). Although Quicken may disagree about whether a formal application is required under the statute, Ms. Kingery's claim is typical because she and the class members share the same facts—they did not submit an application.

the class. This requirement tends to merge with the typicality and commonality requirements, "although [it] also raises concerns about the competency of class counsel and conflicts of interest." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 n.5 (2011) (quotations omitted). For a conflict of interest to prevent class certification, it must "be fundamental" and "go to the heart of the litigation;" it may not be "merely speculative or hypothetical." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430-31 (4th Cir. 2003) (citations omitted) "The inquiry into the adequacy of legal counsel focuses on whether counsel is competent, dedicated, qualified, and experienced enough to conduct the litigation and whether there is an assurance of vigorous prosecution." *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 239 (S.D. W. Va. 2005) (citing *McGlothlin v. Connors*, 142 F.R.D. 626, 633-34 (W.D. Va. 1992)).

There is no evidence that Ms. Kingery has interests that are antagonistic to or conflict with the interests of the proposed class. Rather, she shares a common interest with the class, and she has willingly stepped forward to pursue their claims on a classwide basis. In addition, she has retained counsel who are qualified and able to represent the class. The declarations filed by Ms. Kingery's attorneys indicate they have wide-ranging experience litigating consumer protection class actions and other complex cases. (*See* Decls. of Pl.'s Counsel [Docket 220-21]). Accordingly, I **FIND** that the adequacy requirement is satisfied.

### C. Federal Rule of Civil Procedure 23(b) Categories

A proposed class action must also meet the requirements of at least one of the subsections of Rule 23(b). Here, Ms. Kingery claims the proposed class satisfies Rule 23(b)(3). A class action under Rule 23(b)(3) is appropriate when (1) common questions predominate over individual questions and (2) the class action is superior to other means of adjudicating the dispute.

### i. Predominance

Federal Rule of Civil Procedure 23(b)(3), "as an adventuresome innovation, is designed for situations in which class-action treatment is not as clearly called for." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quotations omitted). A Rule 23(b)(3) class action is permitted where the class "is sufficiently cohesive to warrant adjudication by representation." *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138 (4th Cir. 2001) (quotations omitted). Where significant common questions can be resolved for class members in one action, it is efficient to deal with class claims on a representative rather than an individual basis. *See* Charles Alan Wright & Arthur R. Miller, 7AA *Federal Practice and Procedure* § 1778 (3d ed. 2009). However, "[w]hen individual rather than common issues predominate, the economy and efficiency of class-action treatment are lost and the need for judicial supervision and the risk of confusion are magnified." *Id.* Therefore, the predominance inquiry is "even more demanding" than Rule 23(a)'s commonality requirement. *Comcast Corp.*, 133 S. Ct. at 1432. "The predominance inquiry focuses on whether liability issues are subject to class-wide proof or require individualized and fact-intensive determinations. Deciding whether common questions predominate over individual ones involves a qualitative, rather than quantitative, inquiry." *Singleton v. Domino's Pizza, LLC*, No. 11-cv-1823, 2013 WL 5506027, at *6 (D. Md. Oct. 2, 2013) (citations omitted).

Quicken presents several arguments as to why individual issues predominate in this case. First, Quicken argues that "as soon as reasonably practicable" requires a case-by-case analysis of "(1) the reasonableness of the period between when Quicken Loans used a class member's credit score and when the member received the credit score; and (2) the reasonableness of Quicken Loans' procedures for sending out the disclosure." (Def.'s Mem. in Opp'n [Docket 227], at 18).

13

Because "reasonableness" is a fact-specific inquiry, Quicken argues that individual issues will predominate.

Reasonableness is essentially an individualized inquiry. However, where a defendant's conduct is uniform as to all class members, the chance that this individualized inquiry will overwhelm common questions of liability is slight. Here, it was Quicken's standard policy to send out the credit disclosure at the prequalification denial or application. As a result of Quicken's uniform conduct, the class members did not receive their disclosures within twenty-days after Quicken obtained their scores.

Second, Quicken argues that actual damage determinations will predominate. To obtain actual damages under 15 U.S.C. § 1681o, the plaintiff must establish a causal connection between the statutory violation and the alleged harm. *See* 15 U.S.C. § 1681o. Therefore, actual damages require individualized proof.

