# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**Charleston Division**

**ALISHA KINGERY,**
**f/k/a ALISHA WILKES,**
**individually and on behalf of all**
**others similarly situated,**

        **Plaintiffs,**

     **v.**                  **Civil Action No. 2:12-cv-1353**

**QUICKEN LOANS INC.,**

        **Defendant.**

## DECLARATION OF AMY BISHOP

I, Amy Bishop, declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information, and belief:

1.     My name is Amy Bishop. I am an adult over the age of nineteen (19) years old and of sound mind. I am a resident of Michigan and am competent to testify as to all statements contained herein, which I am making by my own free will.

2.     I am employed with Quicken Loans Inc. ("Quicken Loans") as Deputy Corporate Counsel and I am authorized to make this declaration on behalf of Quicken Loans.

3.     The statements herein are based on my own personal knowledge and business records of Quicken Loans, which are created and maintained in the ordinary course of business.

4.     I have been employed with Quicken Loans for 15 years, occupying several positions during that time. I started with Quicken Loans in 1998 as Associate Corporate Counsel. At that time, I focused on mortgage compliance, but also practiced in litigation, employment, and intellectual property areas of law.

5.      In my present position, I oversee mortgage compliance for Quicken Loans, which includes compliance with federal and state laws regarding the origination, servicing, and licensing functions of Quicken Loans.   My responsibilities include managing 37 employees, implementing regulatory requirements, federal and state reporting, such as, Quicken Loans' annual Home Mortgage Disclosure Act ("HMDA") filing, company and mortgage loan originator licensing, and fair lending monitoring.   For the last six to seven hearing, I have focused solely on mortgage compliance.

6.      In that capacity, I am knowledgeable of and familiar with Quicken Loans' policies and procedures to comply with state and federal laws governing mortgage lending.   With respect to this case, I am knowledgeable of and familiar with Quicken Loans' policy and procedure to comply with section 1681g(g) of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681g(g).   I was part of the legal compliance team in 2003 when Congress enacted the Fair and Accurate Credit Transactions Act ("FACTA") to amend the FCRA to add, among other things, the federal credit score disclosure requirement set forth in section 1681g(g).   I have reviewed compliance materials, emails, and other documents regarding Quicken Loans' efforts to comply with section 1681g(g), which were created and maintained in the ordinary course of Quicken Loans' regularly conducted business activity, at the times noted in the lead detail history, by individuals with personal knowledge of the information contained therein.

7.      I have also reviewed the documents attached hereto as **Exhibits 1 - 12**, which were created and maintained in the ordinary course of Quicken Loans' regularly conducted business activities, at the times noted in the documents, by individuals with personal knowledge of the information contained therein.   It is the regular practice of Quicken Loans to maintain these documents:

a.  **Exhibit 1** is a true and correct copy of the Financial Services Alert dated December 9, 2003 that Quicken Loans received in the ordinary course of business from Goodwin Proctor, bates labeled QL 0005093 – QL0005094.

b.  **Exhibit 2** is a true and correct copy of the email dated December 16, 2003 from Melanie Brody to members of the Mortgage Bankers Association ("MBA"), bates labeled QL 0005571 – QL0005583.

c.  **Exhibit 3** is a true and correct copy of the email chain dated November 7, 2004 with the subject line: "RE: New Form required by FTC for compliance with Fair and Accurate Credit Transactions Act," bates labeled QL0019501 – QL0019503.

d.  **Exhibit 4** is a true and correct copy of the email chain dated November 12, 2004 with the subject line: "RE: New Form required by FTC for compliance with Fair and Accurate Credit Transactions Act," bates labeled QL0019339 – QL 0019342.

e.  **Exhibit 5** is a true and correct copy of the power point presentation from the MBA Live Audio Program presented by Buckley Kolar LLP on November 16, 2004, bates labeled QL 0005065 – QL 0005092.

f.  **Exhibit 6** is a true and correct copy of the email dated November 17, 2004 with the subject line: "Credit Score Notice," bates labeled QL0019669 – QL0019674.

g.  **Exhibit 7** is a true and correct copy of the email dated November 17, 2004 with the subject line: "FACT Act," bates labeled QL0019679.

h.  **Exhibit 8** is a true and correct copy of the email dated November 22, 2004 with the subject line: "Credit Score Notice," bates labeled QL0020662.

i.  **Exhibit 9** is a true and correct copy of the email chain dated November 26, 2004 with the subject line: "RE: Credit Score Notice," bates labeled QL0019652 – QL0019653.

j.  **Exhibit 10** is a true and correct copy of the email chain dated December 1, 2004 with the subject line: "Notice to Home Loan Applicants 2.doc," bates labeled QL0019443 – QL001944.

k.  **Exhibit 11** is a true and correct copy of the invoice from BuckleyKolar LLC that Quicken Loans received in the ordinary course of business, bates labeled QL 0022747 – QL0022748.

l.  **Exhibit 12** is a true and correct copy of the credit score disclosure notice sent to Plaintiff dated May 24, 2010, bates labeled QL 0013162 – QL 0013163.

8.      In 2004, I assigned the task of implementing the new FACTA requirement to Sue Pelto, a compliance specialist on the legal compliance team.  Ms. Pelto took the lead in researching the requirements of the statute, but worked closely with myself and Angelo Vitale, in-house attorneys, David Carroll, an attorney and Vice President, and other Quicken Loans' team members, including a business analyst and IT engineer, to develop and implement Quicken Loans' procedure to comply with section 1681g(g).

9.      Ms. Pelto also consulted Jon Jerison, an attorney at BuckleyKolar, LLP (now BuckleySandler LLP), for advice on complying with the federal credit score disclosure requirement.

10.     At the time FACTA was enacted, there was an existing complex disclosure regime in mortgage originations under the Real Estate Settlement Procedures Act ("RESPA"), the Truth in Lending Act ("TILA"), the Equal Credit Opportunity Act ("ECOA"), and FCRA.

11.     Under the existing disclosure scheme, mortgage disclosures were not provided to consumers in a piecemeal fashion.  Instead, disclosures are grouped together to make them most meaningful to the consumer and to provide context to the content of the disclosures.

12.     At the time FACTA was enacted, there was no regulatory guidance or case law regarding the meaning of several undefined terms in section 1681g(g), including "use," "application sought," and "reasonably practicable."  None of these terms were previously used in the FCRA.

13.     According to the language of section 1681g(g), the credit score disclosure requirement is triggered on "use" of the consumer's credit score "in connection with an application initiated or sought" for a residential mortgage.

4

14.     After analyzing the language of the statute, researching its requirements, and consulting with in-house and outside counsel, Quicken Loans determined that providing credit score disclosures to consumers at the prequalification decision complies with the requirements of section 1681g(g).

15.     Thus, Quicken Loans provides credit score disclosures to consumers: (1) with the application package, and (2) with final denial letters so that a client whose lead is denied at the prequalification phase prior to receiving a formal application also receives the credit score disclosure. For loans that ultimately close, Quicken Loans provides credit score disclosures to clients a second time, in the closing package.

16.     To implement this policy, Quicken Loans provides the credit score disclosure to consumers who initiate an inquiry with Quicken Loans and for whom Quicken Loans obtained a credit score: (1) when a "Status 10" is inputted in AMP, Quicken Loans' origination and underwriting system, which triggers the sending of a loan application package to the consumer, and (2) when a "Status 100" is inputted in AMP, indicating that the lead is denied.

17.     If a client reaches application status in AMP ("Status 10") and is later denied ("Status 100"), then the client receives two credit score disclosure notices, though only one credit score disclosure is required by statute per transaction.

18.     Under either scenario, a client receives the credit score disclosure with Quicken Loans' first mailing of disclosures to that client.

19.     Because it would be too burdensome to make a determination of "use" of a client's credit score on a case by case basis, Quicken Loans chose to be over-compliant by sending credit score disclosure notices even when the consumer's credit score is not "used" in any manner "in connection with an application."

20.     Sending the credit score disclosure at the prequalification decision also provides context for the consumer because the disclosure may explain the reason, in part, for the prequalification decision.

21.     Since 2001, Quicken Loans had been complying with a nearly identical requirement in California.  Cal. Civil Code § 1785.20.2.  Quicken Loans' policy to comply with section 1681g(g) is the same procedure followed by Quicken Loans to comply with the California credit score disclosure requirement.

22.     Quicken Loans' policies have been reviewed numerous times by state and federal regulators.  In addition, Quicken Loans has had outside firms conduct due diligence on its policies and procedures regarding mortgage disclosures, either due to investor requests or on its own accord.  In the thirteen years it has been complying with the FCRA and identical California requirement, no regulatory body has ever taken issue with Quicken Loans' policies and procedures or its compliance with § 1681g(g) and identical California statute.

I have read this declaration consisting of six (6) pages and affirm that the statements herein are based upon my own personal knowledge.  I declare, under penalty of perjury under the laws of the United States of America, that the foregoing statements are true and correct.

March __21__, 2014

AMY BISHOP

# Exhibit 1

GOODWIN PROCTER

# Financial Services *Alert*

December 9, 2003
Vol. 7 No. 16

## New Law Extends Fair Credit Reporting Act Preemption, Imposes New Requirements on Credit Bureaus and Users

On Thursday, December 4, 2003, the President signed into law the "Fair and Accurate Transactions Act of 2003" ("FACTA"). This *Financial Services Alert* article emphasizes the provisions of FACTA that most significantly affect lenders and other users of consumer reports. It should be noted that there are many other provisions that primarily affect consumer reporting agencies ("CRAs"), particularly with regard to consumers who assert that they are victims of identity theft.

The enactment of FACTA was motivated by the scheduled expiration at the end of 2003 of provisions of the Fair Credit Reporting Act ("FCRA") that preempt state laws involving the same subject matter. In particular, FACTA makes permanent an existing FCRA provision that prevents states from restricting the exchange of information among affiliates by giving consumers the right to "opt out" of such information sharing. FACTA also imposes new requirements on lenders and other users of information from CRAs and on the CRAs themselves, including a federal "opt-out" from a company's use of a consumer's financial information and a new notice that must be provided when a credit report influences the pricing or other terms of a loan. The effective date of most of the law's provisions will be determined in joint rules to be adopted by the FRB and Federal Trade Commission ("FTC"). The FRB/FTC rulemaking on the effective date must be completed within two months of enactment and must specify an effective date of no more than ten months later, resulting in an effective date for the FACTA provisions concerned of no later than twelve months after enactment.

*Federal Preemption.* The preemption in existing subject areas is made permanent. If FACTA had not been enacted, the states could have, beginning on January 1, 2004, enacted legislation restricting sharing of information among affiliates. The existing FCRA allows a company to share consumer report information with affiliates, subject to an opt-out right. Several states, most prominently California, had enacted or were in the process of enacting legislation that would have further restricted information-sharing. Many of those state provisions will now be permanently preempted by the amended FCRA.

FACTA also makes permanent the preemption of state laws in the other areas covered by the existing FCRA preemption provision: responsibilities of credit bureaus and users of credit reports; credit and insurance solicitations based on credit bureau prescreening; notices of adverse action; responsibilities of companies that furnish information to credit bureaus; timing requirements for CRAs investigating disputes; and prohibitions against CRAs reporting obsolete information. FACTA also generally preempts state legislation regarding the specific subject matter of the federal provision. But in contrast to the preemption of affiliate information-sharing, FACTA does not preempt other state laws that take different approaches to remedying the same problem. For example, in an effort to address identity theft, FACTA requires point-of-sale terminals to truncate credit and debit card numbers. State laws that require truncation would appear to be preempted to the extent that they differ from the federal law (for example, a state law with an earlier effective date). But state laws that address identity theft in other ways, such as by restricting the use of a social security number, do not appear to be preempted.

A new provision states specifically that nothing in FCRA is intended to preempt state laws regulating the use of credit-based insurance scores or disclosure of their use. Apparently, this provision would allow states to issue rules permitting the use of credit reports in setting insurance rates and would allow the states to determine the contents of any notice.

*Risk-Based Pricing Notice.* FACTA requires a person that uses a credit report in connection with an application for or grant or extension of credit on "material terms that are materially less favorable than the most favorable terms available" to a "substantial proportion" of that creditor's other customers to give the consumer a "risk-based pricing notice." The notice must identify the CRA that provided the information and explains that the information affected the terms of the offer. The notice may be provided orally, electronically (without regard to the consent provisions of the federal E-SIGN law) or in writing. If the lender provides a notice of adverse action, no risk-based pricing notice is required, but the risk-based pricing notice does not replace the adverse action notice.

The FRB and FTC are to issue joint rules that will define terms such as "materially less favorable" and specify the timing of the notice. The notice may generally be provided at application, communication of an offer of credit, or when the credit is granted (closing for real estate transactions), which would allow lenders to provide a generic notice to all applicants at the time of application. But the FRB/FTC rule may

---

**New Subscribers, Past Issues and Background:**

If you would like anyone else to receive issues of the *Financial Services Alert*, would like to receive any past issues, or would like the background materials for any of the matters discussed above, please contact **Greg Lyons, Eric Fischer, Elizabeth Shea Fries or Jackson Galloway** at the e-mail addresses referenced at the end of this newsletter.

**Disclaimer:**

This publication, which may be considered advertising under the ethical rules of certain jurisdictions, is provided with the understanding that it does not constitute the rendering of legal advice or other professional advice by Goodwin Procter LLP or its attorneys.

© 2003 Goodwin Procter LLP. All rights reserved.

**Alert on the Web:**
A search engine enabling key word searches of back issues of the *Alert* is available at www.goodwinprocter.com/fsa.asp

**Goodwin Procter Offices:**

Exchange Place
Boston, MA 02109
Tel: (617) 570-1000

103 Eisenhower Parkway
Roseland, NJ 07068
Tel: (973) 992-1990

599 Lexington Ave.
New York, NY 10022
Tel: (212) 813-8800

1717 Pennsylvania Ave., N.W.
Washington, DC 20006
Tel: (202) 974-1000

December 9, 2003
Vol. 7, No. 16
Page 2

# Financial Services *Alert*

specify situations in which the notice may only be provided after a consumer report has been used to set the terms of a credit offer.

There is no private cause of action for violations of this provision.

*Use of Information from Affiliates.* As noted, FACTA makes permanent the existing FACTA provision that prevents states from going beyond the FCRA requirement to give the consumer the opportunity to opt-out of the sharing of consumer report information with affiliates. (Consumer report information includes both information from CRAs and financial information about the consumer that does not reflect a company's own transactions and experiences with the consumer).

Another FACTA provision, however, restricts the use by a company of any information (including both transaction and experience and consumer report information) obtained from an affiliate for marketing solicitations to persons with which the company (not the affiliate) does not already have a business relationship. In order for a company to use such information, it must first give the consumer the right to opt out of information-sharing for marketing purposes. The federal banking agencies, the FTC, and the SEC are to issue rules implementing the opt-out requirement for companies under their respective jurisdictions, including a "simple" method to opt out. An opt-out will be effective for five years, and a company must give the consumer an opportunity to renew it before its affiliates may begin marketing solicitations based on the information.

The provision does not prohibit the sharing of information for other purposes. Financial services companies may continue to maintain common databases to provide services for an affiliate and use information in connection with employment services or employee benefits provided by the affiliate. The company that shares information about its customers, however, may not solicit its customers on behalf of an affiliate if the customers have opted out of use of the information by affiliates. States may not impose greater restrictions on affiliate-sharing for marketing purposes.

*Other Provisions.* Other provisions of FACTA that affect financial services firms include, among others—

- CRAs that generate credit scores must provide a score upon the consumer's request, together with the key factors that contributed to the score. Mortgage lenders and brokers must provide the score soon after using it, together with the key factors and an explanation of the role of credit scores in lenders' decisions. A mortgage "risk score" that reflects factors other than credit history need not be provided.

- Consumers may place a "fraud alert" in their file with the CRA. Users of credit reports must "utilize . . . reasonable policies and procedures to form a reasonable belief that the user knows the identity of the person making the request" before extending new closed-end credit or opening or increasing an open-end credit line.

- Consumers may receive a free annual credit report, under FTC rules that may stagger the effective date of the free report to protect the CRAs from a surge in demand for free reports.

- Expanded disclosures of the right to opt out of credit information sharing with affiliates.

- A longer statute of limitations, allowing lawsuits within five years of the violation, together with a "discovery rule," also allowing actions within two years of discovery (the latter overruling a recent Supreme Court decision).

- Consumers must be notified before, or within thirty days after, negative information about them is reported to CRAs. This notice may be provided with billing materials or collection letters.

- Expanded responsibilities for furnishers of information to CRAs to avoid reporting inaccurate information.

**Goodwin Procter LLP Financial Services Partners and Counsel**

| | | | | |
|---|---|---|---|---|
| Lynne B. Barr | Peter T. Fariel | Geoffrey R. T. Kenyon | Gregory J. Lyons | Philip H. Newman |
| Melissa Barrett | Melanie L. Fein | Joseph M. Kolar | William P. Mayer | Regina M. Pisa |
| Raymond P. Boulanger | Eric R. Fischer | John Kromer | Kathryn L. Murtagh | William E. Stern |
| Jeremiah S. Buckley | Elizabeth Shea Fries | Thomas J. LaFond | Jeffrey P. Naimon | Margo H. Tank |
| Margaret B. Crockett | Jackson B.R. Galloway | Paul W. Lee | Andrea Lee Negroni | Meryl E. Wiener |
| | | | | R. David Whitaker |

To e-mail any of the above attorneys, use first initial of first name followed by last name followed by @goodwinprocter.com. For example, Gregory J. Lyons would be glyons@goodwinprocter.com.

Goodwin Procter LLP, a firm of 500 lawyers, has one of the largest financial services practices in the United States.

# Exhibit 2

## Pelto, Sue

| | |
|---|---|
| **From:** | Brody, Melanie H. [mbrody@kl.com] |
| **Sent:** | Tuesday, December 16, 2003 6:17 PM |
| **To:** | MBG ATTYS; MBG REG COMPS; PRIVACY; FIGALL |
| **Cc:** | Khoo, Erika B. |
| **Subject:** | Fair Credit Reporting Act Amendments - Summary |

       On December 4, 2003, President Bush signed the Fair and Accurate Credit Transactions Act of 2003 (the "FACT Act"), a statute that amends the federal Fair Credit Reporting Act (the "FCRA") to (1) make permanent the FCRA's state law preemption provisions that were scheduled to expire on January 1, 2004, and (2) add a series of new consumer protection provisions.

       The FACT Act directs the Federal Trade Commission ("FTC") and Federal Reserve Board ("Board") to issue regulations setting forth effective dates for many of the Act's provisions. Today the FTC and the Board issued interim final rules indicating that the FACT Act's preemption provisions will become effective on December 31, 2003. The FTC and the Board also issued proposed rules establishing a schedule of effective dates for certain other FACT Act provisions; comments on the proposed schedule are due by January 12, 2004.

       Attached is a summary of the FACT Act provisions that apply to lenders, users of consumer reports and furnishers of consumer report information. We will follow up shortly with summary of the proposed FACT Act implementation schedule.

       If you have any questions about the FACT Act, please call Melanie Brody at 202-778-9203 or any other member of K&L's Mortgage banking/Consumer Finance Group.


NOTE: If you cannot open the attached file, click on the following link to download Adobe Acrobat Reader http://www.adobe.com/products/acrobat/readstep2.html. Adobe Acrobat Reader is free, and freely distributable software, that allows you to view and print Adobe .pdf files, such as the one attached. After the download is complete, double-click the downloaded file to install Adobe Acrobat Reader on your computer.

If you do not wish to receive any further updates via email from us, please reply to this email with "UNSUBSCRIBE" in the subject line.

Melanie H. Brody
Kirkpatrick & Lockhart LLP
1800 Massachusetts Avenue, N.W.
Washington, DC 20036
ph: 202-778-9203 * fax: 202-778-9100 * email: mbrody@kl.com

This message is confidential and is intended to be covered by the attorney-client or other privileges. If you have received this message in error, please contact me at 202-778-9203 or mbrody@kl.com, or my secretary, Lorraine Graham-Brown, at 202-778-9205 or lgrahambrown@kl.com.

12/17/2003



# Mortgage Banking Commentary

DECEMBER 2003

## President Bush Signs the Fair and Accurate Credit Transactions Act of 2003

On December 4, 2003, President Bush signed the Fair and Accurate Credit Transactions Act of 2003 (the "FACT Act" or the "Act"), the long-anticipated amendment to the federal Fair Credit Reporting Act (the "FCRA").[1]

As the financial services industry hoped, the FACT Act makes permanent the FCRA's preemption of state laws regulating information sharing among affiliated companies. In addition to the preemption, however, the Act contains several new requirements that will significantly impact the activities of many financial institutions, including those that use consumer information received from affiliates for marketing purposes, use credit scores to make loans and/or furnish information to consumer reporting agencies. Among other matters, the Act:

- requires that consumers be given notice and an opportunity to opt out before a person can share virtually any information about the consumer with its affiliate to enable the affiliate to make marketing solicitations;

- requires lenders to provide "Risk-Based Pricing Notices" to consumers who receive materially less favorable credit terms than a substantial portion of the lender's other consumers based in whole or in part on a consumer report;

- requires lenders to disclose credit scores and certain related information to residential mortgage loan applicants;

- imposes new responsibilities on persons who furnish information to consumer reporting agencies; and

- restricts the sale or transfer of debt caused by identity theft.

The Act directs the Federal Trade Commission ("FTC"), the Federal Reserve Board (the "Board") and certain other federal agencies (referred to herein collectively as the "Agencies") to issue regulations implementing many of its requirements. As a result, the financial services industry will not know the full extent of its new obligations until the Agencies issue their regulations in final form.

The FACT Act sets forth specific effective dates for certain of its provisions. For all other provisions, the Act states that the FTC and the Board must, no later than February 4, 2004, issue final regulations establishing effective dates. These effective dates must be "as early as possible," and in no event later than ten months after the date that the FTC and Board issue their regulations.[2] On December 16, 2003, the FTC and the Board issued interim final rules indicating that the Act's preemption provisions will become effective on December 31, 2003.

---

[1] 15 U.S.C. § 1681 *et seq.*

[2] FACT Act Section 3.

**Kirkpatrick & Lockhart LLP**

This Alert briefly summarizes those provisions of the Act that apply to lenders, users of consumer reports and furnishers of consumer report information.

## I.   BACKGROUND

Congress enacted the FCRA in 1970 to, among other matters, limit the circumstances under which persons can access and use consumer reports, require certain disclosures in connection with consumer reports and regulate the information contained in consumer reports.

Congress substantially amended the FCRA in 1996 in an effort to "make the law relevant in the information age."[3]  The 1996 amendments included provisions that expressly preempted certain state laws, including state laws that address "the exchange of information among persons affiliated by common ownership or common corporate control."[4]  In other words, the 1996 FCRA amendments preempted state laws that regulated information sharing among affiliates.

The FCRA's preemption provisions were scheduled to expire on January 1, 2004.  According to FCRA Section 624(d), the statute's preemption of state laws does not apply to any state law that:

- is enacted after January 1, 2004,

- states that it is intended to "supplement" the FCRA, and

- gives "greater protection to consumers" than is provided under the FCRA.[5]

The financial services industry has been lobbying Congress for over a year to eliminate the January 1, 2004 expiration of the FCRA's preemption provisions.  The FACT Act makes the FCRA's preemption provisions permanent, but also adds several new requirements to the statute.

## II.   SUMMARY OF THE ACT

### A.  Affiliate Sharing

#### 1.   In General

Although the FACT Act makes the FCRA's state affiliate sharing provisions permanent, it also imposes new requirements on persons that desire to share information with their affiliates[6] to enable the affiliates to make marketing solicitations.

Currently, the FCRA excludes from the definition of the term "consumer report" any:

- report containing information solely as to transactions or experiences between the consumer and the person making the report ("transaction and experience information");

- communication of transaction and experience information among affiliates; and

---

[3]  Joint Explanatory Statement of the Conference Committee.

[4]  4 15 U.S.C. § 1681t(b)(2).  Note that there is one exception to this preemption.  The FCRA does *not* preempt Vermont Statutes Annotated Title 9, Section 2480e(a) or (c)(1).

[5]  15 U.S.C. § 1681t(d).

[6]  According to the Act, the term "affiliates" means "persons that are related by common ownership or affiliated by corporate control."  FACT Act Section 2(4).

QL 0005573

- communication of *any other* information among affiliates, provided that:
  — it is disclosed to the consumer that the information may be communicated among affiliates; and
  — the consumer is given the opportunity to direct that the information not be so communicated.[7]

In other words, the FCRA currently permits (i) unrestricted sharing of transaction and experience information among affiliates, and (ii) sharing of any other information among affiliates if the consumer first is given notice and an opportunity to opt out.

Under the FACT Act, any person that receives from an affiliate information that would be a consumer report but for the exclusions described above may not use that information to make a marketing solicitation to a consumer, unless:

- it is clearly and conspicuously disclosed to the consumer that the information may be communicated among such persons for the purpose of making solicitations to the consumer; and
- the consumer is provided an opportunity and a simple method to prohibit such solicitations.[8]

In other words, before a person can use virtually any consumer information received from its affiliate for making marketing solicitations, the consumer must first be provided with a notice and an opportunity to opt out of the marketing solicitations.

The notice may be combined with any other notice required to be issued by law (*e.g.*, the privacy notices required by the Gramm-Leach-Bliley Act.)[9]

### 2.   Duration of Opt Out and Notice of Expiration

The Act provides that any election by a consumer to opt out of receiving solicitations shall be effective for five years, beginning on the date that the person receives the consumer's opt out election, unless the consumer requests that the opt out election be revoked. At the expiration of the five-year opt out period, a recipient of information from its affiliate may not use the information to make marketing solicitations unless the consumer first receives notice and an opportunity to extend the opt out period for another five years.[10]

---

[7] 15 U.S.C. § 1681a(d)(2)(A).

[8] Amended FCRA Section 624(a)(1).

[9] Amended FCRA Section 624(b).

[10] Amended FCRA Section 624(a)(3).

QL 0005574

### 3.   Exceptions

The foregoing affiliate sharing requirements do not apply to (among others) persons:

- using information to make a marketing solicitation to a consumer with whom the person has a pre-existing business relationship;[11]

- using information to perform services on behalf of another affiliate, except that this shall not permit a person to send solicitations on behalf of another person, if such other person would not be permitted to send the solicitation on its own behalf as a result of the consumer's opt out election;

- using information in response to a communication initiated by the consumer; or

- using information in response to solicitations authorized or requested by the consumer.[12]

### 4.   Preemption

The FACT Act states that requirements relating to a person's use of information received by it from an affiliate are included among the state law requirements preempted under FCRA Section 625(b)(2).[13]  In addition, the Act adds to the list of preempted topics any subject matter regulated under FCRA Section 624, relating to the exchange and use of information to make a solicitation for marketing purposes.[14]

### 5.   Regulations

The Act directs the Agencies to prescribe final regulations to implement the affiliate sharing requirements no later than nine months after the date of the Act's enactment (i.e., September 9, 2004).  The regulations are to become effective no later than six months after they are issued in final form.[15]

### 6.   Effective Date

The Act's affiliate sharing provisions will become effective when the implementing regulations described above become effective.[16]  Thus, the latest possible effective date will be March 4, 2005.  The affiliate sharing provisions will not prohibit the use of information to send solicitations if the information is received prior to the effective date of the implementing regulations.[17]

---

[11] The term "pre-existing business relationship" means a relationship between a person, or a person's licensed agent, and a consumer, based on:

(A) a financial contract between a person and a consumer which is in force;

(B) the purchase, rental, or lease by the consumer of that person's goods or services, or a financial transaction (including holding an active account or a policy in force or having another continuing relationship) between the consumer and that person during the 18-month period immediately preceding the date on which the consumer is sent a solicitation covered by this section;

(C) an inquiry or application by the consumer regarding a product or service offered by that person during the 3-month period immediately preceding the date on which the consumer is sent a solicitation covered by this section; or

(D) any other pre-existing customer relationship defined in the regulations implementing this section.

[12] Amended FCRA Section 624(a)(4).

[13] Amended FCRA Section 624(c).

[14] Amended FCRA Section 625(b)(1)(H).

[15] Amended FCRA Section 624(b).

[16] Amended FCRA Section 624(b).

[17] Amended FCRA Section 624(a)(5).

QL 0005575

## B. Risk-Based Pricing Notice

### 1. In General

The FACT Act states that if any person uses a consumer report in providing credit on material terms that are materially less favorable than the most favorable terms available to a substantial proportion of consumers from or through that person, based in whole or in part on a consumer report, the person must provide an oral, written, or electronic notice (the "Risk-Based Pricing Notice") to the consumer in the form and manner required by the regulations that will be issued to implement the requirement.[18]   At a minimum, the Risk-Based Pricing Notice must:

- include a statement informing the consumer that the terms offered to the consumer are set based on information from a consumer report;

- identify the consumer reporting agency furnishing the report;

- include a statement informing the consumer that the consumer may obtain a copy of a consumer report from that consumer reporting agency without charge; and

- include the contact information specified by the consumer reporting agency for obtaining the consumer report (including a toll-free telephone number established by the agency in the case of a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis (herein, a "nationwide consumer reporting agency")).

Unless the regulations implementing this requirement provide otherwise, the Risk-Based Pricing Notice may be provided either at the time of credit application or approval.

### 2. Exceptions

The FACT Act will not require a person to provide a Risk-Based Pricing Notice to a consumer if:

- the consumer applies for specific material terms and is granted those terms, unless those terms were initially specified by the person after the consumer initiated the transaction and after the person obtained a consumer report; or

- the person has provided or will provide an adverse action notice to the consumer as required under FCRA Section 615(a).[19]

### 3. Regulations

The Act requires the FTC and the Board to jointly issue regulations implementing the Risk-Based Pricing Notice requirement.[20] The regulations must address, at a minimum:

- the form, content, time, and manner of delivery of the Risk-Based Pricing Notice;

- clarification of the meaning of certain terms, including what credit terms are "material," and when credit terms are "materially less favorable;"

- exceptions to the Risk-Based Pricing Notice for certain classes of persons or transactions;

---

[18] Amended FCRA Section 615(h).

[19] Amended FCRA Section 615(h).

[20] Amended FCRA Section 615(h).

**Kirkpatrick & Lockhart** LLP                5

- a model Risk-Based Pricing Notice; and

- the timing of the Risk-Based Pricing Notice.

### 4. Preemption

The FACT Act adds to the list of subjects that are preempted by the FCRA any subject matter regulated under FCRA Section 615(h), "relating to the duties of users of consumer reports to provide notice with respect to terms in certain credit transactions."[21]

### 5. Enforcement

The FACT Act states that the Act's Risk-Based Pricing Notice requirements shall be enforced exclusively through FCRA Section 621 [administrative enforcement], and that FCRA Sections 616 and 617 [civil liability for willful and negligent noncompliance] shall not apply to any failure to comply with such requirements.[22]

The Act also states that a person shall not be liable for failure to comply with the Act's Risk-Based Pricing Notice requirements if, at the time of the failure, the person maintained reasonable policies and procedures to comply with them.[23]

## C. Disclosures of Credit Scores by Mortgage Lenders

### 1. In General

The FACT Act amends FCRA Section 609 [disclosures to consumers] by adding a new subsection (g) that requires lenders to disclose credit scores and certain related information to mortgage loan applicants.

Under the Act, any mortgage lender[24] that uses a credit score[25] in connection with a mortgage loan[26] application initiated by a consumer must provide the following to the consumer "as soon as reasonably practicable:"

- A copy of the credit score and related information (as described in amended FCRA Section 609(f)[27]) that was obtained from a consumer reporting agency or was developed and used by the user of the information; and

---

[21] Amended FCRA Section 625(b)(1)(I).

[22] Amended FCRA Section 615(h)(8).

[23] Amended FCRA Section 615(h)(7).

[24] For purposes of this requirement, a "lender" is any person who makes or arranges certain mortgage loans. See amended FCRA Section 609(g)(1)(emphasis added).

[25] For purposes of the Act, a "credit score" is "a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default (and the numerical value or the categorization derived from such analysis may also be referred to as a 'risk predictor' or 'risk score')." The term does not include: (i) any mortgage score or rating of an automated underwriting system that considers one or more factors in addition to credit information, including the loan to value ratio, the amount of down payment, or the financial assets of a consumer; or (ii) any other elements of the underwriting process or underwriting decision. Amended FCRA Section 609(f)(2)(A).

[26] For purposes of this requirement, a "mortgage loan" is a closed- or open-end loan for a consumer purpose that is secured by 1 to 4 units of residential real property. Amended FCRA Section 609(g)(1).

[27] Upon the request of a consumer for a credit score, amended FCRA Section 609(f) requires consumer reporting agencies to supply the consumer with: (i) a statement indicating that the information and credit scoring model may be different than the credit score that may be used by the lender, and (ii) a notice that includes: (A) the current credit score of the consumer or the most recent credit score of the consumer that was previously calculated by the credit reporting agency for a purpose related to the extension of credit; (B) the range of possible credit scores under the model used; (C) all of the key factors

**Kirkpatrick & Lockhart LLP**    6

- A "NOTICE TO THE HOME LOAN APPLICANT," which must include the name, address and telephone number of each consumer reporting agency that provided a credit score that was used.[28]

### 2. Disclosures Required by Lenders That Use an Automated Underwriting System

According to the Act, if a lender uses an automated underwriting system, it can satisfy its obligation to provide a credit score by disclosing a credit score and the associated key factors provided by a consumer reporting agency.[29]

If a numerical credit score is generated by Fannie Mae's or Freddie Mac's automated underwriting systems, and that score is disclosed to the lender, the lender must disclose that score to the consumer.

### 3. Disclosures Required by Lenders That Use Credit Scores Not Obtained From a Consumer Reporting Agency

The Act provides that if a lender uses a credit score other than a credit score provided by a consumer reporting agency, the lender may satisfy its obligation to provide a credit score to the consumer by disclosing a credit score and associated key factors supplied by a consumer reporting agency.[30]

### 4. Actions Not Required

The FACT Act clarifies that the foregoing obligations do <u>not</u> require lenders to:

- explain the information provided pursuant to amended FCRA Section 609(f);

- disclose any information other than a credit score or key factors, as defined in amended FCRA Section 609(f);

---

[27] Continued

(*i.e.*, all relevant elements or reasons adversely affecting the credit score for the particular individual, listed in the order of their importance based on their effect on the credit score) that adversely affected the credit score of the consumer in the model used, the total number of which shall not exceed four, subject to subsection (f)(9) (relating to number of enquiries made); (D) the date on which the credit score was created; and (E) the name of the person or entity that provided the credit score or credit file upon which the credit score was created.

[28] The text of the NOTICE TO THE HOME LOAN APPLICANT is as follows:

NOTICE TO THE HOME LOAN APPLICANT:

In connection with your application for a home loan, the lender must disclose to you the score that a consumer reporting agency distributed to users and the lender used in connection with your home loan, and the key factors affecting your credit scores.

The credit score is a computer generated summary calculated at the time of the request and based on information that a consumer reporting agency or lender has on file. The scores are based on data about your credit history and payment patterns. Credit scores are important because they are used to assist the lender in determining whether you will obtain a loan. They may also be used to determine what interest rate you may be offered on the mortgage. Credit scores can change over time, depending on your conduct, how your credit history and payment patterns change, and how credit scoring technologies change.

Because the score is based on information in your credit history, it is very important that you review the credit-related information that is being furnished to make sure it is accurate. Credit records may vary from one company to another.

If you have questions about your credit score or the credit information that is furnished to you, contact the consumer reporting agency at the address and telephone number provided with this notice, or contact the lender, if the lender developed or generated the credit score. The consumer reporting agency plays no part in the decision to take any action on the loan application and is unable to provide you with specific reasons for the decision on a loan application. If you have questions concerning the terms of the loan, contact the lender. Amended FCRA Section 609(g)(1)(A).

[29] Amended FCRA Section 609(g)(1)(B).

[30] Amended FCRA Section 609(g)(1)(C).

QL 0005578

- disclose any credit score or related information obtained <u>after</u> a loan has closed;

- provide more than one disclosure per loan transaction; or

- provide the disclosure described above when another person has made the disclosure to the consumer for that loan transaction.[31]

The Act further provides that the disclosure obligations described above are "limited solely to providing a copy of the information that was received from the consumer reporting agency;" and that no person shall have liability under amended FCRA Section 609(g) for the content of that information or for the omission of any information within the report provided by the consumer reporting agency.[32]

### 5.  Contract Clauses

To reconcile any contractual provisions that prohibit credit score disclosures, the FACT Act states that any provision in a contract that prohibits the disclosure of a credit score by lenders or consumer reporting agencies is void, and that a lender shall not have any contractual liability for disclosing a credit score pursuant to amended FCRA Section 609(g).

### 6.  Preemption

The FACT Act amends the FCRA's preemption provisions to provide (among other matters) that no requirement or prohibition may be imposed under the laws of any state with respect to the disclosures required under amended FCRA Section 609(g).[33]

## D.  Duties of Persons Who Furnish Information to Consumer Reporting Agencies

The FACT Act adds a number of provisions to the FCRA's current requirements regarding responsibilities of persons who furnish information to consumer reporting agencies ("information furnishers" or "furnishers").

### 1.  Procedures for Handling Blocked Information

The Act provides that an information furnisher must adopt reasonable procedures to respond to any notification received from a consumer reporting agency regarding information resulting from identity theft (the FACT Act requires consumer reporting agencies to block such information).[34]  The procedures must prevent the information furnisher from refurnishing such blocked information to other parties.[35]

Furthermore, if a consumer submits an identity theft report to an information furnisher stating that information maintained by the furnisher that purports to relate to the consumer resulted from identity theft, the information furnisher may not furnish such information to any consumer reporting agency, unless the furnisher subsequently knows or is informed by the consumer that the information is correct.[36]

---

[31]  Amended FCRA Section 609(g)(1)(E).

[32]  Amended FCRA Section 609(g)(1)(F).

[33]  Amended FCRA Section 625(b)(3).  The Act sets forth certain exceptions to the state laws preempted under this section. *See* amended FCRA Section 625(b)(3)(A)-(C).

[34]  *See* amended FCRA Section 605B.  This Client Alert focuses on requirements applicable to creditors, and other users and furnishers of consumer reports; it does not describe the FACT Act provisions—such as Section 605B—that apply solely to consumer reporting agencies.

[35]  Amended FCRA Section 623(a)(6)(A).

[36]  Amended FCRA Section 623(a)(6)(B).

**Kirkpatrick & Lockhart LLP**        8

### 2.   Notice to Consumers Regarding Negative Information

The FACT Act requires any creditor that reports negative information about a consumer to a nationwide consumer reporting agency to notify the consumer in writing about the report.  Specifically, the Act states that when any financial institution that extends credit and regularly and in the ordinary course of business furnishes negative information (*i.e.*, information concerning a customer's delinquencies, late payments, insolvency, or any form of default) to a nationwide consumer reporting agency regarding credit extended to a customer, the financial institution must provide a notice regarding the furnishing of negative information, in writing, to the customer prior to, or no later than 30 days after, it furnishes the negative information.[37]  The financial institution may <u>not</u> include the notice with the open-end consumer credit plan disclosures required by Section 127(a) of the Truth in Lending Act, but it <u>may</u> include the notice on or with any notice of default, any billing statement, or any other materials provided to the customer; the notice <u>must</u> be clear and conspicuous.[38]

After providing the notice, the financial institution may submit additional negative information to the nationwide consumer reporting agency with respect to the same transaction, extension of credit, account, or customer without providing additional notice to the customer.[39]

The Act requires the Board to prescribe, by June 6, 2004, a brief model disclosure that may be used to comply with the notice requirement described above.  Financial institutions will not be required to use the model, but the model will serve as a safe harbor for compliance with the notice requirement.[40]

The Act states that a financial institution shall not be liable for failure to perform the duties required by this paragraph if, at the time of the failure, the financial institution maintained reasonable policies and procedures to comply with this paragraph or the financial institution reasonably believed that the institution was prohibited, by law, from contacting the consumer.[41]

### 3.   Accuracy Guidelines and Regulations

The FACT Act requires the Agencies to (i) establish guidelines for information furnishers regarding the accuracy and integrity of the information they furnish to consumer reporting agencies about consumers, and (ii) issue regulations requiring furnishers to adopt policies and procedures to implement the guidelines.[42]

### 4.   Increased Standard of Care Regarding Accuracy of Reported Information

The Act revises the FCRA's prohibition on furnishing information that the furnisher "knows" is inaccurate or "consciously avoids knowing" is inaccurate to a prohibition on furnishing information when the furnisher "knows or has reasonable cause to believe that the information is inaccurate."[43]

---

[37]  Amended FCRA Section 623(a)(7)(A) and (B).  For purposes of this requirement, the terms "financial institution" and "customer" have the same meanings as they have in the Gramm-Leach- Bliley Act (15 U.S.C. § 6809).  Amended FCRA Section 623(a)(7)(G)(ii).

[38]  Amended FCRA Section 623(a)(7)(B)(ii) and (C).

[39]  Amended FCRA Section 623(a)(7)(A)(ii).

[40]  Amended FCRA Section 623(a)(7)(D).

[41]  Amended FCRA Section 623(a)(7)(F).

[42]  Amended FCRA Section 623(e).

[43]  Amended FCRA Section 623(a)(1)(A).  For purposes of this requirement, the term "reasonable cause to believe that the information is inaccurate" means having specific knowledge, other than solely allegations by the consumer, that would cause a reasonable person to have substantial doubts about the accuracy of the information.  Amended FCRA Section 623(a)(1)(D).

QL 0005580

### 5. Consumer Disputes With Furnishers

The Act directs the Agencies to prescribe regulations that will identify the circumstances under which an information furnisher shall be required to reinvestigate a dispute over the accuracy of information contained in a consumer report based on a consumer's request.[44]

The Act also specifies the requirements a consumer must satisfy in submitting a dispute notice to a furnisher,[45] the duties of a furnisher upon receipt of a dispute notice[46] and the procedures the furnisher must follow upon determining that a consumer's dispute is frivolous or irrelevant.[47]   Additionally, the Act amends the FCRA's requirements regarding information furnishers that provide information to consumer reporting agencies about delinquent accounts being placed for collection, charged for profit or loss, or subjected to any similar action.[48] Finally, the Act adds to the duties of information furnishers when an item of information disputed by a consumer is found to be inaccurate, incomplete or unverifiable.[49]

### E. Prohibition on Sale or Transfer of Debt Caused by Identity Theft

The FACT Act amends FCRA Section 615 [requirements on users of consumer reports] to add a provision that prohibits any person from selling or placing for collection any debt if the person has received notice (under amended FCRA Section 605B) that the debt resulted from identity theft.[50]

The foregoing shall not, however, prohibit:

- the repurchase of a debt in any case in which the assignee of the debt requires such repurchase because the debt has resulted from identity theft;

- the securitization of a debt or the pledging of a portfolio of debt as collateral in connection with a borrowing; or

- the transfer of debt as a result of a merger, acquisition, purchase and assumption transaction, or transfer of substantially all of the assets of an entity.

## F. Miscellaneous

### 1. Prescreened Lists

The FACT Act amends the FCRA provisions addressing the use of prescreened lists to: (i) require the FTC, in consultation with certain other agencies, to issue final regulations not later than December 4, 2004 addressing the disclosures that must be provided to prescreened consumers along with the written solicitations; and (ii) extend the duration of a consumer's election to be excluded from prescreened lists from two years to five years.[51]

---

[44]   Amended FCRA Section 623(a)(8)(A)-(B).

[45]   Amended FCRA Section 623(a)(8)(D).

[46]   Amended FCRA Section 623(a)(8)(E).

[47]   Amended FCRA Section 623(a)(8)(F).

[48]   Amended FCRA Section 623(a)(5).

[49]   Amended FCRA Section 623(b)(1)(E).

[50]   Amended FCRA Section 615(f).

[51]   Amended FCRA Sections 615(d)(2), 604(e)(3)(A) and 604(4)(B)(i).

**Kirkpatrick & Lockhart LLP**          10

QL 0005581

**2.    Disposal of Records**

The FACT Act requires the FTC and certain other Agencies to issue final regulations by December 4, 2005 requiring persons that maintain or possess consumer information or compilations of consumer information derived from consumer reports to properly dispose of such information or compilations.[52]

**3.    Medical Information**

Subject to certain exceptions, the FACT Act prohibits creditors from obtaining or using medical information about a consumer for determining the consumer's eligibility for credit.[53]

### G. Obligations Applicable to Debt Collectors

If a person acting as a debt collector (as defined in the Fair Debt Collection Practices Act[54]) on behalf of a third party that is a creditor or other user of a consumer report is notified that any information relating to a debt that the person is attempting to collect may be fraudulent or may be the result of identity theft, that person must:

- notify the third party that the information may be fraudulent or may be the result of identity theft; and

- upon the request of the consumer to whom the debt purportedly relates, provide to the consumer all information to which the consumer would otherwise be entitled if the consumer were not a victim of identity theft, but wished to dispute the debt under provisions of law applicable to that person.[55]

### H. Statute of Limitations

The FACT Act amends the FCRA's statute of limitations to provide that an action to enforce liability under the FCRA may be brought in any appropriate United States district court, without regard to the amount in controversy, not later than the earlier of:

- two years after the plaintiff discovers the violation; or

- five years after the violation occurs.[56]

*     *     *     *     *

If you have any questions about the FACT Act, please contact Melanie Brody or any other member of the Mortgage Banking/Consumer Finance Group.

---

[52] Amended FCRA Section 628.

[53] Amended FCRA Section 604(g)(2).

[54] 15 U.S.C. § 1692a(6).

[55] Amended FCRA Section 615(g).

[56] Amended FCRA Section 618.

**Kirkpatrick & Lockhart LLP**                    11

# MORTGAGE BANKING/CONSUMER FINANCE GROUP

Kirkpatrick & Lockhart LLP was founded in 1946, and, with more than 700 lawyers, is one of the 50 largest law firms in the United States. K&L attorneys are based in ten offices in key U.S. cities—Boston, Dallas, Harrisburg, Los Angeles, Miami, Newark, New York, Pittsburgh, San Francisco, and Washington. Our firm represents a broad range of clients in a wide variety of matters, including corporate and securities, e-commerce, investment management, insurance coverage, financial institutions, mortgage banking and consumer finance, creditors' rights, intellectual property, tax, labor, environmental, antitrust, health care, and government contracts. More than half our attorneys are litigators. We litigate class actions on a range of financial issues, generally defending financial institutions, broker-dealers, public companies, and investment companies and their officers and directors against claims of violations of securities laws, consumer credit laws, and common law tort and contract claims. You can learn more about our firm by visiting our Internet website at www.kl.com.

The Mortgage Banking/Consumer Finance Group provides legal advice and licensing services to the consumer lending industry. We counsel clients engaged in the full range of mortgage banking activities, including the origination, processing, underwriting, closing, funding, insuring, selling, and servicing of residential mortgage loans and consumer loans, from both a transactional and regulatory compliance perspective. Our focus includes both first- and subordinate-lien residential mortgage loans, as well as open-end home equity, property improvement loans and other forms of consumer loans. We also have experience in multi-family and commercial mortgage loans. Our clients include mortgage companies, depository institutions, consumer finance companies, investment bankers, insurance companies, real estate agencies, homebuilders, and venture capital funds. Members of the Mortgage Banking/Consumer Finance Group and their telephone numbers and e-mail addresses are listed below:

## ATTORNEYS

| | | |
|---|---|---|
| Phillip L. Schulman | 202.778.9027 | pschulman@kl.com |
| Laurence E. Platt | 202.778.9034 | lplatt@kl.com |
| Costas A. Avrakotos | 202.778.9075 | cavrakotos@kl.com |
| Melanie Hibbs Brody | 202.778.9203 | mbrody@kl.com |
| Steven M. Kaplan | 202.778.9204 | skaplan@kl.com |
| Jonathan Jaffe | 415.249.1023 | jjaffe@kl.com |
| H. John Steele | 202.778.9489 | jsteele@kl.com |
| R. Bruce Allensworth | 617.261.3119 | ballensworth@kl.com |
| Irene C. Freidel | 617.261.3115 | ifreidel@kl.com |
| Daniel J. Tobin | 202.778.9074 | dtobin@kl.com |
| Jerome Walker | 212.536.4850 | jwalker@kl.com |
| David L. Beam | 202.778.9026 | dbeam@kl.com |
| Emily J. Booth | 202.778.9112 | ebooth@kl.com |
| Krista Cooley | 202.778.9257 | kpatterson@kl.com |
| Eric J. Edwardson | 202.778.9387 | eedwardson@kl.com |
| Suzanne F. Garwood | 202.778.9892 | sgarwood@kl.com |
| Laura A. Johnson | 202.778.9249 | laura.johnson@kl.com |
| Kris D. Kully | 202.778.9301 | kkully@kl.com |
| Christopher G. Morrison | 202.778.9245 | chris.morrison@kl.com |
| Erin Murphy | 415.249.1038 | emurphy@kl.com |
| Sam A. Ozeck | 202.778.9085 | sozeck@kl.com |
| Holly M. Spencer | 202.778.9853 | hspencer@kl.com |
| Nanci L. Weissgold | 202.778.9314 | nweissgold@kl.com |

## DIRECTOR OF LICENSING

| | | |
|---|---|---|
| Stacey L. Riggin | 202.778.9202 | sriggin@kl.com |

## REGULATORY COMPLIANCE ANALYSTS

| | | |
|---|---|---|
| Dana L. Lopez | 202.778.9383 | dlopez@kl.com |
| Nancy J. Butler | 202.778.9374 | nbutler@kl.com |
| Joelle Myers | 202.778.9093 | jmyers@kl.com |
| Marguerite T. Frampton | 202.778.9253 | mframpton@kl.com |
| Jeffrey Prost | 202.778.9364 | jprost@kl.com |
| Patricia E. Mesa | 202.778.9219 | pmesa@kl.com |
| Kenasha Scott | 202.778.9384 | kscott@kl.com |
| Heidi M. Evans | 202.778.9241 | hevans@kl.com |

## LEGAL ASSISTANTS

| | | |
|---|---|---|
| Mera C. Choi | 202.778.9415 | mchoi@kl.com |



**Kirkpatrick & Lockhart LLP**

*Challenge us.®*

www.kl.com

BOSTON ▪ DALLAS ▪ HARRISBURG ▪ LOS ANGELES ▪ MIAMI ▪ NEWARK ▪ NEW YORK ▪ PITTSBURGH ▪ SAN FRANCISCO ▪ WASHINGTON

This publication/newsletter is for informational purposes and does not contain or convey legal advice. The information herein should not be used or relied upon in regard to any particular facts or circumstances without first consulting a lawyer.

© 2003 KIRKPATRICK & LOCKHART LLP. ALL RIGHTS RESERVED.

QL 0005583

# Exhibit 3

| From: | Pelto, Sue [/O=INTUIT/OU=LIVONIA/CN=RECIPIENTS/CN=SUE PELTO] |
|---|---|
| Sent: | 11/7/2004 7:58:54 PM |
| To: | Krause, Shawn [shawnkrause@quickenloans.com]; Gilbert, Dan [dangilbert@quickenloans.com]; Emerson, William [williamemerson@quickenloans.com]; Ziraldo, Jim [jimziraldo@quickenloans.com]; Sanders, Ross [rosssanders@quickenloans.com]; Carroll, Michelle [michellecarroll@quickenloans.com]; Lunsford, Todd [toddlunsford@quickenloans.com] |
| CC: | Carroll, David [davidcarroll@quickenloans.com]; Vitale, Angelo [angelovitale@quickenloans.com]; Chyette, Richard [richardchyette@quickenloans.com]; Bishop, Amy [amybishop@quickenloans.com]; Buckiso, Donna [donnabuckiso@quickenloans.com]; Kas, Andrea [andreakas@quickenloans.com] |
| Subject: | RE: New Form required by FTC for compliance with Fair and Accurate Credit Transactions Act. |

That is what I envisioned until you get the new package developed.  I will follow-up with Andrea tomorrow.


-----Original Message-----
From: Krause, Shawn
Sent: Sunday, November 07, 2004 7:56 PM
To: Pelto, Sue; Gilbert, Dan; Emerson, William; Ziraldo, Jim; Sanders, Ross; Carroll, Michelle; Lunsford, Todd
Cc: Carroll, David; Vitale, Angelo; Chyette, Richard; Bishop, Amy; Buckiso, Donna; Kas, Andrea
Subject: RE: New Form required by FTC for compliance with Fair and Accurate Credit Transactions Act.

Why don't we just get a disclosure form in place for December 1st in our current package?  We can reference it on the form for the docs that don't need to be signed.  Then Jim can work it into the future package however he wants.

Sue can you define that form?  Thanks!

-----Original Message-----
From: Pelto, Sue
Sent: Sunday, November 07, 2004 12:22 PM
To: Pelto, Sue; Gilbert, Dan; Emerson, William; Ziraldo, Jim; Sanders, Ross; Carroll, Michelle; Krause, Shawn; Lunsford, Todd
Cc: Carroll, David; Vitale, Angelo; Chyette, Richard; Bishop, Amy; Buckiso, Donna
Subject: RE: New Form required by FTC for compliance with Fair and Accurate Credit Transactions Act.

One more thing, what ever we end up doing, we just need to make sure we have something in place by 12/1 so we can prove to our investors we are in compliance.  Trust me, they will be looking for our compliance with this and I don't want to be stuck with loans we can't sell.

-----Original Message-----
From: Pelto, Sue
Sent: Sunday, November 07, 2004 12:15 PM
To: Gilbert, Dan; Emerson, William; Ziraldo, Jim; Sanders, Ross; Carroll, Michelle; Krause, Shawn; Lunsford, Todd
Cc: Carroll, David; Vitale, Angelo; Chyette, Richard; Bishop, Amy; Buckiso, Donna
Subject: RE: New Form required by FTC for compliance with Fair and Accurate Credit Transactions Act.

We might also consider adding the language to our existing "Government Disclosure" document that covers a few different federal regs and doesn't need to be signed.  We may end up adding a page to that document, but at least it isn't another document.

I didn't see where the law required the form be "separate" but will double check.

What is the timeframe for the new 1 page document?

-----Original Message-----
From: Gilbert, Dan
Sent: Sunday, November 07, 2004 12:07 PM
To: Emerson, William; Pelto, Sue; Ziraldo, Jim; Sanders, Ross; Carroll, Michelle; Krause, Shawn; Lunsford, Todd
Cc: Carroll, David; Vitale, Angelo; Chyette, Richard; Bishop, Amy; Buckiso, Donna
Subject: RE: New Form required by FTC for compliance with Fair and Accurate Credit Transactions Act.

Great point! I forgot you don't have to sign it!

CONFIDENTIAL

Daniel Gilbert
"Have a great and productive day"
dangilbert@quickenloans.com <mailto:dangilbert@quickenloans.com>

-----Original Message-----
From: Emerson, William
Sent: Sunday, November 07, 2004 11:52 AM
To: Pelto, Sue; Gilbert, Dan; Ziraldo, Jim; Sanders, Ross; Carroll, Michelle; Krause, Shawn; Lunsford, Todd
Cc: Carroll, David; Vitale, Angelo; Chyette, Richard; Bishop, Amy; Buckiso, Donna
Subject: Re: New Form required by FTC for compliance with Fair and Accurate Credit Transactions Act.

Let's review the language of the reg and the form.  Sounds like if we need it we can just make it part of the disclosure package.

-----Original Message-----
From: Pelto, Sue <SuePelto@quickenloans.com>
To: Gilbert, Dan <DanGilbert@quickenloans.com>; Emerson, William <WilliamEmerson@quickenloans.com>; Ziraldo, Jim <JimZiraldo@quickenloans.com>; Sanders, Ross <RossSanders@quickenloans.com>; Carroll, Michelle <MichelleCarroll@quickenloans.com>; Krause, Shawn <ShawnKrause@quickenloans.com>; Lunsford, Todd <ToddLunsford@quickenloans.com>
CC: Carroll, David <DavidCarroll@quickenloans.com>; Vitale, Angelo <AngeloVitale@quickenloans.com>; Chyette, Richard <RichardChyette@quickenloans.com>; Bishop, Amy <AmyBishop@quickenloans.com>; Buckiso, Donna <DonnaBuckiso@quickenloans.com>
Sent: Sun Nov 07 10:38:21 2004
Subject: New Form required by FTC for compliance with Fair and Accurate Credit Transactions Act.

Wanted to give the Mousetrap Team heads-up on a new disclosure that will be required as part of the FACT Act.


Section 212(c) of the Fair and Accurate Credit Transactions Act (FACT Act) of 2003 requires anyone who makes or arranges for a loan and uses a credit score, to provide a "Notice to the Home Loan Applicant". The notice must include prescribed language and must also include the name, address and phone number of each credit reporting agency that provided a credit score to the lender. The lender is ONLY required to give this notice. It is required to be given as soon as practicable. The disclosure requirement goes into effect December 1, 2004.


I have attached a sample of the VMP version of this disclosure.  This is not a model form so we don't have any wiggle room with the language, how ever it does not need to be signed by the client, only delivered.  VMP always includes a signature line but we can create our own form without the signature line.


The law requires we give the notice as soon as practicable.   There is no provision in the law that says a lender does not need to provide the form if the loan is denied within 3 business days like some of the other regulations.  That said, I would recommend we include this with the application package to make sure everyone receives it.  If we do it later in the process we could be sending it to someone we denied, although as an alternative, we could include it with a denial letter if the denial occurred within a few days of application.   Let me know how you would like to proceed.


As an aside, California has a disclosure that is similar to this. I have not seen any changes in CA law that eliminates their credit score disclosure and replaces it with the new FACT Act disclosure. I will look into further to see if we can eliminate one of them because we will look like idiots to our clients if we send two forms that are just slightly different.


If I have excluded anyone from this e-mail please pass along.   Thanks!!  sp

CONFIDENTIAL                                                      QL0019502

CONFIDENTIAL

QL0019503

# Exhibit 4

| From: | Gilbert, Dan [/O=INTUIT/OU=LIVONIA/CN=RECIPIENTS/CN=DAN GILBERT] |
|---|---|
| Sent: | 11/12/2004 9:07:40 AM |
| To: | Krause, Shawn [shawnkrause@quickenloans.com]; Carroll, David [davidcarroll@quickenloans.com]; Pelto, Sue [suepelto@quickenloans.com]; Emerson, William [williamemerson@quickenloans.com]; Ziraldo, Jim [jimziraldo@quickenloans.com]; Sanders, Ross [rosssanders@quickenloans.com]; Carroll, Michelle [michellecarroll@quickenloans.com]; Lunsford, Todd [toddlunsford@quickenloans.com] |
| CC: | Vitale, Angelo [angelovitale@quickenloans.com]; Chyette, Richard [richardchyette@quickenloans.com]; Bishop, Amy [amybishop@quickenloans.com]; Walters, Bob [bobwalters@quickenloans.com]; Kas, Andrea [andreakas@quickenloans.com]; Murtaugh, Rebecca [rebeccamurtaugh@quickenloans.com] |
| Subject: | Re: New Form required by FTC for compliance with Fair and Accurate Credit Transactions Act. |

MT agenda today.

************
Dan Gilbert
"Have a Great and Productive Day!"
I am currently on the road.  This message is being sent from my Blackberry.

-----Original Message-----
From: Krause, Shawn <ShawnKrause@quickenloans.com>
To: Carroll, David <DavidCarroll@quickenloans.com>; Gilbert, Dan <DanGilbert@quickenloans.com>; Pelto,
Sue <SuePelto@quickenloans.com>; Emerson, William <williamEmerson@quickenloans.com>; Ziraldo, Jim
<JimZiraldo@quickenloans.com>; Sanders, Ross <RossSanders@quickenloans.com>; Carroll, Michelle
<MichelleCarroll@quickenloans.com>; Lunsford, Todd <ToddLunsford@quickenloans.com>
CC: Vitale, Angelo <AngeloVitale@quickenloans.com>; Chyette, Richard <RichardChyette@quickenloans.com>;
Bishop, Amy <AmyBishop@quickenloans.com>; Walters, Bob <BobWalters@quickenloans.com>; Kas, Andrea
<AndreaKas@quickenloans.com>; Murtaugh, Rebecca <RebeccaMurtaugh@quickenloans.com>
Sent: Fri Nov 12 08:09:10 2004
Subject: RE: New Form required by FTC for compliance with Fair and Accurate Credit Transactions Act.

So we should move forward with the programming of this document since it's due in 3 weeks?


Does this form need to be signed or can it just be put in the "disclosure" section and acknowledged on
the one page that lists all the forms the client received?


_____

From: Carroll, David
Sent: Thursday, November 11, 2004 2:55 PM
To: Gilbert, Dan; Pelto, Sue; Emerson, William; Ziraldo, Jim; Sanders, Ross; Carroll, Michelle; Krause,
Shawn; Lunsford, Todd
Cc: Vitale, Angelo; Chyette, Richard; Bishop, Amy; Walters, Bob
Subject: RE: New Form required by FTC for compliance with Fair and Accurate Credit Transactions Act.


I like the white paper concept. Below is an excerpt from our Predatory Lending "white paper" (why is it
called a white paper? Isn't most paper white?) on disclosures. I would build off of that.


Two other things to consider:


1. Whether we like it or not, we have to start providing this disclosure in about three weeks. I don't
know where we are with plans for a "one-doc" concept, but unless we're really close to having it done, we
need to prepare this as a standalone document in time for a December 1 launch--period. Otherwise, we risk
problems not only with the federal and state governments, but also with our investors who examine our
loans for compliance as they purchase them. We can always go back and incorporate it into "one-doc"
later. Also, the statute is very clear on what the document must say ver batim. It doesn't leave room for
an "abridged version."

CONFIDENTIAL                                                                    QL0019339

2. As bad as it is to keep adding disclosures, in some sense it beats the alternative. For instance, a legislature could prohibit us from doing certain types of loans, limit our earnings on certain types of loans, etc. Even though disclosure forms are a hassle, they don't fundamentally affect our ability to lend, and the requirements apply equally to our competitors. Also, the existence of a disclosure can help us in lawsuit type situations by adding a presumption that we did nothing wrong.  The point is, we all know that disclosures are the politicians' easy way to write up "feel good" legislation to make the public think they have "done something" about a problem--and in reality, disclosures do nothing to help anyone. But the modest cost of having more disclosures is probably the most convenient way to keep everyone happy and keep the government wolves at bay.


Adding more disclosures will only add to borrower confusion.


An easy "feel good" fix would be to pass new legislation mandating that lenders make certain additional disclosures to borrowers in potential "predatory lending" situations. Lenders wouldn't be offended (after all, who could be against "disclosure"?), and everyone could feel like "something was done" about the problem.


But we must resist this path. Additional disclosures would be a waste of time, and would simply make the mortgage process even more difficult and expensive by adding yet more documentation for all of the parties to deal with. Federal law already requires the Good Faith Estimate, the Truth-in-Lending Disclosure, the Section 32 high cost loan disclosure (in certain cases), the HUD-1 Settlement Statement, the Servicing Transfer Notice, the ECOA Notice, the Three-day Right of Rescission Notice and others. Many states require additional disclosures as well. Usually, the borrowers don't even read these disclosures; and the few borrowers who actually read them, still choose to proceed with the transaction. In fact, in all my years in the mortgage business, I cannot think of one instance where a borrower read a government mandated disclosure at application or closing, and then backed out of the transaction because of what he or she learned in that disclosure.


A brief story will further illustrate this point. A few years ago, we offered our customers a type of second mortgage loan, which allowed for the combined first and second mortgage loan amounts to exceed the property value by 25%. (Note, the loans were commonly referred to as "125's; we stopped offering these a while ago). Since our customers were borrowing against their entire equity (and then some), we felt that it was proper to go above and beyond the standard aforementioned disclosures, and create our own clear, customer-friendly disclosure. So, we prepared a very simple, clear, bold-lettered disclosure form, which spelled out all of the risks more clearly than any government disclosure form I've ever seen. We included this with each and every closing package. We figured that this disclosure would scare some potential borrowers away and hurt our business. But we thought it was the right thing to do regardless. As it turned out, we wound up closing over 2000 of these loans over a 10 to 15 month period, and not one customer changed his/her mind as a result of reading the disclosure.


The point is, additional disclosures won't address the problem. I suspect that in the majority of "predatory lending" cases, the lender did indeed give the borrower numerous written disclosures, and lack of disclosure wasn't the problem. (And for these reasons, I believe that the Fed's efforts to expand the scope of Sections 32 high cost loan parameters will ultimately be futile as well).


-----Original Message-----
From: Gilbert, Dan
Sent: Sunday, November 07, 2004 11:05 AM
To: Pelto, Sue; Emerson, William; Ziraldo, Jim; Sanders, Ross; Carroll, Michelle; Krause, Shawn; Lunsford, Todd
Cc: Carroll, David; Vitale, Angelo; Chyette, Richard; Bishop, Amy; Buckiso, Donna; Carroll, Michelle; Cicurel, Steve; Emerson, William; Farner, Jay; Gilbert, Dan; Hein, Brad; Katzman, David; Kochish, Kathleen; Krause, Shawn; Loussia, Karen; Lunsford, Todd; Lyon, Michael; Mandell, Richard; Mcinnis, Patrick; Sanders, Ross; Stefanski, Susan; Ziraldo, Jim; Allio, Mark; Carroll, David; Chyette, Richard; Eisenshtadt, Jeff; Gilewski, Monica; Hackett, Jeff; Hall, David; Cohen, Jeff; Jones, Elizabeth; Kramer, Rob; McPhail, Evana; Piazza, Stephen Luigi; Pyett, Nick; Rice, Bill; Rosenthal, Steve; Stapp, Bryan; Vitale, Angelo; Walters, Bob; Zionkowski, Tammy

CONFIDENTIAL

Subject: RE: New Form required by FTC for compliance with Fair and Accurate Credit Transactions Act.

This will NOT be a new document to our app package. We will add the language (or our abridged version) to the "one-doc".  We will have to talk about adding this to the denial letter for denied loans.

The absurdity of each year that passes that NEW INSANE AND MEANINGLESS DISCLOSURES our added to the loan process has got to stop.

I challenge Dave Carroll to write a crystal clear "white paper" that defines the issues (with all of the disclosure documents attached) and then maybe proposes a solution. We could then shop this "white paper" to all the groups  involved (I believe it is even possible to convince he consumer groups of the insanity of all of this) as well as all of the politicians who would need to reform this insanity.

It could be titled:

"More disclosures in mortgage process=More confusion plus higher costs with zero benefit to consumers."

Daniel Gilbert
"Have a great and productive day"
dangilbert@quickenloans.com

_____

        From: Pelto, Sue
Sent: Sunday, November 07, 2004 10:38 AM
To: Gilbert, Dan; Emerson, William; Ziraldo, Jim; Sanders, Ross; Carroll, Michelle; Krause, Shawn; Lunsford, Todd
Cc: Carroll, David; Vitale, Angelo; Chyette, Richard; Bishop, Amy; Buckiso, Donna
Subject: New Form required by FTC for compliance with Fair and Accurate Credit Transactions Act.

Wanted to give the Mousetrap Team heads-up on a new disclosure that will be required as part of the FACT Act.

Section 212(c) of the Fair and Accurate Credit Transactions Act (FACT Act) of 2003 requires anyone who makes or arranges for a loan and uses a credit score, to provide a "Notice to the Home Loan Applicant". The notice must include prescribed language and must also include the name, address and phone number of each credit reporting agency that provided a credit score to the lender. The lender is ONLY required to give this notice. It is required to be given as soon as practicable. The disclosure requirement goes into effect December 1, 2004.

I have attached a sample of the VMP version of this disclosure.  This is not a model form so we don't have any wiggle room with the language, how ever it does not need to be signed by the client, only delivered.  VMP always includes a signature line but we can create our own form without the signature line.

The law requires we give the notice as soon as practicable.   There is no provision in the law that says a lender does not need to provide the form if the loan is denied within 3 business days like some of the other regulations.  That said, I would recommend we include this with the application package to make sure everyone receives it.  If we do it later in the process we could be sending it to someone we

denied, although as an alternative, we could include it with a denial letter if the denial occurred within a few days of application.    Let me know how you would like to proceed.


As an aside, California has a disclosure that is similar to this.  I have not seen any changes in CA law that eliminates their credit score disclosure and replaces it with the new FACT Act disclosure. I will look into further to see if we can eliminate one of them because we will look like idiots to our clients if we send two forms that are just slightly different.


If I have excluded anyone from this e-mail please pass along.   Thanks!!  sp

CONFIDENTIAL

QL0019342

# Exhibit 5

QL 0005065

# FACTA Compliance: Credit Scores, Negative Information and Identity Theft

CampusMBA Live Audio Program
November 16, 2004

© 2004 Buckley Kolar LLP

QL 0005066

# FACTA Compliance

- Moderator: Mary Jo Sullivan, MBA 

- Speakers: Jeremiah S. Buckley 
  Jonathan D. Jerison 

## Attorneys with Buckley Kolar LLP

This presentation is provided for general informational purposes only and should not be considered legal advice.

November 16, 2004            © 2004 Buckley Kolar LLP                    2

QL 0005067

# Deadline: 12/1/04

- Credit scoring: disclosure of score required as of 12/1/04
- If negative information is furnished to credit bureaus on or after 12/1/04, notice must be provided
- Bureaus must begin adding fraud and active duty alerts to credit files on 12/1/04

QL 0005068

# Credit Score Disclosure



- Any person who . . .
  – Uses a credit score
  – To make or arrange a loan
  – Secured by 1-4 family residential real property
- . . . must provide credit score information.

QL 0005069

# Credit Score Disclosure

- Disclosure must include:
  - 4 key factors that adversely affected the score
  - Listed in order of importance
  - If number of inquiries was a factor (even if not in top 4), must also provide a clear and conspicuous statement mentioning inquiries

QL 0005070

# Credit Score Disclosure

- Disclosure must also include:
  - Date score created
  - Name of credit bureau
  - Range of possible scores
  - Explanation of role of credit score in process (must use language provided in FACTA)



Note:
Additional information can
also be provided (i.e., website
of bureau)

what if trigmered report?  Include all 3 scores (conservative approach)

QL 0005071

# Credit Score Disclosure

- Need not disclose a "mortgage score" from an automated underwriting system:
  - *I.e.,* AU ratings ("Approve/Eligible," etc.) need <u>not</u> be disclosed
- A "mortgage score" is a score that reflects non-credit factors, such as LTV, DTI, etc.
- However, when a <u>lender</u> or broker is <u>provided a</u> "credit score" through an AU system, it <u>must</u> disclose that score to the borrower

QL 0005072

# Credit Score Disclosure

- Timing:

  *applies to QL*

  - Lenders subject to similar California law have been including score with GFE and early TILA
  - Only one disclosure per transaction
    - *I.e.,* if disclosed with GFE, need not disclose again at closing
    - No disclosure required if another party (*e.g.,* broker) has already made disclosure

November 16, 2004              © 2004 Buckley Kolar LLP                              8

QL 0005073

# Negative Information

- Any "financial institution" must notify the consumer before or within 30 days after reporting negative information about the consumer to a credit bureau

- "Financial institution" includes all mortgage lenders

QL 0005074

# Negative Information

- At lender's option, notice may be provided on or with:
  - Notice of default
  - Billing statement
  - Other materials
- Notice may *not* be provided with initial Truth in Lending Act disclosures



Note: If a separate disclosure, can probably be given w/ initial TILA disclosures

November 16, 2004          © 2004 Buckley Kolar LLP          10

QL 0005075

# Negative Information

- Notice need only be provided once
- Federal Reserve has issued model notices
- FRB notice for future reporting:

    "We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report."

QL 0005076

# Negative Information

- Notice for past reporting:

    "We have told a credit bureau about a late payment, missed payment or other default on your account. This information may be reflected in your credit report."

- Use of FRB language is optional, but provides a safe harbor for compliance

November 16, 2004                © 2004 Buckley Kolar LLP                                    12

QL 0005077

# Identity Theft

- A consumer or consumer's representative may report suspected fraud (including identity theft) or active military duty to a credit bureau

- The credit bureau must include this alert in credit reports

- If an alert appears in a report, lenders may not extend new credit without verifying identity

(we need an independent process- outside of ops )

November 16, 2004          © 2004 Buckley Kolar LLP          13

QL 0005078

# Identity Theft

- What is an "identity theft"?
  - Fraud committed or <u>attempted</u>
  - Using the "identifying information" of another person
  - Without authority

QL 0005079

# Identity Theft

- Definition of "identifying information":
  - Any name or number that may be used, alone or in conjunction with any other information, to identify a specific person
  - Includes name, SSN, date of birth, driver's license no., alien registration no., passport no.

November 16, 2004          © 2004 Buckley Kolar LLP          15

QL 0005080

# Identity Theft

- Access device is also "identifying information"
    - Access device includes credit or debit card, PIN, account number
    - Industry is concerned that including stolen credit/debit cards as "identifying information" might encourage false reports

_to what end_

QL 0005081

# Identity Theft

- Two levels of identity-theft alerts
  - Fraud or "one-call" alerts
    - Valid for up to <u>90 days</u> (unless consumer withdraws it sooner)
  - Extended alerts
    - Valid for up to <u>7</u> years (unless consumer cancels it)
  - Consumer can cancel either type of alert
- Military active duty alerts valid for <u>one year</u>

QL 0005082

# Identity Theft

*[handwritten: how? by whom?]*

- Lender (must verify) identity before extending "new" credit on account that is subject to an alert

*[handwritten: timing prior to closing]*

- "New credit":
  - Making a new loan
  - Increasing HELOC credit limit
  - *Not* an advance under an existing HELOC

November 16, 2004      © 2004 Buckley Kolar LLP      18

QL 0005083

# Identity Theft

- Amount of verification required depends on type of alert
- Greater verification required for extended alerts

November 16, 2004       © 2004 Buckley Kolar LLP       19

QL 0005084

# Identity Theft

- Verification: One-call and active-duty alerts
    - Utilize reasonable policies and procedures to form a reasonable belief that lender knows borrower's identity and request is not result of identity theft
    - If borrower provided phone number, must call that number or use other reasonable method to verify identity

QL 0005085

# Identity Theft

- Verification: Extended alerts
  - Lender must call phone number or other reasonable contact method specified by consumer
  - Must contact and confirm request not the result of identity theft
  - Reasonable belief insufficient



Note:
Independent
verification
would reveal
"inside jobs"

November 16, 2004      © 2004 Buckley Kolar LLP      21

QL 0005086

# Identity Theft

- Consumer can also place a "block" on reporting of an item
- Consumer must file an "identity theft report"
  - Same as for extended alert
- Once reporting of a loan has been blocked, the furnisher may not sell the loan or place it for collection. ( Could be misused to stall legitimate collection/foreclosures )

QL 0005087

# Identity Theft

- Credit bureau must notify furnisher of information of the block
- Furnisher must have reasonable procedures to avoid "refurnishing" blocked information
- Consumer can also directly file identity theft report with furnisher
  - Furnisher must then stop reporting item to credit bureau

© 2004 Buckley Kolar LLP                 23

QL 0005088

# Identity Theft

- Credit bureau can decline or remove a block if:
  - Information blocked in error or consumer requested it in error
  - Block based on material misrepresentation by consumer
  - Consumer obtained possession of goods, services, or money as a result of blocked transaction(s)

 © 2004 Buckley Kolar LLP

QL 0005089

# Identity Theft

- Furnisher can <u>again</u> furnish blocked information if:
  - Furnisher <u>knows</u> that the information is correct, or  (actual knowledge, <u>not</u> a reasonable belief)
  - Consumer tells furnisher that information is correct

© 2004 Buckley Kolar LLP

QL 0005090

# Identity Theft

- Appropriate proof of identity required for consumer to place any type of alert
- Examples:
  - Match against credit file
    - Full name
    - Current and/or recent address
    - SSN
  - Government ID card (*e.g.,* driver's license)
  - Match against information known only to consumer

November 16, 2004                 © 2004 Buckley Kolar LLP                 26

QL 0005091

# Identity Theft

- An extended alert or block requires filing of an "identity theft report," defined as:
  - Copy of an official, valid report filed with any federal, state, or local government agency
  - Report must subject consumer to criminal penalties for filing false information
  - Includes reporting to FTC web site or Postal Inspection Service

  Note: One basis for discrimination claim under ECOA is refusal of credit based on exercise rights under the law (such as FACT Act ; FCRA).

© 2004 Buckley Kolar LLP

QL 0005092

# FACTA Compliance: Credit Scores, Negative Information and Identity Theft

## CampusMBA Live Audio Program
## November 16, 2004

© 2004 Buckley Kolar LLP

# Exhibit 6

| From: | Pelto, Sue [/O=INTUIT/OU=LIVONIA/CN=RECIPIENTS/CN=SUE PELTO] |
|---|---|
| Sent: | 11/17/2004 9:33:52 AM |
| To: | Krause, Shawn [shawnkrause@quickenloans.com] |
| CC: | Carroll, David [davidcarroll@quickenloans.com]; Vitale, Angelo [angelovitale@quickenloans.com]; Bishop, Amy [amybishop@quickenloans.com]; Templeton, Christine [christinetempleton@quickenloans.com]; Fox, Karen [karenfox@quickenloans.com]; Frank, Julie [juliefrank@quickenloans.com]; Buckiso, Donna [donnabuckiso@quickenloans.com]; Chyette, Richard [richardchyette@quickenloans.com] |
| Subject: | Credit Score Notice |
| Attachments: | FAX2027176819.TIF; Notice to Home Loan Applicants.2.doc |

Shawn, so we don't further delay you guys getting started on the Credit Score Notice for FACT Act compliance, I have attached 2 documents.  The first is the CA Credit Score Disclosure with handwritten changes for compliance with FACT Act.  The second is a clean word version which I am also attaching.

David has not reviewed this yet, and I have a couple of unanswered questions I am trying to get some guidance on, but thought you could at least get the obvious changes made.

My unanswered questions are related to the actual credit scores and placement/language on the document. The Act gives us the model language but doesn't give any guidance on the credit score portion, so we are using the CA disclosure as our guide.  If that changes I will let you know.

The second item will be of particular interest to you in case you need to make any programming changes for it.  The FACT Act says we need to include "number of inquiries" if it was a factor (even if not in the top 4).  So basically they are potentially adding a 5th factor.   I am also trying to find out if there has been any suggested language for the "clear and conspicuous" statement we are to provide for this factor and will get that to you ASAP.

Lastly, this disclosure will be used in all states except CA.  We will continue to use the CA specific disclosure as we do today and not provide the federal disclosure in that state.   It is required for all products and all divisions.  We will include the disclosure portion in the application package and this document does not require a signature.  For those products that currently use the streamline application package, this document should be listed on the Disclosure Summary page as evidence it was provided.

Placement of this will be included in the Mousetrap design as that is being built.

P.S. I just noticed I didn't write the "Date Credit Report Pulled" on my handwritten version so tell whoever is working on this to make sure they include it.

Thanks Shawn.  Remember I am out tomorrow until probably late afternoon and working from home this afternoon and Friday.  You have my home number I believe.  If not, will have the blackberry and checking voice mail throughout the day tomorrow.

CONFIDENTIAL

QL0019669



Date: September 8, 2004

## Notice to the Home Loan Applicant / Credit Score Disclosure

~~Thank you for choosing Quicken Loans Inc. for your home financing needs. Quicken Loans Inc. has selected Gredco for processing your credit information.~~ *users and the lender*

In connection with your application for a home loan, ~~Quicken Loans Inc.~~ *the lender* must disclose to you the credit score that a ~~credit bureau~~ distributed to ~~us in~~ connection with your ~~application for~~ a home loan. ~~Quicken Loans Inc. must also provide you~~ with a range of possible scores as well as some of the key factors affecting your credit scores. *Consumer reporting agency and*

*the credit score*
~~A Credit Score~~ is a computer-generated summary calculated at the time of ~~a credit report~~ *the* request ~~by the three national credit-reporting repositories: Trans Union, Equifax and Experian.~~ **The credit score is a numeric value of not less that 350 or greater than 900.** The ~~credit~~ scores are based on data about your credit history and payment patterns. Credit Scores are important because they are used to ~~assist mortgage lenders~~ *determine* ~~in determining~~ whether you will obtain a loan. They may also be used to ~~determine the~~ interest rate you may be offered on ~~your~~ mortgage. Credit Scores can change over time depending on your use of credit, your credit history and payment patterns, and how credit-scoring technologies change. *and based on information that a consumer reporting on lender has on file. what conduct the change the*

~~The credit-scoring model most commonly used was created and is currently maintained by Fair Isaac Company. Fair Isaac Company can be reached at:~~

~~Fair Isaac Company~~
~~200 Smith Ranch Road~~
~~San Rafael, CA 94903~~
~~Phone #: (800) 777-2066~~
~~Website: www.fairisaac.com~~

Because the ~~credit score is significant and~~ is based on your ~~personal~~ credit history, it is very important to review the credit-related material that is being ~~provided in this document~~ to make sure it is accurate. ~~It is important to note~~ Credit Scores may vary from one ~~national credit-reporting repository~~ to another. Your credit ~~score was reported on the same date noted at the top of your credit score report.~~ *information on your records information furnished (Company)*

Applicant:
Mary Homeowner
175 13th st
Burbank, CA 91502
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

Date Credit Report Pulled: 09/08/04

Credit Score 1:   734   TransUnion

001: Too many high current balances on accounts.
008: Too many recent inquiries.
012: Length of revolving account history is too short.
014: Length of account history is too short.

*Could be 5th reason - see note on typed version. I am trying to get some clarification on the "clear and conspicuous" statement.*

*Move all of this to end*

2004/08    canot1.pcl                     Page 1 of 2

CONFIDENTIAL                                                                    QL0019670

Credit Score 2:   728   Equifax BEACON

00001: Too many high current balances on accounts.
00002: Recent delinquency reported on accounts.
00003: Too few bank revolving accounts.
00004: Too many bank revolving accounts.

Credit Score 3:   740   Experian

13: Delinquent account appears too recent.
18: Too many active accounts.
20: Recent legal item or collection item reported.
22: Your account(s) were not paid as agreed and/or a legal item was filed.

*all these more to end*

If you have questions about your score or the credit information that has been furnished to you, ~~please~~ contact ~~the national credit repositories at the address and telephone number provided here:~~ *with this notice, or contact the lender, if the lender developed or generated the credit score.* ~~consumer reporting agency~~

~~National Credit Reporting Repositories - Consumer Relations~~

| Equifax BEACON | Experian | Trans Union Emperies |
|---|---|---|
| P.O. Box 740256 | P.O. Box 2104 | P.O. Box 1000 |
| Atlanta, GA 30374 | Allen, TX 75013 | Chester, PA 19022 |
| (800) 685-1111 | (800) 397-3742 | (800) 888-4213 |
| ~~Website: test@equifacbeacon.com~~ | ~~test@experian.com~~ | ~~test@transunion.com~~ |

*the consumer reporting agency*

~~Please note the credit bureau plays no part in the decision to take any action on the loan application and is unable to provide you with specific reasons for the decision on a specific loan application.~~  *all part of same paragraph*

If you have questions concerning the terms of loan ~~or other questions related to your application please~~ contact the lender. *One or more of the following consumer reporting agencies will provide the credit score:* *Move these down*

CONFIDENTIAL                                                          QL0019671

**Quicken Loans (logo)**

## CREDIT SCORE NOTICE

### Notice to the Home Loan Applicant

In connection with your application for a home loan, the lender must disclose to you the score that a consumer reporting agency distributed to users and the lender in connection with your home loan, and the key factors affecting your credit scores.

The credit score is a computer generated summary calculated at the time of the request and based on information that a consumer reporting agency or lender has on file. The credit score is a numeric value of not less than 350 or greater than 900. The scores are based on data about your credit history and payment patterns. Credit scores are important because they are used to assist the lender in determining whether you will obtain a loan. They may also be used to determine what interest rate you may be offered on the mortgage. Credit scores can change over time, depending on your conduct, how your credit history and payment patterns change, and how credit-scoring technologies change.

Because the score is based on information in your credit history, it is very important that you review the credit-related information that is being furnished to make sure it is accurate. Credit records may vary from one company to another.

If you have questions about your score or the credit information that has been furnished to you, contact the consumer reporting agency at the address and telephone number provided with this notice, or contact the lender, if the lender developed or generated the credit score. The consumer reporting agency plays no part in the decision to take any action on the loan application and is unable to provide you with specific reasons for the decision on a loan application.

If you have questions concerning the terms of the loan contact the lender.

One or more of the following consumer reporting agencies will provide the credit score:

| Equifax | Experian | Trans Union |
|---|---|---|
| P.O. Box 740256 | P.O. Box 2104 | P.O. Box 1000 |
| Atlanta, GA 30374 | Allen, TX 75013 | Chester, PA 19022 |
| (800) 685-1111 | (888) 397-3742 | (800) 888-4213 |

*Applicant*                    *Co Applicant*

Date Credit Report Pulled:

**Credit score 1**
(list the 4 key factors)
**(If number of inquiries was a factor, even if not in the top 4, we must also provide a clear and conspicuous statement mentioning inquiries).**
**Credit Score 2**
(list the 4 key factors)
**(If number of inquiries was a factor, even if not in the top 4, we must also provide a clear and conspicuous statement mentioning inquiries).**
**Credit Score 3**
(list the 4 key factors)
**(If number of inquiries was a factor, even if not in the top 4, we must also provide a clear and conspicuous statement mentioning inquiries).**

**Quicken Loans (logo)**

## CREDIT SCORE NOTICE

## Notice to the Home Loan Applicant

In connection with your application for a home loan, the lender must disclose to you the score that a consumer reporting agency distributed to users and the lender in connection with your home loan, and the key factors affecting your credit scores.

The credit score is a computer generated summary calculated at the time of the request and based on information that a consumer reporting agency or lender has on file. The credit score is a numeric value of not less than 350 or greater than 900. The scores are based on data about your credit history and payment patterns. Credit scores are important because they are used to assist the lender in determining whether you will obtain a loan. They may also be used to determine what interest rate you may be offered on the mortgage. Credit scores can change over time, depending on your conduct, how your credit history and payment patterns change, and how credit-scoring technologies change.

Because the score is based on information in your credit history, it is very important that you review the credit-related information that is being furnished to make sure it is accurate. Credit records may vary from one company to another.

If you have questions about your score or the credit information that has been furnished to you, contact the consumer reporting agency at the address and telephone number provided with this notice, or contact the lender, if the lender developed or generated the credit score. The consumer reporting agency plays no part in the decision to take any action on the loan application and is unable to provide you with specific reasons for the decision on a loan application.

If you have questions concerning the terms of the loan contact the lender.

One or more of the following consumer reporting agencies will provide the credit score:

| Equifax | Experian | Trans Union |
|---|---|---|
| P.O. Box 740256 | P.O. Box 2104 | P.O. Box 1000 |
| Atlanta, GA 30374 | Allen, TX 75013 | Chester, PA 19022 |
| (800) 685-1111 | (888) 397-3742 | (800) 888-4213 |

*Applicant*                              *Co Applicant*

Date Credit Report Pulled:

**Credit score 1**
**(list the 4 key factors)**
**(If number of inquiries was a factor, even if not in the top 4, we must also provide a clear and conspicuous statement mentioning inquiries).**
**Credit Score 2**
**(list the 4 key factors)**
**(If number of inquiries was a factor, even if not in the top 4, we must also provide a clear and conspicuous statement mentioning inquiries).**
**Credit Score 3**
**(list the 4 key factors)**
**(If number of inquiries was a factor, even if not in the top 4, we must also provide a clear and conspicuous statement mentioning inquiries).**

QL0019673



CONFIDENTIAL

QL0019674

# Exhibit 7

| **From**: | Pelto, Sue [/O=INTUIT/OU=LIVONIA/CN=RECIPIENTS/CN=SUE PELTO] |
|---|---|
| **Sent**: | 11/17/2004 9:07:28 AM |
| **To**: | 'jjerison@buckleykolar.com' [jjerison@buckleykolar.com] |
| **CC**: | Vitale, Angelo [angelovitale@quickenloans.com]; Carroll, David [davidcarroll@quickenloans.com] |
| **Subject**: | FACT Act |

Hi Jon, it has been a while since we have talked.   Hope all is well.

Yesterday Angelo, David and I attended the MBA FACT Act audio conference and had a  follow-up question for you regarding the credit score piece.  Also, I am attaching some info regarding the question that came up on the CA Credit Score disclosure and whether you needed to provide both state and federal.   I had the same question last week.

On page 5 of the presentation, 3rd bullet where the number of inquiries is mentioned, has there been any guidance from the regulators on what the "clear and conspicuous" statement mentioning the inquiries must be?

Also, with the exception of the specific language that is required under the federal disclosure, we are modeling the remainder of the disclosure after the CA state disclosure (credit score info and key factors).  Do you see any issues with that?  They say you must use the model language but it doesn't include the credit score piece.

If you need to reach me I will be in the office until 11:00 am today than working from home this afternoon from 12:30 on. Office # 734-805-7178 and home 248-360-2242.
I am out of the office all day tomorrow but you can e-mail me or leave a voice mail message.  I will be checking in throughout the day.

This was the response I received to the CA question.

**Even though the FACT Act preempts many aspects of state law, if you look closely at the FACT Act you will see that it expressly provides that it does NOT preempt California Civil Code Section 1785.20.2 (California's credit score disclosure statute). (See**

**15 U.S.C. § 1681t(b)(3).) So the issue of double disclosing is moot. You go with the California disclosure rules. Also, the FACT Act disclosure and California disclosure are essentially the same, with the primary difference being the use of "credit bureau" in one and "credit reporting agency" in the other (I'm working off of memory, so the actual verbiage may be a little different).**

Sue Pelto
Legal/Compliance Team
(734) 805-7178
(734) 805-0130 (Fax)
Sue_Pelto@Quickenloans.com

CONFIDENTIAL

QL0019679

# Exhibit 8

**From:** Pelto, Sue [mailto:SuePelto@quickenloans.com]
**Sent:** Monday, November 22, 2004 8:34 PM
**To:** Jerison, Jonathan
**Subject:** Credit Score Notice

I have one more question on the credit score notice.   I want to be sure we are sending this notice when we should be and trying to get some clarification on what is meant by "an application sought by".

Section 609 (g) states:

Any person who makes or arranges loans and who uses a consumer credit score, as defined in subsection (f) in connection with an application initiated or sought by a consumer for a closed end loan or the establishment of an open end loan shall provide to the consumer as soon as reasonably practicable……. the credit score notice.

I am interpreting this to mean a client could contact us and give us verbal permission to pull credit, even though we may not have officially taken an application yet.   This would happen when we contact a person that has expressed an interest in a loan with us through our web site, but has not yet applied.

Can you confirm whether this interpretation is accurate.     This will be important for our sales force to know about and I want to be sure our policies and procedures are accurate as well.

Thanks Jon.

CONFIDENTIAL

# Exhibit 9

| From: | Pelto, Sue [/O=INTUIT/OU=LIVONIA/CN=RECIPIENTS/CN=SUE PELTO] |
|---|---|
| Sent: | 11/26/2004 4:13:20 PM |
| To: | Carroll, David [davidcarroll@quickenloans.com] |
| CC: | Vitale, Angelo [angelovitale@quickenloans.com]; Murtaugh, Rebecca [rebeccamurtaugh@quickenloans.com]; Childress, Michelle [michellechildress@quickenloans.com]; Patterson, Letitia [letitiapatterson@quickenloans.com] |
| Subject: | RE: Credit Score Notice |

David, I spoke to Jon Jerrison on Wednesday to see if he could give us any guidance on what is meant by "application sought". Unfortunately we are not the only lender that is struggling with this. He indicated that this is a question the MBA has on the list, however they are not certain whether they want to pose the question for the obvious reason of opening up a can of worms with the FTC.

He said he could write us a legal opinion that the credit score notice was only necessary if we actually took an application vs. the verbal prequalification with the client, but of course indicated that opinion wouldn't be without risk. The feds have adopted the exact same language as CA and there has been no legal action on this so no one is really sure what direction to take.

Currently in CA, we mail the notice once the loan hits Lakewood. I would prefer we keep the process the same until we can get better guidance on what the FTC's intent really is. If we trigger this notice from LOLA, then we run the risk of increased phone calls to Client Relations and Bankers with co-applicants stating they never authorized the credit pull, even thought we know we have "implied" authority if given by the spouse. With this option the notice won't affect Sales and should not increase calls to Client Relations.

If you agree, I will go ahead and start drafting the announcement so it will be ready when Lakewood is. Let me know. Thanks.

**Sent:** Tuesday, November 23, 2004 5:56 PM
**To:** Pelto, Sue
**Cc:** Patterson, Letitia; Murtaugh, Rebecca; Childress, Michelle; Vitale, Angelo
**Subject:** RE: Credit Score Notice

I couldn't venture to guess what "application sought" means, and I'm wondering if Jon's comment would be anything but a guess. They don't cover this in the Regs anywhere? Do they provide examples that might shed light?
-----Original Message-----
**From:** Pelto, Sue
**Sent:** Monday, November 22, 2004 8:14 PM
**To:** Carroll, David
**Cc:** Patterson, Letitia; Murtaugh, Rebecca; Childress, Michelle; Meerschaert, Chris
**Subject:** Credit Score Notice
Here is the info from the FACT Act regarding when we are required to provide the Credit Score Notice:

Any person who makes or arranges loans and who uses a consumer credit score, as defined in subsection (f) in connection with an application initiated or sought by a consumer for a closed end loan or the establishment of an open end loan shall provide to the consumer as soon as reasonably practicable the credit score notice.

To me, "application sought" means the inquiry where we have pulled credit. I will shoot Jon Jerrison a quick e-mail to confirm. That is what we currently do for CA as well.
Training on this will be important, both to announce it and ongoing. Letitia and I will work together on the Sales Force communication and long term training.

I should have my answer tomorrow; Jon is good about getting back to us.

CONFIDENTIAL                                                                                          QL0019652

CONFIDENTIAL

QL0019653

# Exhibit 10

| | |
|---|---|
| **From**: | Pelto, Sue [/O=INTUIT/OU=LIVONIA/CN=RECIPIENTS/CN=SUE PELTO] |
| **Sent**: | 12/1/2004 1:59:00 PM |
| **To**: | Stapp, Bryan [bryanstapp@quickenloans.com] |
| **CC**: | Carroll, David [davidcarroll@quickenloans.com] |
| **Subject**: | FW: New Client Disclosure |
| **Attachments**: | Notice to Home Loan Applicants 2.doc |

Bryan, per my voice mail.  The trigger for this notice will be the application package or denial notice if a lead is verbally denied prior to making it to Lakewood.    The regulation requires this disclosure be provided to a prospective client for an "application initiated or sought" by the client.   Since there is no clear guidance on what is meant by an "application  sought", and in speaking with outside counsel on this, we have made a decision not to include a credit pull from a lead as the trigger, but an actual application package or denied lead.

The other reason this is in the application package is to obtain the clients acknowledge of receipt of this disclosure for investor purposes.   Although the client does not need to sign this document, we need to be able to prove to an investor that we comply with the law so we have them sign a Loan Disclosure Summary and include that document in the shipping package.

I hope this answers your question.  Let me know if you want to discuss.  Thanks.  sp

---

**From:** Pelto, Sue
**Sent:** Wednesday, December 01, 2004 11:17 AM
**To:** All Branch Sales; All Web Sales; All Operations; Kreder, Laura; Vosler, Becky; Hurteau, Greg; Lang, Trisha; DeGoa, Malyka
**Cc:** Profit, Pam; Carroll, David; Chyette, Richard; Bishop, Amy; Fox, Karen; Horner, Todd; Buckiso, Donna; Vitale, Angelo; Doyle, Gail; Frank, Julie; Carroll, Michelle; Templeton, Christine
**Subject:** New Client Disclosure

Beginning today, Wednesday December 1, 2004, Quicken Loans/Rock Financial will be sending each client a new disclosure document called the Credit Score Notice, a copy of which is attached below.  This notice is required as part of the Fair and Accurate Credit Transactions Act that was passed in December of 2003 (FACT Act) and takes effect on December 1, 2004.

This notice includes the client's credit score, the name of the credit reporting agency that was used to obtain the score, and the top 4 factors, listed in order of importance that contributed to the score.  If the number of recent inquiries was a factor, even if not in the top 4, we must list it as a 5th factor. The notice will be included with the application package and will be sent to both the applicant and co-applicant, if applicable, and will not require the client's signature.  It will also be sent to fall out loans that are denied in LOLA prior to an application package being printed.    The notice is very similar to one we've been sending California clients for some time.

We don't expect additional calls because of this new notice, but if your clients have questions regarding their credit score, please refer them to one of the credit reporting agencies listed in the notice.   If

CONFIDENTIAL

QL0019443

they have questions regarding the inquiry on their credit report, please refer them to our Client Relations Team.

If you have any questions, please contact a member of the Compliance Team:

Karen Fox 734-805-8012

Julie Frank 734-805-4870

Sue Pelto 734-805-7178

CONFIDENTIAL

QL0019444

# Exhibit 11

**BUCKLEY KOLAR LLP**

Buckley Kolar }
1250 24th Street, NW
Suite 700
Washington, DC 20037

Phone: 202.349.8000
Fax: 202.349.8080
buckleykolar.com

Fed. ID #: 20-0373854
Invoice Number: 3019
Client Number: 1068.0001

## Quicken Loans
## (General)

December 1, 2004

FOR PROFESSIONAL SERVICES RENDERED for the period through
November 30, 2004, in connection with the following:

| Date | Name | Hours | Description |
|------|------|-------|-------------|
| 11/17/04 | Jerison, J. | 0.80 | Telephone conference with Ms. Pelto regarding FACTA issues. |
| 11/23/04 | Jerison, J. | 1.20 | Review Ms. Pelto's e-mail regarding FACTA credit-score disclosure issues; research regarding same. |
| 11/24/04 | Jerison, J. | 1.30 | Telephone conference with Ms. Pelto regarding credit score issues; research regarding same. |

| | | |
|---|---|---|
| Total Hours | 3.30 | Total Fees $ 1,155.00 |
| Adjusted Total | | $ 1,155.00 |

QL 0022747

# BUCKLEY KOLAR LLP

Buckley Kolar
1250 24th Street, NW
Suite 700
Washington, DC 20037

Phone:  202.349.8000
Fax:  202.349.8080
buckleykolar.com

| Matter Summary by Name | Hours | Rate | | Total |
|---|---|---|---|---|
| Jerison, J. | 3.30 | $ 350.00 | $ | 1,155.00 |
| | 3.30 | | $ | 1,155.00 |

| Bill Disbursement Summary | | Total |
|---|---|---|
| Research | $ | 7.13 |
| Total Disbursements | $ | 7.13 |

**Bill Summary**

| | | |
|---|---|---|
| Total Fees | $ | 1,155.00 |
| Disbursements | $ | 7.13 |
| Less Total Discounts and Adjustments | $ | 0.00 |
| **Total for this Invoice** | $ | 1,162.13 |

Mailed To:  Richard Chyette, Esq.
Senior Corporate Counsel
Quicken Loans
20555 Victor Parkway
Livonia, MI 48152

QL 0022748

# Exhibit 12



Date: May 24, 2010
Loan#: 3224158449

## CREDIT SCORE NOTICE

Alisha Wilkes
18018 Densworth Mews
Gainesville, VA 20155

### Notice to the Home Loan Applicant

In connection with your application for a home loan, the lender must disclose to you the score that a consumer reporting agency distributed to users and the lender in connection with your home loan, and the key factors affecting your credit scores.

The credit score is a computer generated summary calculated at the time of the request and based on information that a consumer reporting agency or lender has on file.  The credit score is a numeric value of not less than 350 or greater than 900.  The scores are based on data about your credit history and payment patterns. Credit scores are important because they are used to assist the lender in determining whether you will obtain a loan. They may also be used to determine what interest rate you may be offered on the mortgage. Credit scores can change over time, depending on your conduct, how your credit history and payment patterns change, and how credit-scoring technologies change.

Because the score is based on information in your credit history, it is very important that you review the credit-related information that is being furnished to make sure it is accurate.  Credit records may vary from one company to another.

If you have questions about your score or the credit information that has been furnished to you, contact the consumer reporting agency at the address and telephone number provided with this notice, or contact the lender, if the lender developed or generated the credit score. The consumer reporting agency plays no part in the decision to take any action on the loan application and is unable to provide you with specific reasons for the decision on a loan application.

If you have questions concerning the terms of the loan contact the lender.

One or more of the following consumer reporting agencies will provide the credit score:

| Equifax | Experian | Trans Union |
|---|---|---|
| P.O. Box 740256 | P.O. Box 2104 | P.O. Box 1000 |
| Atlanta, GA 30374 | Allen, TX 75013 | Chester, PA 19022 |
| (800) 685-1111 | (888) 397-3742 | (800) 888-4213 |
| www.equifax.com | www.experian.com | www.transunion.com |

Applicant:
Alisha Wilkes
18018 Densworth Mews
Gainesville, VA 20155

Date Credit Report Pulled: 05/03/10

2137099782



q03224158449 0894 008 0102

CONFIDENTIAL                                                                                              QL0013162

Credit Score 0:  669  Equifax BEACON                              Loan#: 3224158449

00039: There is a serious delinquency on your credit
report.
00013: Delinquent account appears too recent.
00018: Too many delinquent accounts.
00010: Balances are too high on your bank revolving or
all revolving Credit History accounts.

Credit Score 1:  614  Experian

39: There is a serious delinquency on your credit
report.
13: Delinquent account appears too recent.
18: Too many delinquent accounts.
21: Too many past due accounts.

Credit Score 2:  566  TransUnion

039: There is a serious delinquency on your credit
report.
013: Delinquent account appears too recent.
010: Balances are too high on your bank revolving or
all revolving Credit History accounts.
018: Too many delinquent accounts.

Page 2 of 2

QL Subpoena Wilkes 000008

CONFIDENTIAL                                                                          QL0013163