IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

ALISHA KINGERY,

        Plaintiff,

v.                                      CIVIL ACTION NO. 2:12-cv-01353

QUICKEN LOANS, INC.,

        Defendant.

## MEMORANDUM OPINION AND ORDER

Pending before the court is Quicken Loans, Inc.'s ("Quicken") Motion for Summary Judgment [Docket 216]. This suit arises out of Quicken's alleged failure to provide the plaintiff, Alisha Kingery, a credit score disclosure "as soon as reasonably practicable," in violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681g(g) (2008). Section 1681g(g), provides as follows:

> Any person who makes or arranges loans and who *uses a consumer credit score*, as defined in subsection (f) of this section, *in connection with an application initiated or sought by a consumer* for a closed end loan or the establishment of an open end loan for a consumer purpose that is secured by 1 to 4 units of residential real property . . . . shall provide the following [notice] to the consumer *as soon as reasonably practicable*[.]

15 U.S.C. § 1681g(g)(1) (emphasis added).

The resolution of this case centers on the meaning of "use," which the statute does not define. The parties offer different definitions of "use" and dispute whether, under their respective definitions, Quicken used Ms. Kingery's score. After reviewing the statute's plain language and its statutory context, I conclude that "use" occurs under § 1681g(g) when the lender employs the consumer's score to achieve a purpose or objective, such as employing the score to make a

decision with respect to a loan application. In light of this definition and for the reasons discussed below, Quicken's motion for summary judgment is **GRANTED**.

**I.     Background**

As discussed above, the key issue in this case is whether Quicken used Ms. Kingery's credit score. In addition to their disagreements regarding the meaning of "use," the parties dispute whether Quicken or its software programs used Ms. Kingery's score. Thus, before reaching the facts of Ms. Kingery's particular case, it is necessary to discuss how Quicken and its programs process loan inquiries.

**A.  Quicken's Loan Inquiry Process**

Quicken uses software called Loan Origination and Lead Allocation ("LOLA") to track, deliver, and allocate mortgage leads. A lead is a consumer who contacts Quicken online, by telephone, or through email inquiry. Quicken may also contact the lead to initiate the loan inquiry process. Once this process is initiated, the lead's contact information is transmitted to LOLA. A Quicken mortgage banker will contact the lead to solicit permission to pull the lead's credit report. If the banker obtains consent to pull the lead's credit report, the banker will select a button on the program screen to pull the report.

LOLA then communicates with Loan Platform, an intermediary program, which contacts third-party vendors to obtain the lead's credit report. The report contains the lead's three credit scores. When it receives the lead's credit report, Loan Platform scrapes the data in the credit report and places it into an XML file. Loan Platform also saves a URL of the report so the banker may view the credit report from LOLA. In addition, Loan Platform sorts the three credit scores into high, middle, or low categories. This information is transmitted to LOLA for storage in its database.

Quicken bankers can access the stored credit data for multiple purposes. For example, if the banker wants to market different programs to the lead, he or she can press the "Get Programs" button. (Ex. H, Bradley Hein Dep. Tr. [Docket 216-8], at 96-98, 102-03). An underlying program called Keystroke will examine the lead's middle credit score and provide a list of recommended loan programs. (*See* Ex. K, Lang & Lusk 30(b)(6) Dep. Tr. [Docket 216-11], at 60).

There is variation in how a banker uses a lead's credit report. According to Matthew Muskan, a Quicken mortgage banker, if a pending foreclosure appeared on the credit report, a Quicken banker would not look at the credit score. (Ex. I, Matthew Muskan Dep. Tr. [Docket 216-9], at 50-51). However, Chris McConville, a veteran loan officer and Ms. Kingery's expert, opined that mortgage bankers will always look at the credit score when reviewing a lead. (*See* Ex. 20, Chris McConville Dep. Tr. [Docket 230-20], at 294-97).

For various reasons, a mortgage banker may choose to manually deny or withdraw the lead from LOLA. If the banker selects the "deny/withdraw" button, a drop-down box of reasons for the denial or withdrawal will appear. (*See* Ex. 38, Screenshot of LOLA Program [Docket 230-38]). Reasons for a preliminary denial or withdrawal include lack of interest, credit issues, or an impending foreclosure on the credit report. If the banker denies the lead, he or she may manually transfer the lead to AMP, Quicken's originating and underwriting system, for ultimate denial. The banker may also manually transfer the lead to Second Voice, a program that provides a second review of leads by a senior banker.

An "evening escalation" program may also send the lead to Second Voice via a two-step process. First, the program runs an exclusionary logic to determine whether to automatically exclude the lead. The lead is automatically excluded if certain factors apply, including "two or

more banker contacts[.]" (Ex. G, Decl. of Kevin Lang [Docket 216-7] ¶ 18). If the program does not first exclude the lead, the program will then run an inclusionary logic to determine whether to send the lead to Second Voice. Under the inclusionary logic, the lead will be submitted to Second Voice if his or her score is greater than or equal to 640.

After the lead is transferred to AMP, the lead will receive a status of "10," which means the loan inquiry is accepted, or "100," which means the loan inquiry is denied. At this time, AMP automatically creates a credit disclosure notice. If the lead has created a MyQL account, the credit disclosure, along with the application package or denial letter, is sent to that account. The lead then receives an email notification that documents are available in his or her MyQL account. These documents are usually placed in the MyQL account on the same day AMP enters a status of 10 or 100. If the lead has not provided an email for document disclosure, the documents are mailed to the lead.

### B. Ms. Kingery's Case

On April 29, 2010, Ms. Kingery sent a loan inquiry to MortgageLoans.com. MortageLoans.com identified four potential lenders: Loandepot, Ovation Home Loans, Precision Funding Group, and Quicken. Mr. Muskan, a Quicken mortgage banker, obtained Ms. Kingery's credit report on or about May 3, 2010. Mr. Muskan did not submit Ms. Kingery's lead to Keystroke.

Mr. Muskan claims he preliminarily denied Ms. Kingery's lead due to a pending foreclosure on her property. He did not testify that Ms. Kingery's credit score played a role in his decision to deny her lead. However, Chris McConville, Ms. Kingery's expert, opined that any banker would have considered Ms. Kingery's score in denying her loan inquiry. (*See* Ex. 20, Chris McConville Dep. Tr. [Docket 230-20], at 294-97). In addition, a screenshot of a sample

Quicken credit report reveals that the banker must scroll past the credit scores to get to the foreclosure information. (*See* Ex. 21, Screenshot of Merged Credit Report [Docket 230-21]).

After the preliminary denial, the "evening escalation" program reviewed Ms. Kingery's lead. (*See* Ex. G, Decl. of Kevin Lang [Docket 216-7] ¶ 22). The program automatically excluded her lead from Second Voice because multiple bankers had attempted to contact her. (*See id.*). Therefore, Ms. Kingery's lead was never reviewed by Second Voice. (*See* Ex. K, Lang & Lusk 30(b)(6) Dep. Tr. [Docket 216-11], at 26; Ex. G, Decl. of Kevin Lang [Docket 216-7] ¶ 22).

On May 24, 2010, Ms. Kingery's lead was entered into AMP and assigned a 100 status, which indicated that her loan inquiry was denied. On the same day, AMP sent Ms. Kingery's credit disclosure and denial letter to her MyQL account. Quicken sent Ms. Kingery an email that these documents were available for review in her MyQL account.

## II. Legal Standard

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*,

477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion. *See Felty v. Graves Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *Ross v. Comm'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *abrogated on other grounds*, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

### III.  Discussion

To bring a claim under FCRA, Ms. Kingery must show that Quicken violated 15 U.S.C. § 1681g(g) and that the violation was negligent or willful. *See Dalton v. Capital Associated Indus.*, 257 F.3d 409, 415 (4th Cir. 2001). The parties do not dispute that the § 1681g(g) disclosure requirement is triggered when a mortgage lender "uses a consumer credit score . . . in connection with an application initiated or sought by a consumer[.]" 15 U.S.C. § 1681g(g)(1). Therefore, if Quicken did not use Ms. Kingery's credit score, it had no obligation to send the credit disclosure.

The statute does not define "use." Where a nontechnical term is undefined, the court should interpret the term according to its ordinary and common meaning. *See Smith v. United States*, 508 U.S. 223, 228 (1993). The parties dispute the ordinary meaning of "use." Quicken argues that "use" "occurs when a lender takes the credit score into account in making a credit decision with respect to the application (*i.e.*, whether to grant or deny credit or to offer a certain product or rate)." (Mem. in Supp. of Def.'s Mot. for Summ. J. ("Mem. in Supp.") [Docket 217], at 12). Quicken contends that use entails more than merely obtaining the score. Because Mr.

Muskan denied Ms. Kingery's score based on a foreclosure pending on her credit report, and because Quicken's software did not employ Ms. Kingery's score, Quicken concludes that it did not use Ms. Kingery's score. Ms. Kingery defines "use" more broadly. Ms. Kingery claims that Quicken used her score just by obtaining it. In addition, Ms. Kingery claims use occurred when Quicken's software programs sorted and stored her three credit scores.

In the following sections, I will first address the parties' arguments regarding the meaning of "use." After defining the scope and meaning of the term "use," I will determine if the undisputed facts show that Quicken used Ms. Kingery's score.

### A. The Meaning of "Use"

A common definition of "use" is "the application or employment of something[.]" *Black's Law Dictionary* 1577 (8th ed. 2009). "Use" has also been defined as "to use, employ, enjoy . . . to put into action or service . . . to carry out a purpose or action by means of[.]" *Webster's Third International Dictionary* 2523-24 (unabridged 2d ed. 2002). The *Webster's II New College Dictionary* contains a similar definition: "[t]o bring or put into service or action . . . [t]o put to some purpose[.]" *Webster's II New College Dictionary* 1215 (1995). The United States Supreme Court has defined "use" to mean "'[t]o convert to one's service' or 'to employ.' . . . '[T]o make use of; to convert to one's service; to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of.'" *Smith*, 508 U.S. at 228-29 (citations omitted). "Indeed, over 100 years ago [the Court] gave the word 'use' the same gloss, indicating that it means 'to employ' or 'to derive service from.'" *Id.* at 229 (quoting *Astor v. Merritt*, 111 U.S. 202, 213 (1884)). It is clear from the above definitions that "use" denotes some type of action; that is, use occurs when an object is employed for some purpose. Interpreting a different

statute containing the term "use," the Supreme Court observed that, "these various definitions of 'use' imply action and implementation." *Bailey v. United States*, 516 U.S. 137, 145 (1995).

Ms. Kingery argues that "use" occurs when an individual obtains the score.[1] However, procuring or possessing a score does not fit within the ordinary and natural definition of "use." In addition, Ms. Kingery argues Quicken used her score when Loan Platform obtained, sorted, and stored her three credit scores. Again, the basic definition of "use" requires employment of an object to accomplish a purpose or result. Merely organizing or storing something is not "use." By analogy, a person does not use a set of pens by organizing them by color and placing them into a container. A person uses one of those pens when he or she takes the pen from the container and employs it to accomplish a result, for example, to write a letter. Likewise, merely obtaining scores and sorting them is not use. *See Bailey*, 516 U.S. at 147 ("For example, a defendant who stored a gun in a nearby closet for retrieval in case [a] deal went sour would not have 'use[d] a firearm to commit' a crime.").

Not only is this definition supported by the ordinary meaning of "use," it is also supported by the surrounding statutory text. The form credit disclosure, which is included in the statute, states that "[c]redit scores are important because they are used to assist the lender in determining whether you will obtain a loan. They may also be used to determine what interest rate you may be offered on the mortgage." 15 U.S.C. § 1681g(g)(1)(D). The uses described in

---

[1] Ms. Kingery cites several cases she alleges stand for the proposition that pulling a credit report or score constitutes "use" by a "user." These cases interpret the term "user of information" as used in 15 U.S.C. § 1681n, which has since been amended to remove that language from the statute. *See, e.g.*, *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 49 (2d Cir. 1997); *Yohay v. City of Alexandria Employees Credit Union, Inc.*, 827 F.2d 967, 970 (4th Cir. 1987); *see also Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 900 n.3 (4th Cir. 2003). Those cases are not instructive. Ms. Kingery also argues that because Quicken had to certify its intent to use her report for a permissible purpose, one can assume that Quicken used all of the information in the report. *See* 15 U.S.C. § 1681b(f); *see also* 15 U.S.C. § 1681a(3)(A). However, this argument is unpersuasive because § 1681g(g) is triggered by use of a credit score, not the credit report. Quicken can be in compliance with §§ 1681b and 1681g(g) if it obtains a consumer's report for a permissible purpose, uses some of the information in the report, but does not use the consumer's credit score.

the form disclosure support the conclusion that "use" requires active employment of the score. Therefore, I conclude that use occurs under § 1681g(g) when the lender employs the consumer's score to achieve a purpose or objective.

### B. The Undisputed Facts Do Not Show that Quicken Used Ms. Kingery's Score

To establish that Quicken used her score, Ms. Kingery must show that Quicken used her score to achieve a purpose or objective. The parties have offered the following evidence with respect to whether Quicken used Ms. Kingery's score: First, although he could not remember the loan transaction, Mr. Muskan, the relevant loan officer, testified that "[a]ll I do know is that it was—I clearly denied the loan for foreclosure." (Ex. I, Matthew Muskan Dep. Tr. [Docket 237-4], at 67). Second, Quicken's software programmers testified that Quicken's software did not use Ms. Kingery's score because her lead was not sent to Second Voice or to Keystroke, and therefore did not employ her score for a specific purpose. (*See, e.g.*, Ex. K, Lang & Lusk 30(b)(6) Dep. Tr. [Docket 216-11], at 25-26; *see also* Ex. G, Decl. of Kevin Lang [Docket 216-7] ¶¶ 21-22). Finally, the programmers testified that upon obtaining a lead's consumer report, Loan Platform scrapes the credit scores, sorts them into high, middle, and low categories, and places them into data fields in LOLA. (*See* Ex. 24, Lang & Lusk 30(b)(6) Dep. Tr. [Docket 230-24], at 61-62; *see also* Ex. G, Decl. of Kevin Lang [Docket 216-7], ¶ 9).

Despite this evidence, Ms. Kingery argues that there is a genuine issue of material fact with respect to whether Quicken used her score. First, Ms. Kingery argues that Quicken's software program used her score by obtaining her three credit scores and using them to generate a middle score. If true, this would be evidence of use, but the uncontroverted testimony of Quicken's software programmers shows that Quicken's software does not generate a middle score; it merely sorts the scores from high, middle, and low and then transmits the scores to

LOLA. (*See* Ex. 24, Lang & Lusk 30(b)(6) Dep. Tr. [Docket 230-24], at 61-62; *see also* Ex. G, Decl. of Kevin Lang [Docket 216-7], ¶ 9). Merely sorting and storing items is not use.

Second, Ms. Kingery contends that it is disputed whether Mr. Muskan used her score to deny her loan inquiry. Mr. Muskan testified he denied her loan inquiry due to a foreclosure on her credit report. To dispute Mr. Muskan's testimony, Ms. Kingery cites the expert testimony and opinions of Chris McConville. Based on his personal experience as a banker, Mr. McConville opined that "a Loan Officer would review credit scores in every case ensuring the scores meet the minimum score standards prior to reviewing all the individual trade-lines." (Ex. 44, Expert Report Prepared by Chris McConville [Docket 230-44], at 16).

An expert's testimony may be admissible if he is qualified and his opinions are reliable and helpful to the trier of fact. *See* Fed. R. Evid. 702. In some instances, an expert's specialized knowledge about industry customs and practices may be helpful. For example, expert testimony describing industry customs and practices can help a jury determine whether a party violated a standard of care. *See, e.g.*, *Cinaglia v. Benevicz*, 290 F.R.D. 465, 468-69 (D. Md. 2013). However, this evidence is admissible only if it "will help the trier of fact to understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702. In addition, although an expert's opinion "may embrace[] an ultimate issue," the opinion cannot "merely tell the jury what result to reach[.]" Fed. R. Evid. 704(a) & 1972 Advisory Committee Note.

The customs and practices of a banker, who is not associated with Quicken and has no personal knowledge of Quicken's customs, will not help the jury determine whether Mr. Muskan used Ms. Kingery's credit score. Such evidence is not a proper basis from which a jury can infer that a party acted in accordance with these customs in a particular instance. Allowing this evidence would usurp the jury's fact-finding role; it is the province of the jury to assess Mr.

Muskan's credibility in light of his testimony and the surrounding circumstances. *See R.B. Ventures, Ltd. v. Shane*, No. 91 CIV. 5678 (CSH), 2000 WL 520615, at *3 (S.D.N.Y. May 1, 2000) (finding expert testimony showing it was industry custom for real estate brokers to enter into oral agreements was inadmissible to establish that the parties entered into an oral agreement because "the jury would derive no legitimate assistance from the testimony of plaintiffs' [experts] concerning the frequency with which brokerage commissions are agreed to orally in the industry, . . . such testimony does not provide the basis for a legitimate inference that plaintiff and defendant actually conducted themselves in that manner in this case").

Alternatively, Ms. Kingery is attempting to admit habit evidence. Under Federal Rule of Evidence 406, "[e]vidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice." The rule clearly refers to the routine practice of a specific *organization*, not the customs and practices of an industry. Evidence of the routine practices of Mr. McConville or other organizations is not probative of whether Quicken acted in conformity with these practices. Simply put, evidence of one person's conduct is not evidence of another's conduct. *See R.B. Ventures, Ltd.*, 2000 WL 520615, at *5 ("It is readily apparent that Rule 406 has nothing to do with the proffered expert opinion testimony about industry customs and practices. The plaintiff's proffered experts do not pretend to know anything about the habits of any individual whose conduct is pertinent to the case, or the routine practice of any such organization."). Moreover, whatever marginal probative value this evidence has is substantially outweighed by the danger of causing unfair prejudice, confusing the issues, and misleading the jury. *See* Fed. R. Evid. 403; *R.B. Ventures, Ltd.*, 2000 WL 520615, at *4.

Accordingly, I **FIND** that Mr. McConville's testimony and report is not admissible to establish that Mr. Muskan used Ms. Kingery's report. Thus, Ms. Kingery cannot use Mr. McConville's opinions to create an issue of fact with respect to this issue. Without Mr. McConville's testimony, the relevant evidence is: (1) Mr. Muskan's testimony that he denied Ms. Kingery's loan inquiry due to a foreclosure pending on her credit report, and (2) the testimony of Quicken's software programmers that Ms. Kingery's score was not sent to Keystroke or Second Voice and that the score was simply sorted and stored by Loan Platform. This evidence is insufficient for a jury to reasonably infer that Quicken used Ms. Kingery's score and thus had a duty to send a credit disclosure. Because Ms. Kingery has presented insufficient evidence to show Quicken violated 15 U.S.C. § 1681g(g), I **GRANT** Quicken's motion for summary judgment.

### IV. Conclusion

For the reasons discussed above, Quicken's motion for summary judgment [Docket 216] is **GRANTED**.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER: June 4, 2014

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE