IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
Charleston Division

ALISHA KINGERY, f/k/a
ALISHA WILKES, individually and on
Behalf of all others similarly situated,

        Plaintiffs,

                        CIVIL ACTION NO. 2:12CV1353

v.

QUICKEN LOANS, INC.,

        Defendant.


PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

John W. Barrett (WV Bar No. 7289)
Bailey & Glasser, LLP
209 Capitol Street
Charleston, West Virginia 25301
Telephone: (304) 345-6555
Facsimile: (304) 342-1110
E-mail: jbarrett@baileyglasser.com

Ian B. Lyngklip (*admitted pro hac vice*)
Lyngklip & Associates Consumer Law Group
24500 Northwestern Highway, Suite 206
Southfield, MI 48075
Telephone: (248) 208-8864
Facsimile: (248) 208-9073
E-mail: ian@MichiganConsumerLaw.com

John C. Bazaz (admitted *pro hac vice*)
Law Offices of John C. Bazaz, PLC
4000 Legato Road, Suite 1100
Fairfax, VA 22033
Telephone: (703) 272-8455
Facsimile: (703) 596-4555
Email: jbazaz@bazazlaw.com

Leonard A. Bennett (admitted *pro hac vice*)
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, VA 22601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com

Matthew J. Erausquin (admitted *pro hac vice*)
Consumer Litigation Associates, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Telephone: (703) 273-7770
Facsimile: (888) 892-3512
Email: matt@clalegal.com

## I.    INTRODUCTION

This is a class action case brought pursuant to the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.,* challenging Defendant Quicken Loans, Inc.'s ("Quicken" or "Defendant") uniform practice of deliberately withholding the credit score information it obtains regarding potential borrowers, rather than making the mandated disclosures "as soon as reasonably practicable" as the FCRA requires. *Id.* §1681g(g).

Since the section's enactment in 2003 and even through the date of this filing, Quicken has disdainfully refused to provide this early stage disclosure, providing the score notice for unsuccessful credit applicants (such as Ms. Kingery) only at the time it sends its last communication – its credit denial letter.   This is not by mistake, or even misjudgment.   Quicken's lead compliance official referred to the disclosure provision as "stupid" and another member of the compliance team dismissed the provision as "a lot of paper!"   Quicken's senior compliance attorney, who provided most of the testimony in this case, concluded when asked about the Federal Reserve Board and Federal Trade Commission interpretation that the notice be sent within 3 business days of pulling a score, "[u]nfortunately, the [Board] and [FTC] got it wrong, which is not surprising."   And Dan Gilbert, chairman and founder of Quicken Loans, stated that "[t]his will NOT be a new document to our app package."   He went on to state, "The absurdity of each year that passes that NEW INSANE AND MEANINGLESS DISCLOSURES are added to the loan process has got to stop." (emphasis in original).   Now, not surprisingly, to defend this willful noncompliance Quicken has manufactured arguments not designed to prove that it complied with the law, but instead to contrive an interpretation under which it would not have to.   Every voice Quicken has heard on these points – internal compliance advice, industry seminars and regulatory guidance – all warned Quicken to change its practices. Summary judgment is rarely less appropriate.

1

## II.    PLAINTIFF'S STATEMENT OF DISPUTED FACTS[1]

**2. (5. and 7.)  Disputed**. Significant regulatory guidance existed concerning 1681g(g) r

prior to the class period. (EXHIBIT 1, QL0019165, EXHIBIT 10, FTC Final Rules, QL0013900

second full paragraph ("**within three business days of obtaining a credit score**")[2], EXHIBIT 11,

QL0014616 third full paragraph).   More recent regulatory guidance also exists. (EXHIBIT 12,

Kingery No.302906 first full paragraph, EXHIBIT 13 and EXHIBIT 14, QL0018374, QL0018393

and QL0018394).    And "use" had been used in countless places within the FCRA before the

enactment of § 1681g(g).  Quicken's contention that it is in compliance with the California statute

is false for the same reasons Quicken is not in compliance with 1681g(g).

During 2004 and later in 2009 did not analyze or "use" closely, if at all. (EXHIBIT 1,

EXHIBIT 2, EXHIBIT 3, EXHIBIT 4, EXHIBIT 5, EXHIBIT 6, and EXHIBIT 7).[3]  Quicken

focused almost exclusively on the meaning of "application initiated or sought" and "as soon as

reasonably practicable."  *Id.*  Not a single document evidences Quicken's suggested interpretation

of "use."   Quicken's own compliance personnel, all regulatory and all third party sources

uniformly understood "use" as meaning when credit scores were "pulled", "obtained" or

"received." (EXHIBIT 1, QL0019165 ("after pulling a consumer's credit score"), EXHIBIT 2,

QL0020662, EXHIBIT 3, last full paragraph, EXHIBIT 10, QL0013900 second full paragraph,

EXHIBIT 11, QL0014616, third full paragraph, EXHIBIT 12, 12 CFR 1022.74 commentary see

first full paragraph, EXHIBIT 13, Kingery No. 302877 see second full paragraph, EXHIBIT 14,

---

1 Defense ¶¶ 1, 3, 8, 10, 16-18, 20-21, 24, 25, 26, 29, 31, 33, 35, and 36 are not disputed, and/or are immaterial.
2 Quicken's own expert witness – abandoned by Defendant in this motion - agreed that guidance from the Federal Trade Commission is "very important" and the second place a compliance officer would look only after reading the statute.  (EXHIBIT 17, L. Salzano Dep. at 50-53).
3  Quicken did not use a formal compliance process in the creation of its policies and procedures for the 1681g(g) notices.  The only documents concerning Quicken's compliance process were emails from and to Sue Pelto. (EXHIBIT 8, A. Vitale Dep. at 49:24-15 and 50:1-21).

QL0018374,  QL0018393  and QL0018394.[4]

The meaning of "use" did not receive any meaningful scrutiny in Quicken's "compliance documents" and its compliance members do not recall any substantive conversations concerning the meaning of "use." (EXHIBIT 8, A. Vitale Dep. at 70:20-25 and 71:1-13, EXHIBIT 9, A. Bishop Dep. at 24:10-25, 25:1-10, 48:18-25 and 49:1-11).  By using "we would have" depositions answers, Quicken attempts to use its inability to recall the existence (or content) of any substantive conversation concerning the meaning of "use" to invent analysis that is consistent with its new legal theory presented in this case for the first time. (EXHIBIT 9 at 13:11-25 and 14:1-16).

4.    **Disputed**.  Quicken's existing disclosure scheme was implemented to avoid increased calls to client relations, save paper, and avoid sending additional disclosures at different times.  (EXHIBIT 5, QL0019469, EXHIBIT 15, QL0019488,  and EXHIBIT 16, QL0019529. None of Quicken's contemporaneously created documents support this  assertion.

Quicken's actual motives are less noble than claimed.  Quicken intentionally delays the release of information to consumers and trains its mortgage bankers to delay providing consumers important information and to take advantage their weaknesses.  Its internal documents revealed that withholding information from consumers is a foundational objective at Quicken:

> We must use Controlled Release of Information. This consists of giving only small nuggets of information if the client is PUSHING for answers.. . . The controlled release of information should be used when the client asks specific questions. (EXHIBIT 26 and EXHIBIT 27).

One way that Quicken tries to maintain leverage over potential consumer borrowers is through a sales stratagem known as "bruising." The goal was to find some bad piece of information on the credit report (such as a credit score) and use it against in discussions with the consumer. Quicken's theory is that if the customers can be scared into thinking that they cannot get a loan, then they will be more likely to do business with Quicken instead of negotiating or comparing loan

---

4 QL0018393 and QL0018394 are emails from First American Credo.

terms with a competitor. (EXHIBIT 28, A. Nuckols Dep. at 162-165, EXHIBIT 29 and EXHIBIT 30).

6.      **Disputed.**[5]   Members of Quicken' compliance team attended a FACTA audio conference presented by attorneys at BuckleyKolar, LLP for the Mortgage Bankers Association. However, the FACTA Summary provided at this event stated exactly the opposite as Quicken now argues  "After **pulling a consumer's credit score**, brokers and lenders will have to provide that score . . ." (EXHIBIT 1, QL0019165) (emphasis added).

There was only a brief reference to the California statute.  (EXHIBIT 1 at QL0019168). Further, though Quicken claims that it had consulted BuckleyKolar and the Mortgage Bankers Assocaition ("MBA"), neither entity had any meaningful recollection of having taken the views offered by Quicken here or and advising Quicken as it claims. (EXHIBIT 48 and EXHIBIT 49).

9.      **Disputed**.   Quicken's banker's conduct is uniform.  Quicken incorrectly suggests that it is idiosyncratic.  Quicken's bankers are trained to obtain and use a consumer's credit report at first contact.  (EXHIBIT 18, Banker Greatness: Training Workbook: Checklist, QL 0012003). Credit scores are located on the first page of the credit reports. (EXHIBIT 19, M. Muskan Dep. at 37:23-25 and 38:1-13, EXHIBIT 20, C. McConville Dep. at 294 – 297, and EXHIBIT 21). Bankers will uniformly initially look to those credit scores first. *Id.*[6]

Loan Origination and Lead Allocation ("LOLA") is the software program that Quicken uses to originate and process "leads"—consumers who contact Quicken about obtaining loans—to mortgage sales agents. (EXHIBIT 22, K. Lang Dep. at 24:19-22). All Quicken leads are sent into

---

5 Plaintiff also objects to the "testimony" of Amy Bishop as hearsay pursuant to Fed. R. Civ. P. 56(c)(2).  Quicken's witness testified that she believed she had heard a speaker say as she now argues at an industry conference.
6 Quicken routinely publishes materials explaining the importance of credit scores in the mortgage loan process.
EXHIBIT 39, Ms. Kingery's Documents Bates No. 400046 ("credit score as your overall grade in the class"),
EXHIBIT 40, Ms. Kingery's Documents Bates No. 400066 ("the better your scores – the lower your mortgage rate."),
EXHIBIT 41, Ms. Kingery's Documents Bates No. 400086 ("[y]our mortgage payment, interest rate and ability to
qualify for a home loan can be dictated by your credit score."), EXHIBIT 42, Ms. Kingery's Documents Bates No.
("[b]ut in order to get started with financial analysis, we'll pull your credit") and Ms. Kingery's Documents Bates No.
400131, and EXHIBIT 43, Ms. Kingery's Documents Bates No. 400086 ("lenders will check your credit score").

the LOLA system. (EXHIBIT 23, B. Hein Dep. at 27:18-24.) Quicken employees are trained to pull credit during the first communication with a lead. (EXHIBIT 18 at QL0012003.) Regardless of the credit reporting source, LOLA receives the merged credit report[7] and the raw data the same way. (EXHIBIT 24, Quicken Second Rule 30(b)(6) Dep. at 17; 18:1-8). Quicken pulls and integrates credit scores in every credit report in which the agency can generate one, which is nearly in all instances. (EXHIBIT 24, at 19:11-25 and 20:1-6.) Immediately after obtaining the consumer credit scores, Quicken's "Loan Platform" system uses all three scores to generate a "middle score" value, the only score thereafter material to Quicken's other processes. (EXHIBIT 24, at 61–63.) "Loan Platform" then sends the newly assigned middle score to LOLA, where that system produces a readable merged credit report in Quicken's format with the credit score in bold print on the very first page. (EXHIBIT 23 at 120:18-25 and 121:1-19, see also EXHIBIT 21.) Quicken also "scrapes" and integrates the consumer's credit scores off of the merged credit report as raw data with which to populate relevant fields in LOLA. (EXHIBIT 22 at 37:2-13, 38:10-12.) The "middle score" ultimately generated by "Loan Platform" for the LOLA system is then used again to run multiple automated and computer functions. (EXHIBIT 23 at 81:23-25, 82:1-6, and 102:1-17; EXHIBIT 24 at 60:18-20).

**11.** **Disputed**.  Mr. Muskan has no memory of his conversation with Ms. Kingery. (EXHIBIT 19 at 39:2-5)  Mortgage bankers will always look at a potential clients credit scores. (EXHIBIT 19 at 37:23-25 and 38:1-13, EXHIBIT 20 at 294 – 297, and EXHIBIT 21).  The credit scores are located on this first page of the credit reports in bold print. *Id.* Mortgage bankers will know instantaneously whether or not a loan is possible based on the credit scores alone. (EXHIBIT 20 at 239:12-25, 240 and 241:1-4).

**12.** **Disputed**.  See paragraphs 9 and 11 above. Second Voice is an <u>automated</u> process

---

7 A merged credit report contains three credit reports (including credit scores) from Equifax, Experian and Trans Union.

that runs nightly. (EXHIBIT 22 at 42:3-25; 43:1). Quicken also used Ms. Kingery's credit score to attempt to direct her into its credit repair program (Fresh Start).[8]  Quicken has further confirmed that the intended purpose which it represents to the credit reporting agencies in obtaining credit reports and scores is for use in connection with a credit transaction.  EXHIBIT 45, First Rule 30(b)6 Dep. at 49-52 and EXHIBIT 24 at 85-86).

13. **(14, and 15) Disputed**.  Manual denials occur after Quicken's systems and the mortgage banker has already used the credit scores.  See paragraphs 2, 9 and 11 above.  Second Voice is an underlined_automated process that runs nightly and is used for every consumer who has not otherwise been approved. (EXHIBIT 22, at 42:3-25; 43:1). In order for a consumer to be eligible for the Second Voice computer program, she must have a credit score of at least 620 (or 640). (EXHIBIT 23 at 117:24-25 and 118:1-20, EXHIBIT 22 at 46:7-22 and EXHIBIT 51, Mortgage Banker Training Guide at QL0012376).[9]

19. **Undisputed**.  Despite the important and integrated use of consumer credit scores in Quicken's LOLA process, Quicken does not provide the score disclosures as soon as it is mechanically and cost effectively able to do so. (EXHIBIT 24 at 88:15-25, 89:1-7 and 95:6-18).  It could do so without any reasonable impediment as nearly all of its score disclosures are sent (with the final denial letter) to the electronic "MyQL" mailbox Quicken has class members sign up for. (EXHIBIT 24 at 81:1-5, 93:11-22, 94:13-25 and 95:1-5). In nearly all instances, Quicken does not even have to print and physically mail the disclosure.  Its computer automatically generates and forwards it.  (EXHIBIT 24 at 53:1-23, 58, 59:1-10, 77:17-25 and 78:1-22). Quicken will often wait twenty-one (21) days or more to enter the denial code (Status 100) in AMP. (see paragraph 22

---

8 Fresh Start is offered by Quicken to improve consumer's credit scores, EXHIBIT 39 at Kingery No. 400064 ("a program designed to help you improve your score") and EXHIBIT 53 at QL0012408 ("target clients have a credit score under the conventional 620).

9 In Quicken's Rule 30(b)(6) and "control group" testimony, it tried to illogically parse its computer program's execution of the several necessary eligibility thresholds in a way in which "minimum credit score" was listed as a subsequent factor, rather than acknowledge it as equally necessary and equally dispositive.  Regardless, credit score is one of the co-equal disqualifiers for Second Voice.

below).

22.    **Undisputed**.   Quickens statement in paragraph 22 is misleading; Quicken will usually wait twenty-one (21) days or more to enter the denial code (Status 100) in AMP. (EXHIBIT 24 at 118:12-19).[10]   During the class period, the actual delay for Quicken's sending of the credit score disclosure is over 21 days from first use for 458,354 loans that were coded with a Status 100 denial (out of approximately 873,107 loans in total).[11]   In Ms. Kingery's case, she was denied in LOLA on May 3, 2010 and her credit score disclosure notice was not received for 21 days. (EXHIBIT 25, Kingery No.100006).

23. (and 25.)  **Disputed**.   At the time Ms. Kingery sought a refinance mortgage from Quicken, Equifax had already deleted the inaccurate GMACM tradeline.   (EXHIBIT 31, QL0022693 and EXHIBIT 32, A. Kingery Dep. at 112:17-24).  Ms. Kingery also had a Prince William County Circuit Court order stating that she was not obligated on the inaccurate GMACM account. (EXHIBIT 33, QL0022677).   Ultimately, the GMACM account was removed from all credit reports.  (EXHIBIT 32 at 161:17-19).[12]

27.    **Undisputed**.   Ms. Kingery sought online lenders such as Quicken to refinance her property. (EXHIBIT 37).   She also spoke with another lender Precision Funding. (EXHIBIT 32 at 126:20-24 and 127:1-12).  Also, see paragraph 26 above.

28.    **Disputed**.   Before April 29, 2010, Ms. Kingery had legitimate concerns that the buyers were going to void the real estate sales contract after the home inspection. (EXHIBIT 35 at 70 and 71).   It was at this time Ms. Kingery sought to refinance her property so that she could keep it . (EXHIBIT 32 at 118 – 121).13

---

10 Despite the Court's previous Orders, Quicken continues its refusal to provide or even seek to determine a precise class size.

11 At Quicken's second Rule 30(b)6 deposition, Mr. Andy Lusk brought typed notes concerning potential class sizes. (EXHIBIT 50).

12 Quicken's lawyer in this case also represented GMACM in the previous case.

13 Ms. Kingery sought a refinance loan to remove the deed of trust that was recorded against her property to secure payment of legal fees. (EXHIBIT 34 and EXHIBIT 36 at Line 504.)

**30.** **Disputed**.  Quicken used Ms. Kingery's credit scores.  See paragraph 9, 11, 14 and 15 above. While foreclosure may have been one reason for the denial it does not mean that the credit scores were not used. LOLA only offers a simple drop down menu for selecting one denial/withdrawal reason. (EXHIBIT 38).

**32.** **Disputed.**  Second Voice is an automated process.   Its exclusion occurred for one of several "necessary, but not sufficient" conditions.   Had she satisfied one, but not another her request for an application would still have been denied. See paragraphs 14 and 15 above.

**34.** **Disputed.**  As detailed above, and further in Argument below, Quicken used the Plaintiff's score**.**

## III.    SUMMARY JUDGMENT IS INAPPROPRIATE BECAUSE THE COURT CANNOT DETERMINE AS A MATTER OF LAW THAT 15 U.S.C. §1681g(g) WAS INAPPLICABLE WHEN QUICKEN USED MS. KINGERY'S CREDIT SCORE.

15 U.S.C. § 1681g(g) requires that "[a]ny person who makes or arranges loans and who uses a consumer credit score … in connection with an application initiated or sought by a consumer" for a residential mortgage loan must provide specific credit score disclosures "as soon as reasonably practicable." 15 U.S.C. § 1681g(g)(1)(A). Quicken does not dispute that it is a mortgage lender, that it obtained Ms. Kingery's credit scores to evaluate her eligibility for a mortgage loan, and it faced no practical obstacle to delivering the 1681g(g) score disclosure the day after it received her credit scores.  Plf. Statement of Facts ("SOF") ¶19.  Quicken also concedes that as with Ms. Kingery, it delivers score disclosures to the majority of its consumer "leads" more than 21 days after it receives, analyzes, and integrates the middle credit score into its systems.  SOF ¶22. Nonetheless, Quicken claims that it owed no duty to make those disclosures, let alone make them timely.  Rather it claims that (a.) as used within the FCRA,  'use' of a credit score … occurs when a lender takes the credit score into account in making a credit decision[.]" Def. Mem. at 12; and (b.) "Quicken Loans' obligation to send a credit score disclosure is not triggered unless

and until it 'uses' a credit score <u>'in connection with an application' for a loan sought by a</u> <u>consumer</u>." Def. Mem. at 13.  Both assertions stand contrary Quicken's actual pre-litigation view, and neither finds support in the plain meaning of the statutory text, the dictionary, or even a single interpretive source.

**A.    § 1681g(g) Applies Even if Quicken's Use of a Credit Score was not for a Formal Credit Decision.**

Defendant "used" the Plaintiff's credit score.    The word "use" is in the Top 100 most commonly "used" words in the English language14 and possesses a broad set of meanings. Black's defines "use":    "1. The application or employment of something." BLACK'S LAW DICTIONARY (9th ed. 2009).  The Supreme Court holds: "Indeed, over 100 years ago we gave the word "use" the same gloss, indicating that it means " 'to employ' " or " 'to derive service from.' " S*mith v. United States*, 508 U.S. 223, 228-29 (1993) (quoting *Astor v. Merritt,* 111 U.S. 202, 213, 4 S.Ct. 413, 419, 28 L.Ed. 401 (1884)).   There is nothing new or less than pellucid about the breadth of this word.

Despite this definition and Congress's unqualified use of "use" in § 1681g(g), Defendant asks this Court to limit this broad text.  Quicken claims that "use" of a credit score only "occurs when a lender takes the credit score into account in making a credit decision[.]" Def. Mem. at 12. This newly-contrived "interpretation" – that "use" means only "use to make a credit decision" – ignores the text within § 1681g(g).

Section 1681g(g)'s does not limit its trigger to "use" for a specified purpose and instead simply requires the disclosure from any lender "who uses a consumer credit score."  In contrast, Quicken's creatively narrow "interpretation" finds no support in the actual text of § 1681g(g), but instead an entirely different FCRA section, §1681m.15   The contrast between these two sections

---

14 http://www.oxforddictionaries.com/words/the-oec-facts-about-the-language last visited April 2, 2014.
15 Indeed, every FCRA case upon which Quicken relies is founded upon §1681m. *Nat'l Automobile Dealers Ass'n v. Federal Trade Comm'n*, 864 F. Supp. 2d 65, 80 n.16 (D.D.C. 2012), Def. Mem. at 11; *Gonzalez-Bencon v. Doral*

cleanly disproves Quicken's argument.  Within § 1681m and the decisions cited in Defendant's brief, Congress modified the word "use" with specific limitations that do not appear in §1681g. Each of the cases relied upon by Quicken analyze "use" within the context of the specific limitations which appear in §1681m, none of which appear in §1681g(g) .

For example, § 1681m limits the "use" involved specifically to the rendering of credit decisions.  *See* §1681m(a)(2)(A) (requiring disclosure of score "used by such person <u>in taking any adverse action based in whole or in part</u> on any information in a consumer report[.]"); §1681m(h)(5)(E) ("requiring disclosure of score "used by such person in making the credit decision[.]").  Congress could have similarly limited the triggering "use" within  §1681g, but no such limitations appear within that provision.  Other provisions likewise require a specific use other than use for a credit decision in order trigger coverage.  *See e.g.* §1681a(h) ("The term 'employment purposes' … means a report *used* for the purpose of evaluating a consumer for employment[.]"); §1681s-3(a)(1) ("[M]ay not use [consumer report] to make a solicitation for marketing purposes[.]").  In contrast, some FCRA provisions, including § 1681g(g), require no specific purpose for "use" in order to trigger coverage under the Act.  Therefore, **any** "employment" of the score, report or other subject triggers the respective provision.  *See e.g.* 15 U.S.C. § 1681b(f). 16

As a basic tenet of statutory construction, where the legislature has employed a term in one place and excluded it in another, it should not be implied where excluded.  2A Sutherland Statutory Construction § 46:6 (7th ed.).  The existence of statutory language in § 1681m ("used by such person in making the credit decision") that is not present in §1681g(g) not only

---

*Bank*, 759 F. Supp. 2d 229, 237 n.4 (D.P.R. 2010), Def. Mem. at 11; *Mick v. Level Propane Gases, Inc*., 183 F. Supp. 2d 1014, 1020 (S.D. Ohio 2000), Def. Mem. at 12; *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47, 68-70 (2007), Def. Mem. at 17.

16 While Quicken maintains that "use" has a uniform meaning throughout the FCRA, it ignores controlling Fourth Circuit authority holding that a person who misuses a report, for purposes other than a credit decision, also "uses" that report for purposes of for purposes of §1681b(f).  *Yohay v. City of Alexandria, Employees Credit Union, Inc.*, 827 F.2d 967 (4th Cir. 1987).  No credit decisions is necessary to find a "use" of a credit report in §1681b.

rebuts Quicken's summary judgment claim that such purpose is read into FCRA use of "use", but in fact affirmatively establishes the opposite. Congress's choice to omit any limiting language from §1681g (as otherwise set forth in §1681m) evidences a clear Congressional intent that the term "use" should carry the broadest possible meaning.

Quicken's position presents yet another irreconcilable problem. It reads § 1681g(g) to mean and require exactly the same thing as § 1681m. In fact, Quicken delivers the "as soon as reasonably practicable" credit score disclosure required by § 1681g(g) at the exact same time it sends the post formal approval and post adverse action credit score disclosures which are separately required at § 1681m(a) and (h). SOF ¶¶19, 22. In so doing Quicken treats the § 1681g(g) notice as superfluous in relation to these other score disclosure obligations, even though the § 1681m requirements are not required until after a consumer is notified that a formal application is approved (§1681m(h)) or formally denied (§1681m(a)). Despite the similarity of these alternate disclosures, in enacting all three new FACTA provisions at the same time, Congress clearly intended them to be timed differently and to serve different purposes. The purpose of § 1681g(g) is to empower the consumer to compare, shop and negotiate credit terms. Accordingly, the disclosure timing at issue in this action is the requirement that the score disclosure be made "as soon as reasonably practicable."17

Congress used different language to describe the triggers for the notices in 1681g(g), 1681m and 1681m(a). In order to give full effect to each, the Court must construe each provision "so that no part will be inoperative or superfluous, void or insignificant, and so that one section

---

17 Quicken's motion does not challenge that its disclosures were not made "as soon as reasonably practicable" and instead is based on the argument that it never had to comply with §1681g(g) in the first place. This is of course because 21 days is well past any reasonable timing threshold. The meaning of "practicable" is straightforward: "capable of being done, effected, or put into practice, with the available means; feasible:" RANDOM HOUSE DICTIONARY (2014), *practicable. See also*, *Habecker v Clark Equipment Company*, 36 F.3d 278, 286 (1994); Alatech *Healthcare, L.L.C. v United States*, 89 Fed.Cl 750, 754 (2009); *Haeuse v Dept. of Law, Gov't of Guam*, 97 F.3d 1152, 1155 (9th Cir. 1996). Quicken does not dispute it was "capable" of delivering these notices nearly instantly to each applicant via electronic means, or by simply putting them in the mailbox. SOF ¶19. Instead it chose to withhold this information for its own benefit, to help ensure a captive audience of loan applicants. SOF ¶4.

will not destroy another unless the provision is the result of obvious mistake or error." 2A SUTHERLAND STATUTORY CONSTRUCTION § 46:6 (7th ed.). As with other similar FCRA provisions, a "user" is not excused from compliance because of its self-help desire to minimize "duplication." See e.g. *Williams v. Telespectrum, Inc.*, 3:05CV853, 2006 WL 7067107, •4-5 (E.D. Va. Nov. 7, 2006) (Rejecting the "duplication" justification for Defendants failure to deliver notice at the time required). C.f. Deposition Anthony Vitale, Exhibit 46 at 74, 113 and 118.

When Defendant "pulls" the scores, evaluates them to select the middle score, and then fully integrates these into its LOLA system, it is doing more than simply "storing" them. Plaintiff has also identified other specific and additional uses Quicken makes of its consumer credit scores. SOF ¶¶ 9, 11-15. These activities meet the broad meaning of "use;" Quicken no doubt "employs" credit scores in at least minimal fashion and sufficient to constitute "use." Additionally, Quicken "uses" each score to compare against the others and to determine which score is the middle score. Standing alone, each of Quicken's activities satisfies 1681g(g)'s broad and otherwise unlimited "use" trigger. Taken together, Quicken's processes rely heavily on both the presence and processing of a credit score to drive its telephone sales activities and workflows. Simply put, without credit scores, Quicken cannot process "leads" into loan applications.

Plaintiffs' interpretation of the "use" trigger in § 1681g(g) is not novel, and <u>is the only interpretation any known source has ever given to this provision.</u> Quicken's compliance staff never questioned that "pulling" the credit score into LOLA was other than "use." SOF ¶¶2, 4. Regulatory guidance indicated this interpretation, both from the Federal Reserve Board and the FTC. *Id*. Industry practice interpreted the "use" trigger as satisfied when the scores were pulled and integrated by a lender. *Id*. ¶¶2, 6.

Further, while there is not a single known court decision limiting "use" of a consumer report or score as Quicken asks, a virtual consensus of case law holds that "pulling" a credit report

or score <u>does</u> constitute "use" by a "user."18  *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 49 (2d Cir. 1997) (automobile dealership which requests and receives credit reports for purposes described in § 1681b  is precisely the sort of party that would be expected to "use" credit reports under the Act); *Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971, 982 (7th Cir. 2004)(Same); *Barnette v. Brook Rd., Inc.*, 457 F. Supp. 2d 647, 656-57 (E.D. Va. 2006) ("Pulling" a report" to do an informal credit check is "use.").  "[A] party who requests and obtains a credit report need not put it to any particular 'use' in order to qualify as a 'user of information' under § 1681n." *Northrop*, 134 F.3d at 49(citing *Zeller v. Samia*, 758 F.Supp. 775, 779 n. 2 (D.Mass.1991)). Even the § 1681m cases Quicken attempts to cite confirm this interpretation.  *See e.g. Mick v. Level Propane Gases Inc.*, 183 F. Supp. 2d 1014, 1020 (S.D. Ohio 2000) (uncontested that the defendant was user of consumer reports for where defendant's avers that it routinely consulted a credit scoring program when a potential customer first calls).19

The primary decision on which Quicken relies is largely inapposite for the question in this case.  *Nat'l Auto. Dealers Ass'n v. F.T.C.*, 864 F. Supp. 2d 65, 73 (D.D.C. 2012).  In *NADA*, the D.C. District Court considered nearly the opposite issues as here.  The NADA argued that a car dealer would not have physical control over the credit report and therefore had not directly "obtained" it and therefore the dealer could not have "used" the report.  Against this narrow definition of "use", the FTC asserted one that was much more attenuated.  That is, the FTC was not suggesting that if a report is obtained it is not necessarily used.  Instead, the FTC argued that "obtaining" a report was not a necessary condition for a party to be found to have "used" a credit report.  Stated another way, "used" was a much larger universe than "obtained."   The statement "Not all reports that are used are also obtained" is not logically equivalent to "not all reports that

---

18 Again, the lone exceptions would be cases under § 1681m that regarded "use" for the qualified credit decision purpose expressly stated in the section's text.
19 In its brief Quicken attempts to buttress the unfavorable language in *Micks* by falsely augmenting the quoted language. Def. Mem. at 12.

are obtained are also used."

Quicken's litigation gambit faces yet another flaw of logic. It acknowledges that it obtained the Plaintiff's credit scores, and those of hundreds of thousands of putative class members, for which access is legally restricted by FCRA § 1681b.20  In order for Quicken to have obtained Plaintiff's and class member credit scores, it had to affirmatively represent to the consumer reporting agency that it intended to use the scores for a specific purpose. § 1681b(f). And a consumer reporting agency is lawfully barred from providing these score reports to Quicken unless it receives its verification that it will use the scores for such a stated purpose.  15 U.S.C. § 1681e(a) (Consumer reporting agencies must verify "the *uses* certified by such prospective *user* prior to furnishing such *user* a consumer report."  CRA may not furnish a report if  "the consumer report will not be *used* for a purpose listed in section 1681b of this title.")

Quicken has acknowledged that its purpose for obtaining the scores was for "use [of the] the information in connection with a credit transaction involving the consumer[.]"  15 U.S.C. § 1681b(a)(3)(A); SOF ¶3.  Of course, the point is less that Defendant has certified that it was using the score reports for any specific purpose, but that it was certifying that it was using them at all. These provisions - §§ 1681b and 1681e(a) – would have prevented Quicken from obtaining the scores for an unlawful use or **for no use**.

Finally, Quicken's own conduct confirms that it used the credit scores of the Plaintiff and comparable class members.  It does not send notices to every consumer about whom it obtains such a credit score report.  But it did for Ms. Kingery and other putative class members, albeit 21 days after it was reasonably practicable to do so.  Quicken sent the disclosure notices only to consumers regarding whom it concluded a score had been used.

---

20 *Robinson v. TSYS Total Debt Mgmt. Inc.*, 447 F. Supp. 2d 502 (D. Md. 2006) (Requiring a permissible intended use under § 1681b to obtain a credit score); *Bickley v. Dish Network, LLC*, 2012 WL 5397754, 4 (W.D.Ky.2012)(Requiring a permissible intended use under § 1681b to obtain a credit score); *Kvalheim v. Checkfree Corp.*, 2000 WL 209058, 4 (S.D.Ala.2000) (Same); *Black v. JP Morgan Chase &Co.*, 2011 WL 4102802, 26 (W.D.Pa.2011) (Same).

**B.      FCRA § 1681g(g) Applies when "An Application is Sought" and not Merely when Quicken Creates and Processes a Formal Credit Application.**

Defendant's second basis for summary judgment is its claim that it was not required to provide the § 1681g(g) disclosure to Plaintiff because its use [or whatever alternate word it suggests] of her credit scores was not "in connection with an application." Def. Mem. at 11-14.  To get there, it repeatedly alters the actual text of the statute, changing it from, "in connection with an application initiated or sought by a consumer for a [loan]", to an entirely different phrase, claiming that § 1681g(g) states that the "credit score disclosure is not triggered unless and until it 'uses' a credit score 'in connection with an application' for a loan sought by a consumer."  *Id*. at 13.  Quicken's argument here is plainly wrong, and at least borderline improper.  These two phrases mean entirely different things.   The statutory text requires the score disclosure when a score is used when a consumer initiates <u>or seeks an application</u>, not only when the consumer obtains a formal application from Quicken "for a loan sought by a consumer."   In fact, the actual statutory text and Quicken's need to alter it belies Defendant's claim.  If § 1681g(g) were only triggered when there was a formal application, Congress would not have included the additional phrase "or sought."   The fact that Quicken refuses to provide a consumer a formal application until after it has actually approved an "informal" request (really, itself an application) for credit, does not change the reality that the consumer was seeking to initiate or obtain an "application".

This also demonstrates the flaws in the Defendant's specific challenges to Ms. Kingery's claim.  Quicken argues that she never really needed a loan.  Def. Mem. at 13-14.  That she wanted to stay in West Virginia if she could prevail in the litigation regarding the identity theft foreclosure.  *Id*.  Or that she knew her credit remained damaged and not likely to be approved. *Id*.  First, these facts are disputed and inappropriate for summary judgment.   SOF ¶¶ 23-28.   But regardless, even if Defendant's disparagement of the Plaintiff was true – that she was not likely to actually consummate a loan - there is no dispute that she as at least seeking an application.  *Id*.

**IV. QUICKEN DOES NOT CONTEST PLAINTIFF'S NEGLIGENCE CLAIM FOR ACTUAL DAMAGES.**

While Quicken challenges Plaintiff's willfulness remedies under 15 U.S.C. § 1681n, it remains silent as to Plaintiff's continuing negligence claim under § 1681o.  That claim is of course more modest.   Plaintiff and the putative class would recover only then limited actual damages, but Quicken has not contested that Ms. Kingery and class have suffered actual monetary damages based on the violation of §§ 1681g(g).  Ms. Kingery's expert confirms the value of the delayed credit scores to be $25.85 per consumer.  (Second Amended Complaint at 5:33, Exhibit 46, Plaintiff's Supplemental Fed. R. Civ. P. 26(a)(1) Disclosures at 3, Exhibit 47, Plaintiff's Second Supplemental Answers to Interrogatories at 13, Exhibit 32 at 152:11-21, and Exhibit 44, C. McConville Expert Report at 15, 16 and 17).  Accordingly, no matter how the Court determines Defendant's willfulness defense, the case would continue.

**V.    QUICKEN'S LEGAL ARGUMENTS THAT "USE" MEANS "USE IN A CREDIT DECISION" AND "APPLICATION SOUGHT" MEANS "APPLICATION RECEIVED" ARE NOT OBJECTIVELY REASONABLE.**

Defendant cannot prevail on the merits of its defenses.  "Use" means "use."  "Application sought" means "application sought."  No one other than Quicken's defense team has previously suggested an alternate interpretation § 1681g(g).  A review of Quicken's internal communications, industry advice and regulatory statements leaves no confusion that this defense originates exclusively with Quicken's litigation attorneys, and not with the facts. With this tactic Quicken seeks to create the impression that it faced uncertainty and a less than pellucid statute, providing the opportunity to offer an "interpretation" of the statute.  Even allowing that that the statute is open to interpretation, the construction offered by Defendant's was objectively unreasonable, and the policy that actually adopted was implemented with the knowledge that it likely violated the statute.

**A. The Two Paths to FCRA "Willfulness" – "Objectively Unreasonable" and**

**"Conscious Disregard".**

Under 15 U.S.C. § 1681n, "summary judgment is seldom appropriate" as to whether a party willfully violated the FCRA. *Dalton v. Capital Associated Industries, Inc.*, 257 F.3d 409, 418 (4th Cir. 2001). A "willful" violation can be established by either proof that the defendant knowingly or with conscious disregard violated the statute21, or that it did so "recklessly" – in adopting a particular view of its legal obligation, "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Dreher v. Experian Info. Solutions, Inc.*, 2013 WL 2389878 (E.D. Va. May 30, 2013) citing *Safeco Insurance Co. of America v. Burr.* 551 U.S. 47, 69 (2007). The evidence presented herein establishes either and both of these alternatives.

### B.    Quicken's Conscious Disregard.

This case presents the remarkably easy (and maybe rare) instance in which direct evidence established that the Defendant knew what the law was and what it meant, and still did the opposite. Ms. Kingery has presented sufficient evidence from which a jury could conclude that Quicken acted in knowing violation of the FCRA, and expressly rejected an industry-approved policy that would have complied, and did so for the express purpose of reducing its compliance burden. *This* is the rare case where discovery actually produces that "smoking" e-mail.

In November 6, 2004, Quicken received presentation materials that directed it to send that notice "After pulling a consumer's credit score." (Exhibit 1, QL0019165). On November 22, 2004, Quicken's compliance executive, Sue Pelto acknowledged those materials as "a good summary of the FACT Act Changes [sic]." (Exhibit 1, QL0019162). She correctly observed that "application sought means the inquiry where we have pulled credit" (Exhibit 3, QL0020684), and later in that same day, again confirms that a § 1681 is triggered when the consumer "contact[s] us . . .even

---

21  *Id*; *Saunders v. Branch Banking and Trust Co.* 526 F.3d 142, 151 n.4 (4th Cir. 2008). *See also Fuges. v. Southwest Fin. Servs., Ltd.*, 707 F.3d 241, n.13 (3rd Cir. 2012) (holding "evidence of knowing violations of FCRA is relevant to a claim of willfulness, … but then Safeco's recklessness analysis would not apply.")

though we may not have officially taken an application yet."  (Exhibit 2, QL0020662).  However, after processing the economic costs versus compliance benefits, Ms. Pelto confirmed that she was abandoning any effort to require compliance with this provision.  She cites to Quicken's desire to not field calls from consumers and answer consumer questions.  (Exhibit 4 QL0019469).  "If application sought were to include anyone we pulled credit on can you imagine how many client calls we would get saying they didn't know anything about the credit pull?"  (Exhibit 6, QL0019331).  Quicken's CEO declared, "This will NOT be a new document to our app package. We will add the language (or our abridged version) to the 'onedoc'.  The absurdity of each year that passes that NEW INSANE AND MEANINGLESS DISCLOSURES our added to the loan process has got to stop."  (Exhibit 16, QL0019529).   Quicken's executive Pelto then concluded, "We are not sending this just because credit was pulled unless the governments tells us we need to." (Exhibit 7, QL 0013053).

Six years later (and before Kingery), the FTC provided the very guidance that Quicken now claims was lacking in the statute and 'told Quicken it needed to' send the score disclosures when it pulled the consumer score.  In its rulemaking the FTC opined that it expected delivery of the score notice "within three business days of obtaining a credit score." (Exhibit 10 FTC Final Rules, QL0013900).  When asked about the FTC's views concerning the time of these notices, Quicken's compliance attorney Bishop stated Quicken's view "Unfortunately, the agencies got it wrong, which is not surprising.  But, of course, you know, they're saying it's their understanding.  It doesn't mean that it's required." (Exhibit 45, 30(b)(6) Dep. at 111).  See also Exhibit 45 at 112:9-14).  There may never be as clear a FCRA willful violation based on conscious disregard.

### C.   Quicken's Recklessness.

A defendant's interpretation of the FCRA is "reckless" and thus willful if its reading of the law was not "objectively reasonable".  *Safeco*, 551 U.S. at 69-70.  *Safeco* requires that the Court

consider three factors: (1) whether the statute itself is less than pellucid, (2) whether the defendant's interpretation is founded upon the text of the statute and a "sufficiently convincing justification" *(Fuges v. Sw. Fin. Servs., Ltd.,* 707 F.3d 241, 252 (3rd Cir. 2012)), and (3) whether the defendant adopted its interpretation in the absence of case authority or agency guidance from the FTC. *Safeco*, 551 U.S. at 69-70. Quicken's purported FCRA "interpretations" were not objectively reasonable.

First, as established above, Quicken's view that "use" means "use in a credit decision" is not supported by the statutory text. Quicken arrives at its interpretation of use only by rewriting the statute to *add* missing language. Likewise, the only way Quicken can make its "application" argument was by rewriting the actual text in the statute to remove the word "sought." The actual text plainly means that a consumer was trying to get, ask for or find an application.[22] Thus, Quicken arrives at its interpretation of use only by rewriting the statute to *omit* the language Congress had actually included. Finally, Quicken arrives at its construction of "as soon as reasonably practicable" by substituting in the word "meaningful" instead of "practicable." With each of these constructions Quicken violates fundamental canons of construction, adding words that are missing, removing words that appear, and substituting out unfavorable words for ones that it prefers.[23] These constructions are facially unreasonable and do not satisfy *Safeco*'s "objectively reasonable" interpretation requirement.

Finally, Quicken's refrain that "there does not appear to be any guidance from a court of appeals (or a district court for that matter)" does not evidence uncertainty regarding the words "use" and sought", but rather their obviousness. "The absence of judicial or regulatory interpretation does not give the defendant a free ride under the FCRA. When, as here, a statute

---

22 http://www.merriam-webster.com/dictionary/seek last visited on April 3, 2014.
23 This argument might have been a closer call if Quicken's delay were less than the 21 days it usually takes to provide the score disclosure. While perhaps it could be objectively reasonable to interpret § 1681g(g) to permit a 2 or 3 day delay in sending the disclosure, a delay 21 days falls outside the bounds of a reasonable interpretation of "as soon as reasonably practicable."

presents a clear, cognizable command, the fact that courts have not troubled themselves to parse its meaning does not act as an indictment of the statute's ambiguity." *Boyd v. CEVA Freight, LLC*, 2013 WL 6207418 (E.D. Va. Nov. 27, 2013)." *See also Dreher v. Experian Info. Solutions, Inc.*, 2013 WL 2389878 (E.D. Va. May 30, 2013) *citing Fuges v. Sw. Fin. Servs., Ltd.*, 707 F.3d 241, 253 (3d Cir. 2012); *Cortez v. Trans Union, LLC*, 617 F.3d 688, 722 (3d Cir. 2010). Still, Quicken itself knows better than to assert that it lacked any regulatory guidance.  It had plenty, detailed above, from its own staff, industry, and governmental agencies, including the FTC.  SOF ¶¶2, 6.

## VI.    CONCLUSION

For the reasons stated, Defendant's Motion for Summary Judgment should be denied.


Respectfully submitted**,**
**ALISHA KINGERY** *on behalf of herself and all similarly situated individuals*


By: ___*/s/ John W. Barrett*_____
        Counsel


John W. Barrett (WV Bar No. 7289)
Counsel for Plaintiff
Bailey & Glasser, LLP
209 Capitol Street
Charleston, West Virginia 25301
Telephone: (304) 345-6555
Facsimile: (304) 342-1110
E-mail: jbarrett@baileyglasser.com

Leonard A. Bennett (admitted *pro hac vice*)
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, VA 22601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com

Matthew J. Erausquin (admitted *pro hac vice*)

Consumer Litigation Associates, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Telephone: (703) 273-7770
Facsimile: (888) 892-3512
Email: matt@clalegal.com

John C. Bazaz (admitted *pro hac vice*)
Law Offices of John C. Bazaz, PLC
4000 Legato Road, Suite 1100
Fairfax, VA 22033
Telephone: (703) 272-8455
Facsimile: (703) 596-4555
Email: jbazaz@bazazlaw.com

Ian B. Lyngklip (*admitted pro hac vice*)
Lyngklip & Associates Consumer Law Group
24500 Northwestern Highway, Suite 206
Southfield, MI 48075
Telephone: (248) 208-8864
Facsimile: (248) 208-9073
E-mail: ian@MichiganConsumerLaw.com

**Certificate of Service**

I certify that on April 4, 2014 I will electronically file the foregoing document with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

John C. Lynch, Esq.
Troutman Sanders LLP
222 Central Park Ave., Suite 2000
Virginia Beach, VA 23462
757-687-7765
Fax: 757-687-1504
Email: john.lynch@troutmansanders.com

*/s/ John W. Barrett*
John W. Barrett (WV Bar No. 7289)
Counsel for Plaintiff
Bailey & Glasser, LLP
209 Capitol Street
Charleston, West Virginia 25301
Telephone: (304) 345-6555
Facsimile: (304) 342-1110
E-mail: jbarrett@baileyglasser.com