However, the Fourth Circuit has found that "the need for individualized proof of damages alone will not defeat class certification." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 429 (4th Cir. 2003). "Quantitatively, almost by definition there will always be more individual damages issues than common liability issues . . . . Qualitatively, however, . . . liability issues may far exceed in complexity the more mundane individual damages issues." *Id.* (quotations omitted). Therefore, when the damage determination is not complex and "the fact of injury and damage breaks down in what may be characterized as virtually a mechanical task, capable of mathematical or formula calculation," individual issues do not predominate. *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 68 (4th Cir. 1977) (footnotes omitted). However, where the damages calculation is

complex and requires separate mini-trials, individual issues may overwhelm the common issues of liability. *Id.*

Here, Ms. Kingery alleges that she and the class have suffered actual damages of $25.85[4], "the standard cost of obtaining a consumer's Fair Isaac credit score—the score used by Quicken for its mortgage loan applications." (Second Class Action Compl. [Docket 23] ¶ 33). According to Chris McConville, Ms. Kingery's expert, the class members should have gotten their scores earlier, when the scores had the most informational value. (*See* Ex. 44, Expert Report Prepared by Chris McConville [Docket 230-44], at 15-16). Because of the delayed disclosure, when the class members received their scores, the scores were worthless. (*See id.*). To obtain the scores earlier, the class members would have to purchase the scores, which costs approximately $25.85. (*See id.* at 17). Therefore, Ms. Kingery concludes that "a jury could find that each class member suffered this uniform damage amount ($25.85) [and] [c]ausation as to one class member would be the same for each other class member." (Pl.'s Reply Br. in Supp. of Her Mot. for Class Certification [Docket 227], at 20).

As an initial matter, I find that Ms. Kingery's theory of damages is speculative. At minimum, class members must prove that they actually purchased the score and did so due to Quicken's violation of the statute. Nevertheless, establishing that a score was purchased and the reason for the purchase will not require complex proof. Therefore, the issues of actual damages will not overwhelm the common issues of liability.

Finally, Quicken argues that the determination of statutory damages will predominate. In support, Quicken cites Judge Wilkinson's concurrence in *Stillmock v. Weis Markets, Inc.*, 385 F.

---

[4] In her Second Class Action Complaint, Ms. Kingery alleged this amount was $19.95. (*See* Second Class Action Compl. [Docket 23] ¶ 33). Ms. Kingery's expert now estimates this amount to be $25.85. (*See* Ex. 44, Expert Report Prepared by Chris McConville [Docket 230-44], at 17).

15

App'x 267 (4th Cir. 2010). In *Stillmock*, Judge Wilkinson acknowledged that calculating statutory damages on a per consumer basis involves some individualized inquiry. *Id.* at 277 (Wilkinson, J., concurring). Because statutory damages fall within a range and "because statutory damages are intended to address harms that are small or difficult to quantify, evidence about particular class members is highly relevant to a jury charged with this task." *Id.* It is unclear what factors a jury would consider in determining the amount of statutory damages, but in this case it is clear that some individualized evaluation is required.

However, the majority in *Stillmock* did not find that statutory damages precluded common issues from predominating. *Id.* at 273. With respect to statutory damages, the only significant issue was common—whether the defendant's uniform conduct was willful. To prove willfulness, the jury must determine whether the defendant's interpretation of this statute was "objectively unreasonable." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007). This analysis focuses on the conduct of the defendant and not the individual class members. As to the amount of damages, Quicken's process of sorting and storing credit score information was uniform and thus the risk of harm, however it may be quantified, was similar. Accordingly, I **FIND** that individual issues do not predominate.

### ii. Superiority

Rule 23(b)(3) requires the proposed class action to be superior to other methods of adjudication so that the class action will "achieve economies of time, effort and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quotations omitted).

As discussed above, this case will not be difficult to manage. However, several courts have questioned the superiority of FCRA class actions for two interdependent reasons: (1) the potential enormity of statutory damages where actual damages are non-existent or *de minimus* and (2) FCRA's provision for attorney fees and costs in *any* successful action establishing the defendant's violation as willful or negligent. *See, e.g.*, *Ehren v. Moon, Inc.*, No. 09-21222-CIV, 2010 WL 5014712, at *2 (S.D. Fla. Dec. 3, 2010) ("If class action treatment were applied here, where the complaint contains no indication of any actual damages, the aggregated relief could be oppressive in consequence and difficult to justify. Certifying a class action in this matter is not superior to other methods of litigation because a class action in this context could raise serious constitutional problems implicating the Defendant's Due Process rights."); *Klotz v. Trans Union, LLC*, 246 F.R.D. 208, 217 (E.D. Pa. 2007) (Attorney fees and punitive damages "might not encourage each putative class member to bring suit, but they dispel the notion that a class action is the only way to adjudicate the lawfulness of the defendant's practices."); *Anderson v. Capital One Bank*, 224 F.R.D. 444, 453 (W.D. Wis. 2004) ("If indeed there are other persons who believe that they were injured by receipt of the kind of letter plaintiffs received, they have an incentive to sue. Not only can they receive up to $1,000 in statutory damages or any amount of actual damages they incurred plus punitive damages if they can prove wilfulness and actual damages if they prove only negligence, but their suits are essentially costless because they are entitled to an award of the attorney fees and costs they incur in bringing suit.").

Other courts have rejected these arguments and found that statutory and/or punitive damages and attorney fees are insufficient to incentivize individual litigation. *See, e.g.*, *Summerfield v. Equifax Info. Servs. LLC*, 264 F.R.D. 133, 143 (D.N.J. 2009) ("[C]lass actions have

17

not been foreclosed merely by the presence of a fee shifting provision."); *Braxton v. Farmer's Ins. Gp.*, 209 F.R.D. 654, 662 (N.D. Ala. 2002) ("[T]he cost of investigating and trying these cases individually likely exceeds the value of any statutory and/or punitive damage award that may be due to any particular class claimant.").

>As succinctly stated in *Chakejian v. Equifax Info. Servs.*,
>
>>Although the availability of attorney's fees to litigants is indicative that a class action is by no means the "only" feasible route for litigants, it remains the superior mechanism here, where there is an inverse relationship between the cost of an individual action relative to the potential recovery, and where meaningful enforcement of the statute through individual consumer litigation is unlikely. Although it could have done so, Congress has not chosen to preclude class actions under the FCRA, and the availability of attorney's fees does not undermine the advantages of class certification in this case.

256 F.R.D. 492, 501-02 (E.D. Pa. 2009) (citations omitted). Moreover, in an unpublished opinion, the Fourth Circuit has indicated its support of this position:

>First, the low amount of statutory damages available means no big punitive damages award on the horizon, thus making an individual action unattractive from a plaintiff's perspective. Second, there is no reasoned basis to conclude that the fact that an individual plaintiff can recover attorney's fees in addition to statutory damages of up to $1,000 will result in enforcement of FCRA by individual actions of a scale comparable to the potential enforcement by way of class action. . . . Other factors also cut definitively in favor of concluding that the class action which Plaintiffs propose is superior to individual cases. First, there is no indication in this case that class members would have a strong interest in individual litigation. Second, class certification promotes consistency of results, giving Weis Markets the benefit of finality and repose.

*Stillmock v. Weis Markets, Inc.*, 385 F. App'x 267, 274-75 (4th Cir. 2010) (citations omitted).

Although it is debatable whether class actions are superior in the FCRA context, I find the unpublished analysis of the Fourth Circuit as well as the opinions of other courts sufficiently persuasive. While class members may have some incentive to pursue individual litigation, that incentive is insufficient to spur meaningful litigation of these rights. In addition, even if significant

individual litigation would ensue without the class action device, the possibility of inconsistent judgments suggests that individual litigation is not superior. Accordingly, I **FIND** that this class action is superior to other methods of adjudication.

### IV. Conclusion

For the reasons discussed above, Ms. Kingery's motion to certify a class action [Docket 220] is **GRANTED.** The court **DIRECTS** Ms. Kingery to file a proposed notice form on or before **May 28, 2014**.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: May 21, 2014

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE